# Exhibit A

Use these links to rapidly review the document
[TABLE OF CONTENTS](#)
[TABLE OF CONTENTS1](#)

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

(Mark One)

☒     ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.

For the fiscal year ended December 31, 2018

OR

☐     TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.

For the transition period from                     to

Commission file number 0-26301

# United Therapeutics Corporation
(Exact Name of Registrant as Specified in Its Charter)

| Delaware | 52-1984749 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **1040 Spring Street, Silver Spring, MD** | **20910** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(301) 608-9292**
Registrant's Telephone Number, Including Area Code

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $.01 per share | Nasdaq Global Select Market |

Securities registered pursuant to Section 12(g) of the Act:

None
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒     No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐     No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒     No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒     No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | | | Emerging growth company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☒

The aggregate market value of the Common Stock held by non-affiliates of the registrant, based on the closing price on June 30, 2018, as reported by the Nasdaq Global Select Market was approximately $4,302,864,919.

**The number of shares outstanding of the issuer's common stock, par value $0.01 per share, as of February 20, 2019, was 43,722,436.**

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive proxy statement for the registrant's 2019 annual meeting of shareholders scheduled to be held on June 26, 2019, are incorporated by reference in Part III of this Form 10-K.

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| PART I | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 40 |
| Item 1B. | Unresolved Staff Comments | 58 |
| Item 2. | Properties | 58 |
| Item 3. | Legal Proceedings | 58 |
| Item 4. | Mine Safety Disclosures | 58 |
| PART II | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 59 |
| Item 6. | Selected Financial Data | 60 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 60 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 79 |
| Item 8. | Financial Statements and Supplementary Data | F-1 |
| Item 9. | Changes In and Disagreements With Accountants on Accounting and Financial Disclosure | 81 |
| Item 9A. | Controls and Procedures | 81 |
| Item 9B. | Other Information | 82 |
| PART III | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 82 |
| Item 11. | Executive Compensation | 83 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 84 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 85 |
| Item 14. | Principal Accounting Fees and Services | 85 |
| PART IV | | |
| Item 15. | Exhibits, Financial Statement Schedules | 86 |
| Item 16. | Form 10-K Summary | 92 |
| SIGNATURES | | 93 |

2

# PART I

## ITEM 1.  BUSINESS

### Overview

United Therapeutics Corporation focuses on the strength of a balanced, value-creating biotechnology model. We are confident in our future thanks to our fundamental attributes, namely our obsession with quality and innovation, the power of our brands, our entrepreneurial culture and our bioinformatics leadership. We also believe that our determination to be responsible citizens—having a positive impact on patients, the environment and society—will sustain our success in the long term.

Through our wholly-owned subsidiary, Lung Biotechnology PBC, we are focused on addressing the acute national shortage of transplantable lungs and other organs with a variety of technologies that either delay the need for such organs or expand the supply. Lung Biotechnology is the first public benefit corporation subsidiary of a public biotechnology or pharmaceutical company.

We market and sell four commercial therapies in the United States to treat pulmonary arterial hypertension (PAH): Remodulin® (treprostinil) Injection (Remodulin); Tyvaso® (treprostinil) Inhalation Solution (Tyvaso); Orenitram® (treprostinil) Extended-Release Tablets (Orenitram); and Adcirca® (tadalafil) Tablets (Adcirca). We also market and sell an oncology product in the United States, Unituxin® (dinutuximab) Injection (Unituxin), which is approved for the treatment of high-risk neuroblastoma. Outside the United States, our only significant revenues are derived from the sale of Remodulin, which is approved in Europe and various other countries. We are also engaged in research and development of new indications, formulations and delivery devices for our existing products, as well as new products to treat PAH and other conditions.

We generate revenues from sales of our five commercially approved products noted above. Remodulin was approved by the U.S. Food and Drug Administration (FDA) for subcutaneous and intravenous administration in 2002 and 2004, respectively, and has been sold commercially in the United States since 2002. Tyvaso and Adcirca were both approved by the FDA and launched commercially in the United States in 2009. Orenitram and Unituxin were approved by the FDA in 2013 and 2015, respectively, and were launched commercially in the United States in 2014 and 2015, respectively. Our sales, marketing and other commercial staff supports the availability of our commercial products in the United States, and these efforts are supplemented by our contract distributors. Outside the United States, our contract distributors are primarily responsible for sales and marketing efforts.

United Therapeutics was incorporated in Delaware in June 1996. Our principal executive offices are located at 1040 Spring Street, Silver Spring, Maryland 20910 and at 55 T.W. Alexander Drive, Research Triangle Park, North Carolina 27709.

Unless the context requires otherwise or unless otherwise noted, all references in this Annual Report on Form 10-K (this Report) to "United Therapeutics" and to the "company", "we", "us" or "our" are to United Therapeutics Corporation and its subsidiaries.

3

**Our Commercial Products**

Our commercial product portfolio consists of the following:

| Product | Mode of Delivery | Indication | Current Status | Our Territory |
|---|---|---|---|---|
| Remodulin | Continuous subcutaneous | PAH | Commercial in the U.S., most of Europe*, Argentina, Brazil, Canada, Chile, China, Israel, Japan, Mexico, Peru, Saudi Arabia, South Korea, Taiwan and Venezuela | Worldwide |
| Remodulin | Continuous intravenous | PAH | Commercial in the U.S., most of Europe*, Argentina, Canada, China, Israel, Japan, Mexico, Peru, Saudi Arabia, South Korea and Switzerland | Worldwide |
| Tyvaso | Inhaled | PAH | Commercial in the U.S., Argentina and Israel | Worldwide |
| Adcirca | Oral | PAH | Commercial in the U.S. | United States |
| Orenitram | Oral | PAH | Commercial in the U.S. | Worldwide |
| Unituxin | Intravenous | High-risk neuroblastoma | Commercial in the U.S.; Approved in Canada, with launch planned for second quarter 2019. | Worldwide |

\* We have obtained approval for subcutaneous and intravenous Remodulin in 24 member countries of the European Economic Area (EEA), as well as other non-EEA countries in Europe, and have received pricing approval in most of these countries.

**Products to Treat Pulmonary Arterial Hypertension**

PAH is a life-threatening disease that affects the blood vessels in the lungs and is characterized by increased pressure in the pulmonary arteries, which are the blood vessels leading from the heart to the lungs. The elevated pressure in the pulmonary arteries strains the right side of the heart as it pumps blood to the lungs. This eventually leads to right heart failure and, ultimately, death. PAH is characterized by structural changes in blood vessel walls, aggregation of platelets and alteration of smooth muscle cell function. We believe that PAH affects about 500,000 individuals worldwide. We have seen increases in the number of people diagnosed with the disease, but due to the rarity of the disease and the complexity of diagnosing it, only a small fraction of patients with PAH are being treated.

Current FDA-approved therapies for PAH focus on three distinct molecular pathways: the prostacyclin pathway, the nitric oxide (NO) pathway, and the endothelin (ET) pathway. The classes of drugs that target these three pathways are:

- *Prostacyclin Analogues and IP Prostacyclin Receptor Agonists.* Patients with PAH have been shown to have reduced levels of prostacyclin, a naturally occurring substance that relaxes the pulmonary blood vessels, prevents platelet aggregation and inhibits the proliferation of smooth muscle cells in the pulmonary vessels. Therefore, drugs that mimic the action of prostacyclin, known as prostacyclin analogues, are established PAH treatments. Another class of therapy, called IP prostacyclin receptor agonists, has recently been developed to address PAH through the prostacyclin pathway. As compared with prostacyclin analogues, which broadly mimic the effect of prostacyclin, IP prostacyclin receptor agonists bind selectively to the IP receptor, one of several prostacyclin receptors.

- *Phosphodiesterase Type 5 (PDE-5) Inhibitors and Guanylate Cyclase (sGC) Stimulators.* Patients with PAH have also been shown to have reduced levels of the enzyme responsible for producing NO, a naturally occurring substance in the body that causes relaxation of the pulmonary blood vessels. NO produces this effect by increasing intracellular levels of cyclic guanosine monophosphate GMP (cyclic GMP). Therefore, another established therapeutic approach has been to inhibit the degradation of cyclic GMP using drugs known as PDE-5 inhibitors. In addition, sGC is an enzyme found in the endothelial cells and the receptor for NO. When NO binds to sGC, the enzyme enhances production of cyclic GMP. As a result, sGC stimulators are also approved to treat PAH.

- *Endothelin Receptor Antagonists.* PAH patients have also been shown to have elevated levels of endothelin-1, a naturally occurring substance in the body that causes constriction of, and structural changes to, the pulmonary blood vessels. Therefore, another established therapeutic approach has been to block the action of endothelin with drugs that are known as endothelin receptor antagonists (ETRAs).

Because any or all of the three pathways may be therapeutic targets in a patient, these classes of drugs are used alone or in combination to treat patients with PAH. We currently market drugs in two of these classes. Remodulin, Tyvaso and Orenitram are all formulations of treprostinil, a prostacyclin analogue, and Adcirca is a PDE-5 inhibitor.

The clinical severity of PAH is classified according to a system originally developed for heart failure by the New York Heart Association and then modified by the World Health Organization (WHO) for patients with PAH, ranging from functional class I (no symptoms) through functional class IV (severe symptoms). Labeled indications for PAH therapies often note that clinical studies for the drug predominantly included patients in one or more functional classes.

PAH is a subset of the condition more broadly known as pulmonary hypertension. WHO has classified pulmonary hypertension into five groups, with PAH being designated WHO Group 1, which includes multiple etiologies such as idiopathic (meaning the cause is unknown) and heritable PAH, as well as PAH associated with connective tissue diseases. While our PAH therapies' labeling is limited to the treatment of WHO Group 1 PAH, we are engaged in research and development efforts to expand the use of Orenitram to treat pulmonary hypertension in certain categories of WHO Group 2, and Tyvaso to treat pulmonary hypertension in certain categories of WHO Group 3. For further details, see *Research and Development* below.

**Remodulin**

We sell Remodulin to specialty pharmaceutical distributors in the United States and to pharmaceutical distributors internationally. We recognized $599.0 million, $670.9 million and

5

$602.3 million in Remodulin net product sales, representing 37 percent, 39 percent and 38 percent of our total revenues for the years ended December 31, 2018, 2017 and 2016, respectively. Remodulin is indicated to treat patients with PAH, to diminish symptoms associated with exercise. Studies establishing effectiveness included patients with functional class II-IV (moderate to severe) symptoms.

Outside of the United States, Remodulin is approved for the treatment of PAH in 38 countries by continuous subcutaneous administration and in 35 countries by continuous intravenous administration, and is sold commercially in most of these countries. In May 2019, our marketing authorization for Remodulin in China will expire, at which point we expect to withdraw Remodulin from the Chinese market in light of the anticipated availability of a generic version of Remodulin. Revenues from sales of Remodulin in China have been immaterial.

We believe Remodulin has many qualities that make it an appealing alternative to competitive therapies. Remodulin is stable at room temperature, so it does not need to be cooled during infusion and patients do not need to use cooling packs or refrigeration to keep it stable. Treprostinil is highly soluble and highly potent, which enables us to manufacture Remodulin in concentrated solutions. This allows therapeutic concentrations of Remodulin to be delivered at very low flow rates via miniaturized infusion pumps for both subcutaneous and intravenous infusion. Remodulin can be continuously infused for up to 48 hours intravenously or 72 hours subcutaneously before refilling the external infusion pump. This profile contrasts favorably with the other continuously infused prostacyclin therapies in the market—Flolan®, Veletri® and generic epoprostenol.

Flolan and generic epoprostenol are not stable at room temperature (and therefore require refrigeration or the use of cooling packs), but Veletri may be stable at room temperature depending on its concentration. Flolan, generic epoprostenol, and Veletri have shorter half-lives than Remodulin, requiring mixing prior to pump refills. None of these competitive products may be administered via subcutaneous infusion, and therefore may only be delivered intravenously.

We settled litigation with each of Sandoz, Inc. (Sandoz), Teva Pharmaceuticals USA, Inc. (Teva), Par Sterile Products, LLC (Par) and Dr. Reddy's Laboratories, Inc. (Dr. Reddy's), related to their abbreviated new drug applications (ANDAs) seeking FDA approval to market generic versions of Remodulin before the expiration of certain of our U.S. patents. Under the terms of our settlement agreements, Sandoz was permitted to market its generic version of Remodulin in the United States beginning in June 2018, and Teva, Par and Dr. Reddy's were each permitted to launch their generic versions in the United States beginning in December 2018. To our knowledge, none of these companies has yet launched sales of a generic version of Remodulin. For further detail, see the section below entitled *Patents and Other Proprietary Rights, Strategic Licenses and Market Exclusivity—Generic Competition* .

Patients must use external pumps manufactured by third parties to deliver Remodulin. Smiths Medical manufactures the pumps used by most patients in the United States to administer Remodulin, including the Smiths CADD® MS-3 pump used to deliver subcutaneous Remodulin. In 2015, Smiths Medical notified us that it was planning to discontinue the manufacture of the CADD MS-3 pumps and associated cartridges. We entered into an agreement with Smiths Medical to fund the manufacture of a further supply of CADD MS-3 pumps and cartridges for use with branded Remodulin only. We anticipate this supply will be sufficient to ensure continued support of subcutaneous Remodulin for several years, and are working with Smiths Medical to develop a next-generation infusion system called RemoLife prior to the exhaustion of the available CADD MS-3 supply. As noted below under *Research and Development* , we are also working on developing the Trevyent and RemUnity systems for subcutaneous delivery of Remodulin.

There are serious adverse events associated with Remodulin. For example, when infused subcutaneously, Remodulin causes varying degrees of infusion site pain and reaction (redness and swelling) in most patients. Patients who cannot tolerate the infusion site pain related to the use of

subcutaneous Remodulin may instead use intravenous Remodulin. Intravenous Remodulin is delivered continuously through a surgically implanted central venous catheter, similar to Flolan, Veletri and generic epoprostenol. Patients who receive therapy through implanted venous catheters have a risk of developing blood stream infections and a serious systemic infection known as sepsis. As a result, subcutaneous administration is the preferred method of Remodulin delivery, and is used by a majority of U.S. Remodulin patients. Other common side effects associated with both subcutaneous and intravenous Remodulin include headache, diarrhea, nausea, jaw pain, vasodilation and edema.

*Tyvaso*

We sell Tyvaso to the same specialty pharmaceutical distributors in the United States that distribute Remodulin. We recognized $415.2 million, $372.9 million and $404.6 million in Tyvaso net product sales, representing 25 percent, 22 percent and 25 percent of our total revenues for the years ended December 31, 2018, 2017 and 2016, respectively. Tyvaso is approved in the United States, Israel and Argentina.

Tyvaso is administered four times a day by inhaling up to nine breaths during each treatment session, which takes approximately three minutes. Tyvaso is required to be administered using our proprietary Tyvaso Inhalation System, which consists of an ultra-sonic nebulizer and related accessories. A single ampule containing Tyvaso is emptied into the Tyvaso Inhalation System once per day, so the Tyvaso Inhalation System only needs to be cleaned once daily. Tyvaso is regulated by the FDA as a drug-device combination product, consisting of Tyvaso drug product and the Tyvaso Inhalation System.

Ventavis® (iloprost) is the only other FDA-approved inhaled prostacyclin analogue. Patients need to inhale Ventavis six to nine times per day via a nebulizer. According to its package insert, each Ventavis inhalation consists of four to ten minutes of continuous inhalation via the nebulizer. We completed an open-label study in the United States to investigate the clinical effects of switching patients from Ventavis to Tyvaso. Patients in this study saved an average of approximately 1.4 hours per day when administering Tyvaso compared to Ventavis.

Studies establishing the effectiveness of Tyvaso included predominately patients with functional class III symptoms (may not have symptoms at rest but activities are greatly limited by shortness of breath, fatigue, or near fainting). Tyvaso was generally well tolerated in our trials. The most common adverse events were transient cough, headache, nausea, dizziness and flushing.

In August 2018, we settled patent litigation with Watson Laboratories, Inc. (Watson) related to its ANDA seeking to market a generic version of Tyvaso in the United States. Under the terms of this settlement, Watson may launch its generic version of Tyvaso in the United States beginning in January 2026, although Watson may be permitted to enter the market earlier under certain circumstances. For further detail, see the section below entitled *Patents and Other Proprietary Rights, Strategic Licenses and Market Exclusivity—Generic Competition* .

*Orenitram*

Orenitram is the only FDA approved, orally administered prostacyclin analogue, and is the only oral PAH prostacyclin class therapy approved in the United States that is titratable to a maximum tolerated dose, without a dose ceiling. We sell Orenitram to the same specialty pharmaceutical distributors in the United States that distribute Remodulin and Tyvaso. We recognized $205.1 million, $185.8 million and $157.2 million in Orenitram net product sales, representing 13 percent, 11 percent and 10 percent of our total revenues for the years ended December 31, 2018, 2017 and 2016, respectively. The primary study that established efficacy included predominately patients with functional class II-III symptoms and etiologies of idiopathic or heritable PAH (75 percent) or PAH associated with connective tissue disease (19 percent). The most common side effects observed in our clinical studies were headache, nausea and diarrhea. Orenitram is not approved outside the United States.

In February 2018, we settled patent litigation with Actavis Laboratories FL, Inc. (Actavis) related to its ANDA seeking to market a generic version of Orenitram in the United States. Under the terms of this settlement, Actavis may launch its generic version of Orenitram in the United States beginning in June 2027, although Actavis may be permitted to enter the market earlier under certain circumstances. For further detail, see the section below entitled *Patents and Other Proprietary Rights, Strategic Licenses and Market Exclusivity—Generic Competition* .

### *Adcirca*

Adcirca is a PDE-5 inhibitor, the active pharmaceutical ingredient of which is tadalafil. Tadalafil is also the active pharmaceutical ingredient in Cialis®, which is marketed by Eli Lilly and Company (Lilly) for the treatment of erectile dysfunction. We acquired the commercial rights to Adcirca for the treatment of PAH in the United States from Lilly in 2008. We sell Adcirca at prices established by Lilly, which are at parity with Cialis pricing. We recognized $323.7 million, $419.7 million and $372.2 million in Adcirca net product sales, representing 20 percent, 24 percent and 23 percent of our total revenues for the years ended December 31, 2018, 2017 and 2016, respectively.

In 2009, the FDA approved Adcirca with a recommended dose of 40 mg, making it the only once-daily PDE-5 inhibitor for the treatment of PAH. Adcirca is indicated to improve exercise ability in patients with PAH. Studies establishing effectiveness included predominately patients with functional class II-III symptoms. Headaches were the most commonly reported side effect.

Prior to the approval of Adcirca, Revatio®, which is marketed by Pfizer Inc. (Pfizer), was the only PDE-5 inhibitor approved for the treatment of PAH. Sildenafil citrate, the active ingredient in Revatio, is also the active ingredient in Viagra®, which is marketed by Pfizer for the treatment of erectile dysfunction. In 2012, several companies launched generic formulations of sildenafil citrate. Revatio and generic sildenafil citrate are dosed three times daily.

In September 2014, Gilead Sciences, Inc. (Gilead) announced the results of a study of ambrisentan (an ETRA) and tadalafil in PAH patients as a first-line combination treatment, compared to treating PAH patients with only ambrisentan or tadalafil. In the study, first-line treatment with both therapies reduced the risk of clinical failure (a composite endpoint that incorporates clinical worsening events—death, hospitalization and disease worsening—and a component of unsatisfactory long-term clinical response) compared to a monotherapy treatment by 50 percent. Based on these results, in October 2015, the FDA approved an update to the new drug application (NDA) for Letairis® (ambrisentan), permitting the use of Letairis in combination with tadalafil for PAH to reduce the risks of disease progression and hospitalization for worsening PAH, and to improve exercise ability.

In May 2017, we amended our Adcirca license agreement with Lilly to clarify and extend the term of the agreement and to amend the economic terms of the agreement following the expiration of a patent covering Adcirca in November 2017. As a result of this amendment, beginning December 1, 2017, our royalty rate on net product sales of Adcirca increased from five percent to ten percent, and we are required to make milestone payments to Lilly equal to $325,000 for each $1,000,000 in net product sales. Adcirca's cost of product sales as a percentage of Adcirca's net product sales has increased significantly since December 1, 2017 due to these cost increases. In August 2018, Mylan N.V. announced the launch of its generic version of Adcirca, which resulted in a material adverse impact on Adcirca net product sales. Additional companies launched generic versions of Adcirca in February 2019. For further detail, see the section below entitled *Patents and Other Proprietary Rights, Strategic Licenses and Market Exclusivity—Generic Competition* .

Our license agreement with Lilly related to Adcirca expires on December 31, 2020.