# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SANDOZ INC. and RAREGEN, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 3:19-cv-10170 |
| v. | ) | (BRM) (LHG) |
| | ) | |
| UNITED THERAPEUTICS | ) | |
| CORPORATION and SMITHS | ) | |
| MEDICAL ASD, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 4

I.    UTC and Smiths Ensured a Supply of Devices for Remodulin Patients That Otherwise Would Not Have Existed. .................................................................... 4

    A. Facing Discontinuation of the CADD-MS 3, UTC Invested in More Pumps and Cartridges for Remodulin Patients. ...................................................... 4

    B. UTC and Smiths Expanded Their Investment and Commitment To Supply Remodulin Patients with CADD-MS 3 Devices. ......................................... 6

    C. UTC and Smiths Ensured Remodulin Patients Did Not Lose Access to Cartridges, Consistent with the Supply Agreement. ..................................... 8

II.   Sandoz Elected Not To Invest in Developing Available Delivery Devices. ... 10

    A. Sandoz Failed To Plan Delivery of Its Generic Drug to Patients. .............. 10

    B. Sandoz Knew About the Discontinuation—and Did Nothing. ................... 11

    C. ██████████████████████████████████ .................................. 12

III.  Sandoz and RareGen Launched Without Research or Investment. ................. 13

    A. RareGen Neglected Diligence ████████████████ .............. 13

    B. Sandoz and RareGen Decided To Launch Without a Subcutaneous Delivery Solution. ..................................................................................... 14

    C. Plaintiffs ███████████████████████████ ............................ 16

ARGUMENT ........................................................................................................... 19

I.    Plaintiffs Have Not Suffered Any Irreparable Harm. ....................................... 19

A. Plaintiffs' Claimed Reputational Injury Is Speculative and Unfounded. ...19

B. Any Reputational Damage Would Be Compensable by Money Damages............................................................................................20

C. Plaintiffs Concede an Injunction Would Not Prevent Asserted Harm. .......22

D. Any Reputational Damage Is Self-Inflicted.................................................22

II. Plaintiffs Are Unlikely To Succeed on the Merits.............................................24

A. Plaintiffs Cannot Show Foreclosure Because Alternatives Exist. ..............25

1. Plaintiffs Could ███████ Develop a Cartridge Swiftly....................27

2. Plaintiffs Could Develop a Pump █████████████..................28

3. Plaintiffs Could Obtain Clearance for an Overseas Device. .................29

B. Defendants' Agreements Are Justified by Procompetitive Effects. ............29

1. Defendants' Procompetitive Conduct Enhanced Output and Ensured Supply. ...............................................................................................29

2. Defendants' Procompetitive Conduct Deterred Free Riding.................31

3. Plaintiffs Cannot Show a Viable Less Restrictive Alternative..............33

C. Plaintiffs Cannot Prove a Relevant Antitrust Market. ................................35

D. Both Plaintiffs Lack Antitrust Standing......................................................38

1. Neither Plaintiff Suffered Antitrust Injury from Inaction. ...................38

2. RareGen Is Not a Proper Party To Assert Antitrust Claims..................39

III. The Balance of Equities and Public Interest Factors Also Weigh in Defendants' Favor...........................................................................................39

CONCLUSION ..........................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Acierno v. New Castle Cty.*, 40 F.3d 645 (3d Cir. 1994)..........................................23

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir. 1975) ............................................................................................................34

*BanxCorp v. Bankrate, Inc.*, 2019 WL 2098842 (D.N.J. 2019) ..............................36

*Borough of Lansdale v. Phila. Elec. Co.*, 692 F.2d 307 (3d Cir. 1982) ..................27

*B.P.C. v. Temple Univ.*, 2014 WL 4632462 (E.D. Pa. 2014) ...................................22

*Brandywine Vill. Assocs. v. Carlino E. Brandywine, LP*, 2018 WL 1532195 (E.D. Pa. 2018)...........................................................................................22

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007)..........................36

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988) ..............................32

*Byrne v. Calastro*, 205 F. App'x 10 (3d Cir. 2006)..................................................21

*Caplan v. Fellheimer*, 68 F.3d 828 (3d Cir. 1995) .......................................22, 23, 24

*Carpet Grp. Int'l v. Oriental Rug Importers Ass'n*, 2005 WL 3988699 (D.N.J. 2005)...........................................................................................................40

*Cherry Hill Towne Ctr. Partners v. GS Park Racing*, 2019 WL 4187836 (D.N.J. 2019)...........................................................................................20

*Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977)...........................32

*ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223 (3d Cir. 1987).......................................19

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394 (3d Cir. 2016)........ ......................................................................... 24, 25, 26, 27, 29, 36

*Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223 (3d Cir. 2013) ...................39

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205 (3d Cir. 2014) ............................................................................................................19

*Gemini Concerts, Inc. v. Triple-A Baseball Club Assocs.*, 664 F. Supp. 24 (D. Me. 1987)................................................................................32

*IDT Telecom, Inc. v. CVT Prepaid Sols., Inc.*, 250 F. App'x 476 (3d Cir. 2007) ...............................................................................21

*In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132 (3d Cir. 2017) ..........................38

*Instant Air Freight, Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989)........................................................................20, 21, 22

*Jame Fine Chems., Inc. v. Hi-Tech Pharm. Co.*, 2007 WL 927976 (D.N.J. 2007)........................................................................27

*Mon Cheri Bridals, LLC v. Bowls*, 2015 WL 1383948 (D.N.J. 2015)....................21

*Mylan Inc. v. SmithKline Beecham Corp.*, 2010 WL 4181139 (D.N.J. 2010)........................................................................23

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421 (3d Cir. 2016)........................................................................29, 36, 40

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ...............................................25, 29

*Omega Envt'l, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997). ..............26, 27

*Ortho Biotech Prods., LP v. Amgen Inc.*, 2006 WL 3392939 (D.N.J. 2006)........................................................................21

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455 (S.D.N.Y. 1996)........................................................................35

*Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506 (W.D. Pa. 2019) ........................................................................37

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997)........................................................................37

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010)........................................ 24, 25, 29, 30, 33, 36, 38, 39

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) ...............................19, 24

*Ride the Ducks of Phila., LLC v. Duck Boat Tours, Inc.*, 138 F. App'x 431 (3d Cir. 2005)..............................................................................23, 24

*Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (5th Cir. 1987) ..................................32

*Scanvec Amiable Ltd. v. Chang*, 80 F. App'x 171 (3d Cir. 2003)..........................19

*URL Pharma, Inc. v. Reckitt Benckiser Inc.*, 2016 WL 1592695 (E.D. Pa. 2016)..............................................................................................22

*United States v. Brown Univ.*, 5 F.3d 658 (3d Cir. 1993)..........................................34

*U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589 (1st Cir. 1993) ............................................................................................24, 25

*Van Dyk Research Corp. v. Xerox Corp.*, 478 F. Supp. 1268 (D.N.J. 1979)..............................................................................................38

## STATUTES

15 U.S.C. §§ 1–7 (Sherman Antitrust Act).....................................24, 25, 33, 34, 36

21 U.S.C. § 355....................................................................................................17

## OTHER AUTHORITIES

Fed. R. Civ. P. 65 ................................................................................................19

Fed. R. Evid. 801 ................................................................................................13

## **INTRODUCTION**

Plaintiffs Sandoz Inc. ("Sandoz") and RareGen, LLC ("RareGen") seek the extraordinary remedy of an injunction to avoid the consequences of their own shortsightedness and indolence in failing to secure a subcutaneous drug delivery device. Plaintiffs would have the Court ignore that the world existed before late 2018. But the seeds of this dispute were sown years ago by the contrasting ways Sandoz and Defendant United Therapeutics Corporation ("UTC") fulfilled their responsibilities as manufacturers of their pulmonary arterial hypertension drugs.

UTC sprang into action when confronted with news in 2015 that Defendant Smiths Medical ASD, Inc. ("Smiths") had discontinued production of the subcutaneous CADD-MS® 3 pump platform, which many U.S. patients on UTC's branded therapy Remodulin® (treprostinil) Injection used. Out of its own pocket, UTC funded an exclusive deal with Smiths for an additional production run of pumps and cartridges for its patients. This secured an interim solution for its patients while UTC was spending millions of dollars to develop next-generation delivery devices. When additional materials became available in 2017, UTC increased its purchase commitment to ensure its supply of cartridges (used with the pump) mirrored the useful life of its pumps. Contemporaneous documents demonstrate that UTC and Smiths understood and agreed from the outset that these pumps and cartridges were for UTC's Remodulin patients.

Meanwhile, after determining in 2015 that it would launch its generic drug as soon as June 2018, Sandoz—a Swiss pharmaceutical behemoth—chose to do nothing to secure a supply of subcutaneous pumps and cartridges for any future patients.  Despite repeated warnings that the CADD-MS 3 had been discontinued, and the availability of many other options, Sandoz first sat on its hands, then looked to rid itself of the problem. ███████████████████ ███ RareGen, which also did nothing to secure pumps and cartridges ███ ███████████████████ .

Sandoz ███████████████████ when it found itself in early 2019 without access to the cartridges needed for a subcutaneous launch:

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

Their motion to enjoin enforcement of UTC's exclusivity provisions—which would make the cartridges funded and owned by UTC freely available to UTC's competitors—fails the two most basic requirements of a preliminary injunction:

First, Plaintiffs mount no evidence of irreparable harm, instead reciting their own fears that they "*may*" suffer reputational injuries following their decision to

2

launch with the capability to inject their drug only intravenously and not subcutaneously. Any such reputational harms—wholly speculative here—could be remedied by money damages.

[1] Moreover, Plaintiffs inflicted the purported reputational harm on themselves not only by failing to secure a supply of devices for years, but also by ███████████████████ launching intravenously-only ███

Such self-inflicted harms are not irreparable, nor antitrust injuries.

Second, Plaintiffs' antitrust claims are groundless. By restricting to UTC's patients the pumps and cartridges that UTC funded, Defendants did not substantially foreclose Plaintiffs' ability to compete. The evidence is ████ that Plaintiffs could—███████—engage a manufacturer to develop cartridges ███████, and could have developed a full pump system in a slightly longer time, ████████ ████████ ████ Hence the self-recriminations by Sandoz's launch team.

Even if these alternatives had not been available—and they were throughout the seven-year period leading up to the launch—the antitrust laws do not afford

---

[1] Despite Plaintiffs' misleading implication about "harm to patients," Mot. at 40, no patient lacks medication or the devices needed to administer it. ████

Plaintiffs the right to free ride off UTC's investments. Plaintiffs pretend that those investments were made in 2016 and 2017 without strings attached. That ignores the reality, purpose, and procompetitive effect of Defendants' deal: to create and ensure a supply of delivery devices that would not otherwise exist for Remodulin patients. Plaintiffs' motion should be denied, and the Court should instead grant Defendants' motion to dismiss. *See* Dkt. 53.

## STATEMENT OF FACTS

**I.  UTC and Smiths Ensured a Supply of Devices for Remodulin Patients That Otherwise Would Not Have Existed.**

**A.  Facing Discontinuation of the CADD-MS 3, UTC Invested in More Pumps and Cartridges for Remodulin Patients.**

The CADD-MS 3 pump, first released in 2006, was a modified insulin pump—namely, Smiths made software modifications to dispense medicine by milliliters, not units of insulin. Ex. 1079.[2] By 2014, it was an "aging platform" that was "increasingly more expensive" for Smiths to produce due to exhaustion of FDA-cleared parts and materials. Ex. 1078. Smiths decided to discontinue production, and consulted with UTC to avoid "creating panic" because more than a thousand patients were using it. Watson Dep. 160:5–161:4. As explained by UTC's co-CEO at that time, Roger Jeffs, now a RareGen co-owner and board member, the discontinuation was ████████████████████

---

[2] Exhibits and deposition excerpts are attached to the Declaration of Edward C. Barnidge.

4

██████████████    ████████████████████████████.

Under Jeffs's leadership, UTC discussed with Smiths a manufacturing run of pumps and cartridges for Remodulin patients. Exs. 257, 265. Although UTC was developing "next generation" delivery devices—including one implantable pump and another using acoustic volume sensing technology—it could "not afford any gaps in supplying their ████ business to life-critical patients." Ex. 402.

Smiths circulated end-of-life notices to customers in August 2015, including specialty pharmacies like ██████. Donovan Dep. 328:15–331:5; Ex. 461. The notices explained that the pump was discontinued "effective immediately" and cartridges would be supplied for a limited duration. Ex. 1082. By October 2015, Smiths shuttered its manufacturing line for pumps. Quinn Decl. ¶ 11.

Meanwhile, the parties discussed the financial commitment Smiths required to reopen manufacturing lines, and the exclusivity UTC required to ensure a pump and cartridge supply for its U.S. patients. Stamp Decl. ¶¶ 19, 25, 39; Benkowitz Decl. ¶¶ 6–7. Smiths estimated that, with UTC's support, it could produce ████ pumps and ██████ cartridges that may extend supply for up to six years, but only if it made "efforts to restrict sales of remaining 3ml cartridges for use with Remodulin." Ex. 1081. Without guaranteed investment from UTC, Smiths predicted it only could produce enough cartridges for the "next 3 years (Feb 2019)." Ex. 1077.

5

In March 2016, UTC and Smiths executed the CADD-MS 3 Supply Agreement. Ex. 67. Smiths committed to produce ▇▇ pumps and ▇▇▇▇ cartridges, and agreed that they "shall only be sold to UT" and other designated customers "[i]n order to ensure supply is available for use in connection with Remodulin drug product." Ex. 67 §§ 3–7. The agreement permitted Smiths to sell a ▇▇▇▇▇▇▇ to legacy customers. Ex. 67 § 5(a); Ex. 1070. UTC committed to pay Smiths ▇▇▇▇ up front, and a total of up to ▇▇▇ for pumps, and up to ▇▇▇ for cartridges. Ex. 67 §§ 3–6 & Ex. A. If Smiths received a similar offer to produce additional "Pumps or Cartridges," UTC could match the offer, but Smiths otherwise was free to accept it. Ex. 67 § 9.

When describing the Supply Agreement a few months later, Smiths confirmed the purpose of granting "exclusivity" to UTC over "the remaining 3mL cartridges." Ex. 69. UTC would not have entered into the Agreement without exclusivity, Benkowitz Decl. ¶ 7, and carefully tracked sales of CADD-MS 3 supplies to ensure their use for Remodulin. *See, e.g.*, Ex. 1071. Exclusivity terms are common for investments in the pharmaceutical industry. ▇▇▇▇▇ ▇▇ ▇▇▇ ▇▇▇▇ ▇▇ ▇▇▇▇▇

**B.    UTC and Smiths Expanded Their Investment and Commitment To Supply Remodulin Patients with CADD-MS 3 Devices.**

In the months following the Supply Agreement, Smiths began to run out of

cartridges more quickly than forecasted. Rhodes Decl. ¶ 7. Facing a shortfall on its contract, Smiths sought to increase cartridge production. Exs. 77, 408. Smiths found another company that had conducted a last-time buy of the same discontinued resin it had used to produce cartridges, and bought slightly more than it thought it needed to deliver on its commitment to UTC. Exs. 77, 78, 79.

Smiths advised UTC of its resin purchase, and suggested, subject to an enhanced commitment by UTC, that Smiths could produce as many as ███████ ██████ additional cartridges, thereby extending supply for Remodulin patients from six to as many as ten years. Exs. 205, 1072; Rhodes Decl. ¶ ██████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

From UTC's perspective, increasing to a ten-year supply made sense considering its policy of maintaining buffer for its products, flux in consumption, and uncertainty about the future number of patients. Rhodes Decl. ¶ 9. In addition, because UTC expected to sell the new pumps for at least six years, more cartridges would allow patients who bought pumps at the end of that time to use them for their useful life. *Id.* ¶¶ 9–10, 12.

As before, exclusivity was central to these discussions. Smiths agreed to limit non-Remodulin sales to ██████ cartridges per year for two years to its

7

legacy customers. Rhodes Decl. ¶ 9. All other cartridges were reserved for UTC. *Id.* Smiths's reporting would help ensure those cartridges were "available for use with Remodulin, just like the pumps we are buying." Ex. 206; *see* Ex. 211 ("to prove the continued sales are in compliance"). ███████████████████

█████████████████████████████████████

█████████████████████████████████

████████████████████████████████████

██████████████████████████████

The parties formalized these discussions in a Second Amendment dated July 31, 2017. Ex. 202; Rhodes Decl. ¶¶ 9–10. By then, UTC effectively had become the owner of all remaining pumps, which it arranged to sell directly to specialty pharmacies in late 2017. Exs. 722, 724. Once Smiths exhausted its ████ cartridge allocation, the plan was for UTC to own all remaining cartridges. Rhodes Decl. ¶¶ 9, 15; Ex. 206. As Smiths explained at the time, its cartridges were "now wholly allocated to the United Therapeutics supply agreement, which restricts [them] to be sold to Remodulin-only through ██████████" Ex. 462.

## C. UTC and Smiths Ensured Remodulin Patients Did Not Lose Access to Cartridges, Consistent with the Supply Agreement.

█████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

8

████ ████████████████████████████████████████████

████████, *see* Exs. 464, 465, informed UTC it would "follow up," Ex. 58, and later told UTC that "the contracts were done." Rhodes Dep. 139:3–23, 146:2–20.

In fall 2018, Smiths was nearing the limit of its allocation, and prepared to send notices discontinuing cartridges for those customers. Exs. 88, 89; Stamp Decl. ¶ 31; Rhodes Decl. ¶ 15. One customer, ████, had bought over ████ cartridges for ████████████████ division bought others for an unclear use. Exs. 89, 1074. ████████████████████████████

████████████████████████████████████████████

████████████████████████████. UTC also learned Sandoz was about to launch generic treprostinil. Rhodes Decl. ¶ 18; Benkowitz Decl. ¶ 11.

These revelations exposed an urgent risk to the bargain UTC and Smiths had struck in 2016: that cartridges guaranteed for Remodulin patients could be siphoned for other uses, including sudden large purchases. Rhodes Decl. ¶¶ 17–19; Benkowitz Decl. ¶ 12. To protect against that, ████████ UTC could approve every cartridge sale as Smiths neared its allocation end, until distributors agreed to limit cartridge sales to Remodulin patients. ████████

No cartridges were withheld from any patients; after all, preserving Remodulin patients' access to cartridges was the purpose of the contract. *Id.* ¶¶ 19–21. Failing to secure access would have risked supply gaps. Ex. 402.

9

Indeed, in mid-January 2019, ▮▮▮▮ tried to buy more than ▮▮▮▮ cartridges—had that order been fulfilled, it would have exhausted Smiths's entire cartridge stock for months, leaving none for UTC's patients. Ex. 56 § 6(a); Ex. 329.

By April 2019, Smiths had reached the end of its allocated cartridge supply, with only ▮▮▮▮ cartridges remaining. Ex. 56 § 6(a). Because UTC had the right to direct the distribution of all of Smiths's future stock, Smiths agreed, as it already had done with pumps, to streamline distribution by selling all units directly to UTC and allowing UTC to manage all sales functions. Rhodes Decl. ¶¶ 22–23; Gray Decl. ¶¶ 7–8. The parties formalized that agreement in a Third Amendment dated April 8, 2019. Ex. 56. As Plaintiffs' own economics expert recognized, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Similar to the distribution agreements it signed after assuming ownership of all remaining pumps in 2017, Exs. 722, 724, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Exs. 723, 725; Gray Decl. ¶¶ 5–8, 10. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ Benkowitz Decl. ¶ 8; Rhodes Decl. ¶¶ 18, 22–23.

## II. Sandoz Elected Not To Invest in Developing Available Delivery Devices.

### A. Sandoz Failed To Plan Delivery of Its Generic Drug to Patients.

Sandoz applied to launch a generic version of Remodulin in 2011, via an

10

Abbreviated New Drug Application ("ANDA") filed with the FDA.  Sandoz's

ANDA ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████  Yet for seven years after filing its ANDA, Sandoz did nothing

to secure a subcutaneous delivery device for future patients.

Sandoz took no steps to secure a device after receiving █████████████

██████████████████████████████  *See* Exs. 379, 1064.  Sandoz's inaction

persisted even after September 2015, when it settled patent litigation with UTC and

obtained a June 26, 2018 launch date.  Ex. 1006. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

### B.  Sandoz Knew About the Discontinuation—and Did Nothing.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



**C.**

12

███████████████████████████████████████████

███████████████████████████████████████████

## III. Sandoz and RareGen Launched Without Research or Investment.

**A.    RareGen Neglected Diligence** ███████████████

███████████████    ███████████    ██████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

████████████████████████  ████████████████

█████████████████████████████████████████████

██████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

---

[3] Plaintiffs did not depose the specialty pharmacies (nor otherwise obtain discovery from them). Plaintiffs' attempt to rely on conversations with them is rank hearsay. Fed. R. Evid. 801(c). ████████████████████████████

██████████████████████████████████████

13



**B.    Sandoz and RareGen Decided To Launch Without a Subcutaneous Delivery Solution.**



the CADD-MS 3 had been discontinued.  Exs. 5, 318, 319.

did not yield a supply of devices.

15



Sandoz did not launch its drug until March 25, 2019. ███████ Sandoz's launch started the clock running on the statutory 180-day period after which any approved manufacturer could sell generic treprostinil. *See* 21 U.S.C. § 355(j)(5)(B)(iii)–(iv).

### C. ███████████████████████

In the lead-up and aftermath of their decision to launch, ███████████

16



Smiths submitted a proposed license agreement with terms Plaintiffs requested on March 26, 2019. *See* Exs. 337, 338, 1084. Unwilling to take yes for an answer, Plaintiffs made an additional demand—that Smiths provide "an interim supply of cartridges for the period during which we are negotiating the license agreement." Ex. 1083. Smiths explained it could not supply Plaintiffs with cartridges in the interim, but would be happy to assist Plaintiffs in making their own. Ex. 1085. Plaintiffs did not inquire further.

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████

Plaintiffs also could have hired an insulin pump manufacturer to customize a pump to deliver Sandoz's drug. ████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

Plaintiffs also could have worked to obtain FDA clearance of an overseas treprostinil pump (the CADD-MS 3 is only used in the U.S.; overseas patients use other pumps). Ex. 1104. ███████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

18

## ARGUMENT

Plaintiffs seek "an extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). They must show: (1) likelihood of success on the merits, (2) irreparable harm, (3) the balance of equities tips in their favor, and (4) the public interest favors relief. *Id.* The "gateway" requirements are likelihood of success and irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 178–79 (3d Cir. 2017). Plaintiffs demonstrate neither.[4]

### I.   Plaintiffs Have Not Suffered Any Irreparable Harm.

A plaintiff seeking an injunction "has the burden of proving a 'clear showing of immediate irreparable injury.'" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). Merely "[e]stablishing a risk of irreparable harm is not enough." *Id.* Plaintiffs fail to meet their burden because the claimed irreparable injury—damage to reputation—is factually unsupported, compensable by monetary damages, not redressed by an injunction, and self-inflicted.

### A.  Plaintiffs' Claimed Reputational Injury Is Speculative and Unfounded.

Plaintiffs do not cite any facts supporting their claim that they will suffer reputational damage based on perceptions that they cannot meet their commitments

---

[4] Even if Plaintiffs could satisfy their burden, which they cannot, they also would have to post a substantial bond. *Scanvec Amiable Ltd. v. Chang*, 80 F. App'x 171, 176 (3d Cir. 2003); *see* Fed. R. Civ. P. 65(c).

19

to specialty pharmacies and patients.  Mot. at 35–36.  The record contains no statements by doctors, patients, pharmacies, or other customers regarding how they perceive Plaintiffs' reputation, let alone whether perceptions would change if only IV delivery continues to be offered for a drug launched over six months ago.  Plaintiffs' economist simply states ██████████████████████████ ███████████████████████ And Plaintiffs muster only a self-serving affidavit ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████ "Injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." *Cherry Hill Towne Ctr. Partners v. GS Park Racing*, 2019 WL 4187836, at *7 (D.N.J. 2019).  Injunctive relief should be denied on this basis alone.

## B.  Any Reputational Damage Would Be Compensable by Money Damages.

Even if Plaintiffs had provided factual evidence of "reputational" harm, such injuries are compensable by money damages and, thus, not irreparable.  *Instant Air Freight, Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  The lone exception—when a party is losing control over its reputation due to "consumer

20

confusion," such as in trademark infringement cases, *see IDT Telecom, Inc. v. CVT Prepaid Sols., Inc.*, 250 F. App'x 476, 479 (3d Cir. 2007); *Ortho Biotech Prods., LP v. Amgen Inc.*, 2006 WL 3392939, at *8 (D.N.J. 2006)—is inapplicable here. This case presents the opposite scenario. Plaintiffs argue that they may have lost goodwill because prescribers do *not* confuse their generic drug with UTC's Remodulin but rather will distinguish between the two.

As no risk of "consumer confusion" exists, the rule in *Instant Air Freight* controls, and any harm would be compensable by money damages. For example, in *Mon Cheri Bridals, LLC v. Bowls*, 2015 WL 1383948 (D.N.J. 2015), because the designer's departure from a dressmaker's employ did not risk a "loss of control of reputation," any reputational harm was not irreparable. *Id.* at *5. Money damages were adequate because "[a]ny losses suffered due to cancelled orders are easily quantifiable" and the dressmaker at trial could present "expert testimony" and "all manner of evidence" of reputation damages. *Id.*; *see Instant Air Freight*, 882 F.2d at 801–02 (reputational loss compensable with money damages).[5]

The record reveals ███████████████████████████

████████████████████████████████  ███████

---

[5] Plaintiffs cite a case that also involved reputational injury due to confusion. Mot. at 35 (citing *Byrne v. Calastro*, 205 F. App'x 10, 16 (3d Cir. 2006) (pension funds seeking to remove executives accused of ties to organized crime due to likelihood of funds' reputation being associated with executives under investigation)).

██████████████████████████████████████████

███████████████████████████    █████████████

████████████████████████  *Brandywine Vill. Assocs. v. Carlino E.*

*Brandywine, L.P.*, 2018 WL 1532195, at *3 (E.D. Pa. 2018) ("Our Circuit has

'held an inability to precisely measure financial harm does not make that harm

irreparable or immeasurable.'").[6]  Plaintiffs possess an adequate remedy at law.

### C.  Plaintiffs Concede an Injunction Would Not Prevent Asserted Harm.

Plaintiffs also concede that the desired equitable remedy would *not* protect

them from injury.  Injunctive relief is not proper if it would not prevent the claimed

harm. *Instant Air Freight*, 882 F.2d at 801 (injunction "must be the only way of

protecting the plaintiff from harm"); *see B.P.C. v. Temple Univ.*, 2014 WL

4632462, at *5 (E.D. Pa. 2014) (no irreparable harm "when the requested

injunction would not remedy the alleged harm"). ████████████████

██████████████████████████████████████████

████████████████████████████That too is fatal.

### D.  Any Reputational Damage Is Self-Inflicted.

Finally, self-inflicted harm is not irreparable. *Caplan v. Fellheimer*, 68 F.3d

---

[6] Plaintiffs cite *URL Pharma, Inc. v. Reckitt Benckiser Inc.*, 2016 WL 1592695 (E.D. Pa. 2016), in which a court relied on a contract stating there was no adequate remedy at law upon breach to hold that the harm was irreparable under state law. *Id.* at *10–11.  No such agreement governs here.

828, 839 (3d Cir. 1995). A competitor who acted "improvidently" and brought "harm upon itself" lacks irreparable injury. *Ride the Ducks of Phila., LLC v. Duck Boat Tours, Inc.*, 138 F. App'x 431, 434 (3d Cir. 2005) (no irreparable harm because watercraft buyer complaining of lack of access to a ramp its competitor built "improvidently purchased [boats] without the means to put them in the water"); *see Mylan Inc. v. SmithKline Beecham Corp.*, 2010 WL 4181139, at *4 (D.N.J. 2010) (generic drug maker's "self-inflicted" harm not irreparable); *see also Acierno v. New Castle Cty.*, 40 F.3d 645, 654 (3d Cir. 1994) (plaintiff "could have avoided his problem if he had acted within three years after his [plan] was filed").

Here, any reputational harm to Plaintiffs resulted from (1) their reckless assumption ███████████████████████████ and (2) their subsequent decision, when realizing their error, ████████████ ████████████████████████ ████████████████████████ ███████████████ Yet *for seven years Plaintiffs failed to secure delivery devices.* This is the quintessential self-inflicted injury. ████ ████████████████████ ████████████████████ Even in 2019, Plaintiffs could have waited ████████████████ ███████████████ Instead, they opted to launch in

23

March without a subcutaneous solution ███████████████, exposing themselves to any reputational harm they now claim is irreparable.

Having readied the drug "without the means to put [it] in the [patients]," *Ride the Ducks*, 138 F. App'x at 434, Plaintiffs then chose "to permit the outcome which they find unacceptable" by launching, *Caplan*, 68 F.3d at 839. Their motion must fail as a result.

## II. Plaintiffs Are Unlikely To Succeed on the Merits.

Plaintiffs also cannot make their other "critical" showing of likely success on the merits. *Reilly*, 858 F.3d at 179. Plaintiffs proceed "based on only their Sherman Act claims" attacking Defendants' exclusive dealing arrangements. Mot. at 19. Such arrangements have well-recognized procompetitive benefits. *See U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 595 (1st Cir. 1993).

It is blackletter law that to prevail on an exclusive dealing claim under either § 1 or § 2 of the Sherman Act, Plaintiffs must demonstrate harm to competition. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010); *see Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 399–400 (3d Cir. 2016) ("The antitrust laws are concerned with 'the protection of competition, not competitors.'").[7] Plaintiffs cannot because there were

---

[7] Plaintiffs' suggestion that "quick look" suffices here instead of a rule of reason analysis is wrong. Mot. at 19–20. It is well-settled that "quick look" analysis cannot apply to § 2 monopolization claims nor to § 1 claims premised upon

numerous reasonable alternatives for them to reach the market, meaning they were not foreclosed from an opportunity to compete.[8]

Even if Plaintiffs could show harm to competition, Defendants have the opportunity to show that the challenged agreements had procompetitive effects. *Race Tires*, 614 F.3d at 75. If Defendants make this procompetitive showing, that ends the analysis for a § 2 claim—there can be no liability—whereas for a § 1 claim, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Am. Express*, 138 S. Ct. at 2284. Here, the overwhelmingly procompetitive nature of the output-enhancing supply arrangements provides an independent basis for denial of Plaintiffs' motion.

## A. Plaintiffs Cannot Show Foreclosure Because Alternatives Exist.

Plaintiffs cannot prevail on their core claim that they were substantially foreclosed from the market. Foreclosure is not "substantial" unless conduct "'bar[s] a substantial number of rivals or severely restrict the market's ambit.'"

---

vertical restraints like exclusive dealing. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018); *Eisai*, 821 F.3d at 403; *see U.S. Healthcare*, 986 F.2d at 595 ("no 'quick look' would ever suffice" for exclusive dealing claims, which require "the most careful weighing of alleged dangers and potential benefits").

[8] As detailed below, there are independent reasons Plaintiffs cannot show harm to competition, including their failure to show that Defendants had market or monopoly power in any properly defined market (or, in the alternative, that output decreased and prices increased), or that Plaintiffs have antitrust standing.

25

*Eisai*, 821 F.3d at 403. If Plaintiffs had alternatives to reach the market that are "reasonably available," they cannot claim harm to competition. *Id.*

██████████████████████████████  ██████████████████████████ ████████████████████████████████████████████████████ that Plaintiffs had reasonable alternatives for subcutaneous pumps and cartridges available to them at all relevant times. Unable to deny the existence of this evidence, Plaintiffs invent a new crabbed meaning of foreclosure, arguing the test is whether pumps or cartridges were readily available in March 2019—*i.e.*, available off-the-shelf without lifting a finger. Mot. at 37–40. Courts reject this claim. *Eisai*, 821 F.3d at 403–04; *Omega Envt'l, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997).

In *Eisai*, the Third Circuit rejected the plaintiff's assertion that it was foreclosed by the defendant drug manufacturers' price discounts, which rewarded customers who bought defendants' drug for its many FDA-indicated uses, because the plaintiff had the option of seeking additional FDA indications for its drug too. 821 F.3d at 400, 406. It did not matter that "obtaining an FDA indication requires investing a significant amount of time and resources in clinical trials" because there was no evidence "that fixed costs were so high that competitors entering the market were unable to obtain" FDA indications. *Id.* at 406. Thus, "nothing in the record indicates that an equally efficient competitor was unable to compete with [defendants]." *Id.* In *Omega*, the Ninth Circuit similarly reasoned that "[i]f

26

competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing] restrictions foreclose from competition *any* part of the relevant market." 127 F.3d at 1163. There, the plaintiff's ability to "develop alternative distributors" helped defeat any purported foreclosure effect. *Id.* This is consistent with cases establishing that a plaintiff's ability to overcome a barrier within several months prevents a finding of substantial foreclosure. *See, e.g., Jame Fine Chems., Inc. v. Hi-Tech Pharm. Co.*, 2007 WL 927976, at *5 (D.N.J. 2007) ("complete absence of any generic competition" for "between five and nine months" is "not a sufficiently substantial foreclosure"); *cf. Borough of Lansdale v. Phila. Elec. Co.*, 692 F.2d 307, 313–14 (3d Cir. 1982) (no monopoly power and no antitrust violation if rival can build alternative transmission line within "14 to 16 months").

Plaintiffs had the opportunity to be "an equally efficient competitor" and "develop alternative [suppliers]" had they pursued any of the alternatives available to them at any time after 2011 to access what they perceived to be a four billion dollar market. *See* Ex. 600.

### 1. Plaintiffs Coul█ ███████ Develop a Cartridge Swiftly.

It is undisputed that Plaintiffs could have hired a manufacturer to develop cartridges ███████████████████████████████. Talpade Rpt. ¶¶ 76–83.

███████████████████████████████████████████████

27



Plaintiffs cannot claim to be foreclosed from the market because they cannot use UTC's cartridges.[10]

### 2. Plaintiffs Could Develop a Pump ████████████████.

Sandoz also could have engaged a manufacturer to develop a pump. █

Had Plaintiffs made that relatively modest effort years ago, they would have been ready to launch.

28

### 3.  Plaintiffs Could Obtain Clearance for an Overseas Device.

Sandoz also could have approached a device manufacturer to obtain FDA clearance for a subcutaneous infusion device for treprostinil used elsewhere in the world.  Indeed, Remodulin patients outside the US have access to several such pumps.  Ex. 1104; Talpade Rpt. ¶¶ 96–98.  Historical regulatory review times for analogous infusion pumps run from two to six months.  Talpade Rpt., Tbl. 1.

Because Plaintiffs had alternate means—indeed, a wide variety of options— there is no basis to find that competition was foreclosed.  *Eisai*, 821 F.3d at 406.

### B.  Defendants' Agreements Are Justified by Procompetitive Effects.

Even if Plaintiffs had no access to alternatives—and they clearly did—their claims fail because of the "'nonpretextual' procompetitive justifications" for Defendants' conduct.  *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 438 (3d Cir. 2016).  Those include expanding output, ensuring a supply of pumps and cartridges for Remodulin patients, and discouraging free riding.  *Am. Express*, 138 S. Ct. at 2289; *Race Tires*, 614 F.3d at 76.

### 1.  Defendants' Procompetitive Conduct Enhanced Output and Ensured Supply.

Cartridges exist today only because UTC committed over ███████ to produce up to ██████ of them, along with more than ████ pumps that use those cartridges.  Exs. 67, 202.  Enhancing output and ensuring supply are hallmark examples of procompetitive effects.  *See Am. Express*, 138 S. Ct. at 2289

29

("expanding output"); *Race Tires*, 614 F.3d at 76 ("highly efficient" to "assure supply" and "outlets"). Without UTC's investments, Smiths predicted in 2015 that it would run out of cartridges by February 2019—a month before Plaintiffs launched. Ex. 265. UTC would not have entered into any of the agreements without a commitment that the supply it created would be available for patients using its therapy. Benkowitz Decl. ¶¶ 6–9; Rhodes Decl. ¶¶ 5, 8–10, 22–23. Smiths would not have reopened manufacturing it no longer considered profitable without UTC's up-front investments and purchase guarantee. Stamp Decl. ¶ 25.[12]



---

[12] Plaintiffs' characterization of UTC's investment ▮▮▮▮▮▮▮▮▮▮▮▮ rather than a capital expenditure is a distinction without a difference. Mot. at 33. Either way, Smiths would not have agreed to the deal without it. Stamp Decl. ¶¶ 25, 39.

Plaintiffs' argument is an artificial attempt to limit the Court's inquiry to 2019 agreements—and disregard the output-enhancing arrangement of which they are part and parcel. Plaintiffs ignore the text of the Supply Agreement and its amendments confirming Defendants' purpose. *See, e.g.*, Exs. 67 & 202 § 7 ("In order to ensure supply is available for use in connection with Remodulin drug product"); Ex. 56 ("to ensure that such Pumps and Cartridges would be available for use with Remodulin"). Plaintiffs also ignore that Smiths contemporaneously recognized restrictions for Remodulin use before and after agreements were signed in March 2016 and July 2017. *See* Ex. 264 (January 2016: "Restrict sales of 3ml cartridge to US/CAN Remodulin patients to extend supply until 2022."); Ex. 69 (October 2016: "We didn't agree to the UT exclusivity of the remaining 3mL cartridges until March 2016 when we signed the Supply Agreement."), Ex. 462 (November 2017: "We have a limited supply of the plastic resin for the 3mL cartridge, which is now wholly allocated to the [UTC] supply agreement, which restricts these 3mL cartridges to be sold to Remodulin-only through ███████

████ ). And Plaintiffs fail to recognize that UTC would not have done the deal without such restrictions. Benkowitz Decl. ¶¶ 6–8. Cartridges exist today because of exclusivity guarantees that began with the 2016 Supply Agreement.

## 2. Defendants' Procompetitive Conduct Deterred Free Riding.

Defendants' restrictions also prevented others from free riding off UTC's

31

supply. Vertical restrictions induce investments that otherwise might be deterred due to "'the so-called 'free rider' effect.'" *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724–25 (1988); *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55 (1977) (manufacturers may restrict distributors to combat the "'free rider' effect").[13] Entitling free riding by competitors that do nothing to invest in output or assume risk discourages innovation and diligent planning.

In *Gemini Concerts, Inc. v. Triple-A Baseball Club Associates*, 664 F. Supp. 24 (D. Me. 1987), a concert promoter invested in creating a new concert arena at a ballpark, and secured exclusive rights to hold concerts there. The court recognized its "legitimate interest in preventing its competitors from taking a free ride on its investment." *Id.* at 27. Defendants' agreements here likewise made "'possible the very activity that is allegedly restrained'": distribution by a manufacturer that would have discontinued aging products. *Id.* Neither UTC nor Smiths was obliged to part with supplies that exist only by their investment, foresight, and diligence. ██████████████████████████████████████████████ *See Race Tires*, 614 F.3d at 79, 82 (considering exclusivity evidence of movant's

---

[13] Contrary to Plaintiffs' suggestion, Mot. at 33–34, courts have found efforts to prevent "interbrand" competitors from free riding to be procompetitive. *See, e.g., Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1234 & n.17 (5th Cir. 1987). Here, preventing free riding will promote competition as Plaintiffs develop their own subcutaneous devices—increasing innovation, alternatives, and supply, and lowering prices.

32

"prior conduct" and industry's "generally accepted practice").

. By Plaintiffs' own logic, UTC's

protection of its investment in Remodulin patients is procompetitive.[14]

### 3. Plaintiffs Cannot Show a Viable Less Restrictive Alternative.

Because Defendants' agreements had procompetitive effects, Plaintiffs

cannot succeed on a § 2 claim, *Race Tires*, 614 F.3d at 75, nor can they meet their

burden on a § 1 claim to prove "that there exists a viable less restrictive

---



[14] Regardless, the evidence is tautological—of course, exclusive dealing arrangements exclude—but exclusivity is not itself anticompetitive. *Race Tires*, 614 F.3d at 76. Excluding ███████, or anyone else from using UTC's cartridges does not mean that a would-be competitor could not compete by securing its own, and that is the relevant inquiry.

alternative." *United States v. Brown Univ.*, 5 F.3d 658, 679 (3d Cir. 1993). Defendants need not deploy "the least restrictive alternative." *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1248 (3d Cir. 1975). Courts consider whether conduct "is 'fairly necessary' in the circumstances of the particular case, or whether the restriction 'exceed(s) the outer limits of restraint reasonably necessary to protect the defendant.'" *Id.* at 1248–49.

Plaintiffs' only proposed alternative, that ████████████████████ ████████████████████████████████████████ ██████████████████████ is counterfactual. Plaintiffs do not say when Smiths could have raised the price—it could not have done so after 2016, when the Supply Agreement fixed the price, *see* Ex. 67 (Ex. A) ("████ per Cartridge"), and even absent the Agreement, a higher price would be unjustified because numerous alternatives existed for UTC—Smiths's primary customer and only investor in increased output—to obtain cartridges, *supra* Part II.A. Plaintiffs also do not say when Smiths could have purchased more of the resin it uses to make cartridges, ignoring that Smiths failed to locate more of it after searching. Walker Dep. 46:9–25. Even if Smiths could take either step, Plaintiffs' speculation it can ████████ ██████ is unsupported, and contrary to Smiths's analysis that it maximized profits by discontinuing the CADD-MS 3 and focusing on other products. Quinn Decl. ¶¶ 6–9, 15; Stamp Decl. ¶ 7. Plaintiffs' hypothetical is unfounded and would visit

34

harm upon consumers via increased prices just to protect less efficient competitors. *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 470 (S.D.N.Y. 1996) (refusing "to require businesses to price their products at unreasonably high prices . . . so that less efficient competitors can stay in business").

Without proposing an alternative, Plaintiffs also quibble about ███████████ ████████████████████████████████████████████████████ ████████████████████████. Mot. at 34. It is rich for Plaintiffs to attack UTC as too conservative in planning for patients suffering from a life-threatening disease considering Plaintiffs' cavalier failure over seven years to secure any delivery platform.[15] UTC ultimately funded production of a ten-year supply of cartridges to match the useful life of its pumps; as it became possible for Smiths to manufacture additional cartridges, UTC agreed to underwrite the additional output. Rhodes Decl. ¶¶ 6, 8, 12. That was consistent with patient-focused efforts to maintain buffer inventories, to account for difficulty in forecasting cartridge use, and above all, to create additional, useful supply. *Id.* ¶ 12.

## C.  Plaintiffs Cannot Prove a Relevant Antitrust Market.

Plaintiffs also cannot show that Defendants possess market or monopoly

---

[15] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ UTC cannot afford to underestimate patient needs. *Id.*

power in a properly defined relevant market. *Race Tires*, 614 F.3d at 74 (§ 1 claim requires proof of either "actual anti-competitive effects" or "the defendant's market power"); *id.* at 75 (§ 2 monopolization claim requires "'the possession of monopoly power in the relevant market'").

Plaintiffs and their economist attempt a short cut, contending they can show harm to competition without needing to define a market by presenting "direct evidence." Mot. at 20–22; Rao Rpt. ¶ 91. But only unmistakable evidence of both "supracompetitive prices and restricted output" can obviate the need to define an antitrust market. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007); *see BanxCorp v. Bankrate, Inc.*, 2019 WL 2098842, at *4 (D.N.J. 2019) (requiring evidence of both). Such evidence is "rarely available," *Mylan*, 838 F.3d at 434, and this is not that rare case. ████████████████

████████████████████████████████████████

████████████████████████ and Plaintiffs offer no evidence of any output reduction in their asserted treprostinil "market."[17]

---

[16] Plaintiffs' assertion that ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

[17] ████████████████████████████████████████████

████████████████████████████████████████████

36

Absent "direct evidence," Plaintiffs must prove the contours of the relevant antitrust market. But Plaintiffs' asserted definition—the sale of treprostinil for use by subcutaneous injection—is a gerrymandered market that finds no support in the record. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) ("[N]o court has defined a relevant product market with reference to the particular contractual restraints of the plaintiff."). Plaintiffs fail to meet their burden to provide expert analysis to support this artificial market definition. *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 526 (W.D. Pa. 2019). That alone is fatal to their claims. *Id.*

Plaintiffs could not support their definition in any event. Their attempt to exclude all other prostacyclins fails because prostacyclins have overlapping indications and physicians prescribe them to all patient classes.[18] Gaier Rpt. ¶¶ 175–176; Roberts Dep. 71:3–15; 80:12–21; 109:16–111:7; Waxman Decl. ¶¶ 22, 32–33; Waxman Dep. 122:6–17. ███████████████ ███████████ Ex. 349. Nor can the market exclude drugs delivered via intravenous injection, which would ignore evidence of substantial switching

---

[18] Plaintiffs' alternative market definition consisting solely of "injected prostacyclins," Mot. at 25–28, is invalid for similar reasons, including because switching among Remodulin and non-injected prostacyclins is prevalent. Gaier Rpt. ¶¶ 175–84 & Figs. 12, 13, 14, 15, 16.

37

between subcutaneous and intravenous uses—the clearest indication possible that the two compete in the same market. Gaier Rpt. ¶ 170 & Fig. 11; Waxman Dep. 127:13–16; 141:10–20. UTC sells vials of treprostinil, and does not distinguish between subcutaneous and intravenous uses in sales or pricing. Benkowitz 30(b)(6) Dep. 14:20–15:3; Benkowitz Dep. 54:24–55:11; Rhodes Dep. 43:9–23.

██████████████████████████████

### D.  Both Plaintiffs Lack Antitrust Standing.

Plaintiffs have no antitrust standing. Neither can show antitrust injury when any harm was self-inflicted. *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 164 (3d Cir. 2017). And RareGen, as an intermediary, is not a proper party. *Id.*

### 1.  Neither Plaintiff Suffered Antitrust Injury from Inaction.

Neither Sandoz nor RareGen can prove antitrust injury because they cannot show that "but for" Defendants' conduct, Plaintiffs would have obtained cartridges for launch. *Id.* at 166. Courts assess whether alleged antitrust violations deprived plaintiffs of an "opportunity to compete" for supply. *Race Tires*, 614 F.3d at 83–84. When plaintiffs have an opportunity to secure supply, but fail to do so, there exists no "harm to competition." *Id.* at 83; *see Van Dyk Research Corp. v. Xerox Corp.*, 478 F. Supp. 1268, 1327 (D.N.J. 1979) (plaintiff "failed to prove that it was prevented from securing adequate financing by any alleged unlawful conduct").

As detailed above, Defendants did not deprive any competitor of the

opportunity to obtain cartridges; instead, Plaintiffs' plight is a product of their own inaction. *See* Parts I.D, II.A. Sandoz failed to avail itself of an "opportunity to compete." 614 F.3d at 84. Had Defendants been as inert as Plaintiffs, cartridges would have run out by February 2019 and would not have been available when Sandoz launched a month later. Ex. 265.

## 2. RareGen Is Not a Proper Party To Assert Antitrust Claims.

As briefed in Defendants' motion to dismiss, Plaintiff RareGen also fails to establish antitrust standing because ██████████████████████████ ██████████ Dkt. 53, at 15–17; Dkt. 59, at 11–13. In the "highly regulated pharmaceutical market in this country," a plaintiff lacks standing when "customers in the United States cannot purchase the drug at issue from [plaintiff]." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 235 (3d Cir. 2013).

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████ Thus, RareGen is not a proper party to assert antitrust claims against UTC or Smiths.

## III. The Balance of Equities and Public Interest Factors Also Weigh in Defendants' Favor.

Even if the Court finds it necessary to consider additional factors, both the

39

equities and public interest favor Defendants. These two factors are intertwined because depriving UTC and Smiths of the benefit of their bargain is grossly unfair to them given their substantial investments, and has broader adverse ramifications given the "important public interest in encouraging innovation in the pharmaceutical industry." *Mylan*, 838 F.3d at 440.

UTC had foresight, exercised diligence, and made investments in a delivery platform. Allowing Plaintiffs to free ride on those investments would thwart the "procompetitive or efficiency-enhancing effects of rigorous competition." *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n*, 2005 WL 3988699, at *3 (D.N.J. 2005). If others could buy up UTC's run of cartridges, UTC would have funded thousands of pumps without the cartridges to operate them—an absurd partitioning of its bargain, because pumps are useless without cartridges. Plaintiffs' request to preclude any future purchases that "impede competition," Dkt. 106-2, also would entangle Smiths or, likely, the Court in meting out cartridges among competitors. Plaintiffs' position is but a naked bid to expropriate Defendants' industriousness for themselves.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

Respectfully submitted,

/s/ Stephen M. Orlofsky                    October 25, 2019
Stephen M. Orlofsky

**BLANK ROME LLP**                         **WILLIAMS & CONNOLLY**
A Pennsylvania LLP                         Edward J. Bennett (*pro hac vice*)
Stephen M. Orlofsky                        Edward C. Barnidge (*pro hac vice*)
Adrienne C. Rogove                         Jonathan B. Pitt (*pro hac vice*)
*New Jersey Resident Partners*             C. Bryan Wilson (*pro hac vice*)
Michael R. Darbee                          725 Twelfth Street NW
300 Carnegie Center, Suite 220             Washington, DC 20005
Princeton, NJ 08540                        Telephone: (202) 434-5000
Telephone: (609) 750-2646                  Facsimile: (202) 434-5029
Facsimile: (609) 897-7286                  EBennett@wc.com
Orlofsky@BlankRome.com                     EBarnidge@wc.com
Rogove@BlankRome.com                       JPitt@wc.com
MDarbee@BlankRome.com                      BWilson@wc.com

*Attorneys for Defendant United Therapeutics Corporation*

/s/ Frederick L. Whitmer                   October 25, 2019
Frederick L. Whitmer

**KILPATRICK TOWNSEND & STOCKTON LLP**
Frederick L. Whitmer                       Peter M. Boyle (*pro hac vice*)
The Grace Building                         Patrick J. Pascarella (*pro hac vice*)
1114 Avenue of the Americas                Christina E. Fahmy (*pro hac vice*)
New York, NY 10036                         607 14th Street NW
Telephone: (212) 775-8773                  Washington, DC 20005
Facsimile: (212) 775-8821                  Telephone: (202) 508-5800
fwhitmer@kilpatricktownsend.com            Facsimile: (202) 585-0057
                                           pboyle@kilpatricktownsend.com
                                           ppascarella@kilpatricktownsend.com
                                           cfahmy@kilpatricktownsend.com

*Attorneys for Defendant Smiths Medical ASD, Inc.*