**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SANDOZ INC. and RAREGEN, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED THERAPEUTICS CORPORATION and SMITHS MEDICAL ASD, INC.,<br><br>Defendants. | Case No. 3:19-cv-10170-BRM-LHG<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendant United Therapeutics Corporation's ("UTC") Motion to Dismiss Count 7 of Plaintiff Sandoz Inc.'s ("Sandoz") Amended Complaint. (ECF No. 179.) Sandoz opposes the Motion. (ECF No. 184.) Having reviewed the submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, UTC's Motion to Dismiss is **DENIED.**

## I. BACKGROUND

### A. Factual Background

For the purposes of deciding this Motion to Dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to the Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Further, the Court also considers any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig.*

*Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

This action stems from a Settlement Agreement (the "Agreement") dated September 29, 2015, between Sandoz and UTC. (Am. Compl. (ECF No. 178) ¶¶ 8, 39.)[1] Sandoz is a Colorado corporation that sells generic and biosimilar medicines, and has a principal place of business in Princeton, New Jersey. (*Id.* ¶ 9.) UTC is a Delaware biotechnology company that markets and sells four commercial drugs in the United States to treat pulmonary arterial hypertension ("PAH"), with its principal place of business in Silver Spring, Maryland. (*Id.* ¶ 11.)

PAH is a disease "that causes high blood pressure in the arteries that run from the heart to the lungs." (*Id.* ¶ 2.) The New York Heart Association has created four classes of PAH patients which are organized by the severity of the PAH patient's symptoms. (*Id.* ¶ 19.) Class I patients have no observable symptoms, while Class II patients experience symptoms when active. (*Id.*) Class III patients experience symptoms even when resting, and Class IV patients "are severely affected by PAH at all times." (*Id.*) Doctors typically prescribe treprostinil injections for Class III and IV patients. (*Id.* ¶ 20.) Remodulin, a drug marketed and sold by UTC, is an injectable form of treprostinil. (*Id.* ¶ 21.) The drug can be administered through injection under the patient's skin (*i.e.*, a subcutaneous injection) or through injection directly into the patient's veins (*i.e.*, an intravenous injection). (*Id.*) UTC estimates "more than half of the patients being treated for PAH with Remodulin are receiving Remodulin through subcutaneous injections, and subcutaneous injection is the preferred method of administration for new patients." (*Id.*) PAH patients that are

[1] While RareGen, LLC and Smiths Medical ASD, Inc. are also parties to this action, they were not parties to the Agreement Sandoz is claiming UTC breached. RareGen, LLC and Sandoz are not both alleging breach of contract. Sandoz clarifies in its Amended Complaint that its breach of contract claim is "a separate claim" arising under "a 2015 Settlement Agreement between United Therapeutics and Sandoz." (ECF No. 178 ¶ 8.) On November 13, 2020, Sandoz and RareGen, LLC settled their claims against Smiths Medical ASD, Inc. (ECF No. 247.)

prescribed subcutaneous treprostinil injections receive their Remodulin injections exclusively through the CADD-MS 3 pump, manufactured by Smiths. (*Id.* ¶ 22.) Currently, there are no other medical devices that can be used to administer subcutaneous treprostinil injections in the United States, leaving patients with no other option than to use Smiths' pump. (*Id.* ¶ 23.) Additionally, PAH patients need a physician's prescription to receive treprostinil, and those prescriptions can only be filled by either Accredo Health Group ("Accredo") or CVS Specialty Pharmacy ("CVS Specialty"). (*Id.* ¶ 24.)

In 2011, Sandoz submitted an Abbreviated New Drug Application ("ANDA") to the FDA requesting permission to market a generic version of treprostinil in both subcutaneous and intravenous injections. (*Id.* ¶ 36.) After Sandoz filed its ANDA, UTC sued Sandoz claiming that its patents were infringed by the generic version of treprostinil. (*Id.* ¶ 38.) On September 29, 2015, the parties settled their patent litigation. (*Id.* ¶ 39.) The resulting Settlement Agreement is the subject of this litigation.

Under the Agreement, the parties stipulated Sandoz could begin marketing its generic treprostinil alternative in June 2018. (*Id.*) Additionally, under Section 11(b) of the Agreement, UTC agreed "[n]ot to take any action directly or indirectly to prevent, delay, limit, or otherwise restrict the launch, manufacture, use, sale, offer for sale, importation or distribution of the Sandoz ANDA Product in or for the Territory by Sandoz and its Affiliates as permitted under the terms of this Agreement." (ECF No. 180-1 at 11-12.) And under Section 15(a) of the Agreement, UTC agreed that it would not

> initiate or otherwise undertake any activity in the Territory, directly or indirectly, against the Sandoz ANDA or the Sandoz ANDA Product to . . . interfere with Sandoz's efforts to launch the Sandoz ANDA Product in the Territory as of the Effective Launch Date under the terms provided by this Agreement.

(*Id.* at 14.) Lastly, Section 13(c) of the Agreement specifies that "[n]othing in this agreement shall be construed to grant any right to any Third Party proprietary technology, including Remodulin Implantable System, the DEKA pre-filled semi-disposable pump system, any other pump or delivery system for the Sandoz ANDA Product or any other form of treprostinil." (*Id.* at 12.)

In November 2017, the FDA approved Sandoz's ANDA for generic treprostinil, for both subcutaneous and intravenous injections. (ECF No. 178 ¶ 41.) In August 2018, Sandoz and RareGen, LLC entered into an agreement to market and sell generic treprostinil for subcutaneous and intravenous injections. (*Id.* ¶ 48.) And by late 2018, Sandoz and RareGen, LLC were preparing to launch the generic treprostinil. (*Id.* ¶ 49.)

However, in December 2018, in an attempt to protect its market-share from the threats of a new generic version of its branded drug, Smiths, at UTC's direction, "began telling specialty pharmacies that it would not sell CADD-MS 3 cartridges for use with generic treprostinil injections," like those produced by Sandoz and RareGen, LLC. (*Id.* ¶ 50.)

Furthermore, "Smiths told Accredo and CVS Specialty that any additional cartridges they obtained could only be used with Remodulin." (*Id.*) Smiths also sold all of its remaining cartridges to UTC, giving UTC access to enough cartridges to supply the entire market. (*Id.* ¶ 52-54.) This supply is dedicated solely to Remodulin, which "blocks generic entry and maintains high prices for Remodulin." (*Id.* ¶ 53.) Because of UTC's actions, "Sandoz has been unable to sell generic treprostinil to Accredo and CVS for subcutaneous treatments." (*Id.* ¶ 120.) Instead, Sandoz is limited to making its generic treprostinil available for use intravenously, the lesser preferred method of injection. (*Id.*)

### B. Procedural History

On April 16, 2019, Plaintiffs Sandoz and RareGen, LLC, filed their Complaint, asserting six claims against all Defendants, United Therapeutics Corporation and Smiths Medical ASD, Inc., for (1) restraint of trade under 15 U.S.C. §1 (Count One), (2) monopolization under 15 U.S.C. § 2 (Count Two), (3) restraint of trade under N.J. Stat. Ann § 56:9-3 (Count Three), (4) restraint of trade under N.C. Gen. Stat. §75-1 (Count Four), (5) unfair trade practices under N.C. Gen. Stat § 75-1.1 (Count Five), and (6) tortious interference with prospective economic advantage (Count Six). (ECF No. 1.) On May 24, 2019, Defendants filed their Motion to Dismiss. (ECF No. 53.) On June 17, 2019, Plaintiffs filed their Opposition. (ECF No. 56.) On June 24, 2019, Defendants field their Reply. (ECF No. 59.) On October 4, 2019, Sandoz moved for a preliminary injunction. (ECF No. 106.) On October 25, 2019, UTC filed an Opposition. (ECF No. 122.) The Court issued an opinion denying both the Motion for a Preliminary Injunction and Motion to Dismiss. (ECF No. 168.)

On February 12, 2020, Defendants answered the Complaint. (ECF No. 171.) On March 30, 2020, the Court entered a consent order allowing Plaintiffs to file a First Amended Complaint. (ECF No. 177.) On the same day, Plaintiffs filed their First Amended Complaint (ECF No. 178) in which Sandoz asserted a breach of contract claim against UTC arising from its alleged failure to carry out its obligations under the 2015 Settlement Agreement (Count Seven). (*Id.* ¶ 107-21.) On April 17, 2020, Defendants filed a Motion to Dismiss Count Seven of Plaintiff's First Amended Complaint. (ECF No. 179, 181.) On May 11, 2020, Plaintiffs filed an Opposition to Defendants' Motion to Dismiss. (ECF No. 184.) On May 18, 2020, Defendants filed their Reply to Plaintiffs' Opposition. (ECF No. 187.)

## II.	LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *Burlington Coat Factory*, 114 F.3d at 1426 (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).[2]

[2] Sandoz did not attach the Agreement to its Amended Complaint. (*See* ECF No. 178.) However, courts in this Circuit have held that documents may be considered in addressing a defendant's motion to dismiss if those documents are "quoted from" and "relied on" by plaintiffs in their complaint. *See, e.g.*, *Young v. Johnson & Johnson*, 2012 WL 1372286, at *3 n.3 (D.N.J. Apr. 19, 2012), *aff'd*, 525 F. App'x 179 (3d Cir. 2013). Here, Sandoz relies on and quotes from the Agreement throughout its Amended Complaint. (ECF No. 178 ¶¶ 8, 39-40, 111-14, 116-21.) Accordingly, the Court considers this Agreement as it is "integral or explicitly relied upon" in the Amended Complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

## III. DECISION

UTC contends Sandoz has failed to state a claim for breach of contract because "the plain language of the Agreement refutes Sandoz['s] theory by expressly disclaiming new duties relating to delivery devices." (ECF No. 181 at 2.) UTC argues that defined terms contained within the Agreement preclude it from breaching the contract. (*Id.* at 10-11.) It notes "the Sandoz ANDA Product" is defined to apply only to the generic drug and "expressly [does] not include . . . any technology associated with any UTC product(s)." (*Id.* at 11.) UTC also points to Section 13(c) of the Agreement, which states "[n]othing in this agreement shall be construed to grant any right to any Third Party proprietary technology," including the pumps and delivery systems used for Sandoz's generic drug. (ECF No. 181-1 at 9.) UTC states these provisions and definitions "reveal the parties' intent in the Agreement to exclude any rights with respect to delivery devices." (ECF No. 181 at 12.) As a result, UTC argues its acquisition of "enough cartridges to supply the entire market" (ECF No. 178 ¶ 53) does not amount to a sufficient allegation for breach of contract.

Sandoz argues UTC breached two provisions of the Agreement, both of which prohibit UTC from negatively impacting the launch of Sandoz's generic treprostinil. (ECF No. 178 ¶¶ 113-14.) Sandoz contends UTC breached these provisions by restricting the availability of the cartridges needed to administer treprostinil subcutaneously and preventing cartridges from being used with generic treprostinil. (ECF No. 178 ¶ 118.) For the reasons set forth below, the Court agrees with Sandoz.

"A party alleging a breach of contract satisfies its pleading requirement if it alleges (1) a contract; (2) breach of that contract; (3) damages flowing therefrom; and (4) that the party performed its own contractual duties." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 210 F. Supp. 2d 552, 561 (D.N.J. 2002) (citations omitted).

Sandoz alleges in its Amended Complaint that "Sandoz and United Therapeutics entered into a valid and binding contract in the form of the Settlement Agreement." (ECF No. 178 ¶ 116.) UTC does not attack the adequacy of this allegation; it relies on the Agreement to argue its terms prohibit Sandoz from properly alleging a breach of contract. (ECF No. 181 at 8-12.) Therefore, Sandoz has properly alleged the first element of its breach of contract claim. Additionally, Sandoz properly alleges it would incur damages flowing from UTC's breach by stating "[UTC's] breach of contract has caused and will cause Sandoz to suffer damages." (ECF No. 178 ¶ 121.) Further, Sandoz properly alleges that it performed its own obligations by noting "Sandoz coordinated with [UTC] to effectuate the dismissals needed to resolve the patent litigation" and "Sandoz also honored its obligations not to market generic treprostinil before the agreed effective launch date and not to impermissibly challenge the licensed patents' validity or enforceability." (*Id.* ¶ 117.) Accordingly, because Sandoz sufficiently pled three of the four elements for a breach of contract claim, the only issue is whether Sandoz properly alleged breach of the Agreement by UTC.

Sandoz alleges that two provisions of the Agreement were breached: Section 11(b) and Section 15(a). (ECF No. 178 ¶ 113-14.) Section 11(b), provided in full above, states UTC cannot take any action to restrict the launch of Sandoz's generic drug. (ECF No. 180-1 at 11.) Section 15(a), also provided above, states UTC cannot undertake any activity to interfere with Sandoz's efforts to launch its generic drug. (*Id.* at 14.)

In its Amended Complaint, Sandoz alleges UTC breached both Section 11(b) and 15(a) of the Agreement by "causing Smiths to threaten to withhold CADD-MS 3 cartridges from Accredo and CVS Specialty until the pharmacies acquiesced and agreed to sign contracts designed to block Sandoz's generic treprostinil from competing with Remodulin." (ECF No. 178 ¶ 119.) Additionally, Sandoz states "[UTC] also entered into agreements with Smiths, Accredo, and CVS

Specialty that made [UTC] the sole distributor of CADD-MS 3 cartridges and prohibited Accredo and CVS Specialty from dispensing cartridges with generic treprostinil." (*Id.*) By limiting access to cartridges, Sandoz alleges, UTC took "calculated steps that restricted and interfered with the launch of Sandoz's competing generic" which "breached the terms of the Settlement Agreement causing substantial injury to Sandoz." (*Id.* ¶ 8.)

When interpreting a contract, like this Agreement, "a court must determine the intention of the parties as revealed by the language in the agreement." *Gordon v. United Continental Holding, Inc.*, 73 F. Supp. 3d 472, 479 (D.N.J. 2014) (citing *Globe Motor Co. v. Igdalev*, 139 A. 3d 57, 65 (N.J. 2016)). Under New Jersey's rules for contract interpretation, "the terms of an agreement are to be given their plain and ordinary meaning." *Gordon*, 73 F. Supp. 3d at 479 (quoting *M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 794 A.2d 141 (N.J. 2002)).

To settle their 2015 patent litigation, UTC and Sandoz exchanged a series of promises, which are embodied in the Agreement. UTC made explicit promises to Sandoz in Section 11 of the Agreement. (ECF No. 180-1 at 12.) In Section 11(b), UTC promised not to interfere with the launch of the Sandoz ANDA Product. (*Id.* at 12-13.) In Section 12, Sandoz promised not to market or sell the Sandoz ANDA Product before the effective launch date or "challenge . . . the validity or enforceability" of the patents for the Sandoz ANDA Product. (*Id.*) Based on the language of the Agreement, the parties appear to have intended that Sandoz was entitled to an unimpeded launch of its generic drug, so long as it waited until the effective launch date and did not attack the validity of UTC's patents related to the Sandoz ANDA Product. By stating that UTC "placed artificial restrictions on Smiths' cartridges to ensure they can only be used to administer injections of the brand-name treprostinil drug supplied by [UTC]" and "instructed pharmacies dispensing treprostinil that they are prohibited from purchasing or dispensing Smiths' cartridges for use with

generic treprostinil," Sandoz properly alleged UTC breached its promise by impeding the generic drug's launch (ECF No. 178 ¶ 4.) Because Sandoz has sufficiently alleged all four elements of a breach of contract claim, it has properly stated a claim.

UTC points out that "the Sandoz ANDA Product" refers only to the generic drug itself and not the cartridges needed to administer the drug subcutaneously. (ECF No. 181 at 11.) However, by taking efforts to become the "sole distributor" of cartridges and entering into agreements with pharmacies to prevent cartridges from being used with generic treprostinil, UTC interfered with the launch of Sandoz's generic treprostinil and breached the Agreement. UTC's reliance on Section 13(c) is also unpersuasive. Section 13(c) merely states that the Agreement does not provide Sandoz with any rights to technology like the pumps or cartridges needed to administer treprostinil. Sandoz is not claiming a right to the pumps or cartridges, it is claiming a right to launch its generic drug without interference or limitation by UTC.

Accordingly, UTC's Motion to Dismiss Count Seven of the Amended Complaint is **DENIED.**

## IV. CONCLUSION

For the reasons set forth above, UTC's Motion to Dismiss is **DENIED**. An appropriate order will follow.

**Date: November 18, 2020**

***/s/ Brian R. Martinotti___________***
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**