**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SANDOZ INC. and RAREGEN, LLC,<br><br>                Plaintiffs,<br><br>      v.<br><br>UNITED THERAPEUTICS CORPORATION<br><br>                Defendant. | Case No. 2:19-cv-10170 (BRM) (JSA)<br><br>**REDACTED OPINION** ~~TEMPORARILY FILED UNDER SEAL~~ |

**MARTINOTTI, DISTRICT JUDGE**

      Before this Court is Plaintiff Sandoz Inc.'s ("Sandoz") Motion to Dismiss Defendant United Therapeutics Corporation's ("UTC") First Counterclaim for Fraudulent Concealment. (ECF No. 264.) UTC opposes the Motion. (ECF No. 273.) Having reviewed the submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Sandoz's Motion to Dismiss is **GRANTED**.

      **I.**      **BACKGROUND**

           **A.**      **Factual Background**

      The underlying facts are set forth at length in this Court's November 18, 2020 Opinion. (*See* ECF No. 251.) In the interest of judicial economy, the Court refers the parties to that Opinion for a full recitation of the factual background of this dispute, as the Court will only provide the facts relevant to UTC's counterclaim.



UTC alleges, "[p]rior to January 1, 2019, Sandoz was aware that its employees and officers used their Sandoz-issued mobile phones to send and receive text and other messages relating to their work at Sandoz." (*Id.* ¶ 17.) ██████████████████████████████████████████████████████████████████████████████████████ (*Id.* ¶ 18.) On April 16, 2019, Sandoz and RareGen filed this lawsuit, and "[s]ome employees at Sandoz with knowledge relevant to this litigation case were added to a litigation hold on April 12, 2019." (*Id.* ¶¶ 21–22.) ████████████████████████████████████████████████████████████████████████████████ (*Id.* ¶ 23.) UTC alleges Sandoz violated its internal policies by failing to preserve the relevant documents of at least three of its executives: Executive 1, Executive 2, and Executive 3. (*Id.* ¶ 24.)

---

[1] UTC's counterclaim is only asserted against Sandoz, not RareGen. (ECF No. 258 at 31 ("UTC asserts the following counterclaim against Plaintiff Sandoz.").)

Executive 1 was previously the Director of Specialty Pharmacy at Sandoz and was added to the April 12, 2019 litigation hold. (*Id.* ¶ 25.) UTC alleges Executive 1 "used her cell phone to text colleagues at Sandoz regarding matters relevant to the claims and defenses in this case," and the text messages on her phone "contained Sandoz Business Information relevant to this litigation," as they were used "as exhibits to depositions and in briefing related to [its] motion for a preliminary injunction in 2019." (*Id.* ¶¶ 26–28.) UTC asserts Executive 1 "changed the settings on her Sandoz-issued phone to auto-delete text messages approximately four months after Plaintiffs filed" their lawsuit. (*Id.* ¶ 29.) Because of these alleged deletions, UTC claims Sandoz failed to control the settings on the phones it issued to employees, despite having the right to do so. (*Id.* ¶ 30.)

According to UTC, Sandoz was aware Executive 1 had relevant text messages on her Sandoz-issued phone in 2019 and was required under its internal policies and the litigation hold, "to preserve the text messages stored on" Executive 1's phone, but instead, allowed the text messages to be destroyed. (*Id.* ¶¶ 31–32.) In approximately August 2019, Executive 1 changed the auto-deletion setting on her Sandoz-issued phone, and when her phone "was imaged for this litigation on July 15, 2020, Sandoz's outside counsel discovered she had activated the auto-deletion setting" on her Sandoz phone. (*Id.* ¶¶ 33, 35.) UTC alleges "Sandoz claims that approximately two weeks after the Sandoz-owned phone was imaged, [Executive 1] reported that her cell phone was missing." (*Id.* ¶ 36.)

Executive 2 "was Sandoz's Associate Director for U.S. Pipeline and Launch Management and was involved in the launch of generic treprostinil," "was the project lead for the treprostinil launch team since at least 2016," and "was regarded as a 'key person within the team' charged with launching generic treprostinil at Sandoz." (*Id.* ¶ 38.) Executive 2 "used his Sandoz-issued cell

3

phone to text colleagues at Sandoz concerning generic treprostinil leading up to" the launch of generic treprostinil, which occurred in March 2019. (*Id.* ¶ 39.) Executive 2 was also subject to Sandoz's April 12, 2019 litigation hold, but "left his employment with Sandoz on April 29, 2019 and returned his Sandoz-issued phone to the company." (*Id.* ¶ 41.) UTC alleges while "Sandoz was required to preserve the text messages" stored on Executive 2's phone pursuant to its policies and the litigation hold, Sandoz "wiped Executive 2's cell phone and failed to preserve any of his text messages." (*Id.* ¶¶ 42–43.)

Executive 3 "is Sandoz's Executive Director of Finance" and "played an important role relating to Sandoz's decision [about] when and how to [] launch generic treprostinil." (*Id.* ¶ 44.) Unlike Executives 1 and 2, Executive 3 was not added to the Sandoz litigation hold "until almost one year after Sandoz issued its April 12, 2019 hold." (*Id.* ¶ 45.) Executive 3, along with other senior Sandoz executives, "evaluated various launch scenarios for generic treprostinil, including whether Sandoz should delay the launch until Sandoz was fully prepared to reach all patients using infused treprostinil." (*Id.* ¶ 48.) Executive 3 "and a small number of senior Sandoz executives concluded that Sandoz should launch generic treprostinil, in Sandoz's words, 'IV Only.'" (*Id.* ¶ 49.) UTC alleges Executive 3 "used his Sandoz-issued cell phone to text colleagues at Sandoz concerning the launch of generic treprostinil," and his phone "contained Sandoz Business Information relevant to this litigation." (*Id.* ¶¶ 52–53.) Sandoz did not include Executive 3 on its litigation hold "despite being aware of his role in deciding to launch generic treprostinil 'IV Only.'" (*Id.* ¶ 55.)

In June 2019, Executive 3 was issued a new Sandoz phone and UTC alleges "in or around June 2019, Sandoz destroyed the text messages from [Executive 3's] previous Sandoz-issued phone." (*Id.* ¶ 57.) UTC asserts "Sandoz did not attempt to collect text messages from [Executive

4

3] until August 2020." (*Id.* ¶ 58.) Sandoz's alleged deletions from Executives 1, 2, and 3 "caused the loss of valuable evidence." (*Id.* ¶ 59.) UTC, on information and belief, alleges the evidence destroyed by Sandoz would have established:

> (1) Sandoz failed to investigate or secure non-CADD-MS 3 delivery devices despite knowing the supply limitations of the CADD-MS 3 system; (2) Plaintiffs launched generic treprositnil without first undertaking important preparatory work; (3) Sandoz launched generic treprostinil despite knowing that Sandoz's failure to prepare would cause (and did cause) the harms of which it now complains; and (4) Sandoz launched generic treprostinil despite knowing that patients, healthcare providers, payers, and other actors critical to the successful launch of generic treprositnil would view Sandoz's decision to launch "IV Only" negatively, and that those views would significantly hinder the financial prospects of the launch.

(*Id.* ¶ 60.)

UTC asserts it "could not have obtained access to the text message communications from another source" and "has not been able to access (1) the hundreds of text messages deleted from [Executive 1's] Sandoz-issued phone; (2) the text messages deleted from [Executive 2's] Sandoz-issued phone; and (3) the text messages deleted from the Sandoz-issued phone used by [Executive 3] prior to June 2019." (*Id.* ¶ 77.) On information and belief, UTC submits "Sandoz knew prior to April 2019 that Sandoz employees who worked on the launch of generic treprostinil used their Sandoz-issued phones to communicate about issues concerning generic treprostinil." (*Id.* ¶ 81.) Despite knowledge of this practice, UTC alleges Sandoz chose not to search Executive 2 and 3's phones until after Executive 2 ended his employment at Sandoz and Executive 3 received a new phone and "intentionally destroyed the data from the Sandoz-issued cell phones" of Executives 2 and 3. (*Id.* ¶¶ 82–83.) UTC alleges "Sandoz intentionally declined to search the phones of Sandoz Executive 2 and Sandoz Executive 3 until after their phones had been erased in order to deprive

5

UTC of the information contained on those devices." (*Id.* ¶ 84.) Additionally, UTC asserts Executive 1, acting as an agent of Sandoz, "switched her phone settings to auto-delete text messages in order to prevent UTC from obtaining additional text messages harmful to Sandoz's claims in this litigation and helpful to UTC's defenses," and "Sandoz allowed the destruction of the relevant evidence contained on [Executive 1's] Sandoz-issued phone in order to prevent UTC from obtaining additional text messages harmful to [its] claims . . . and helpful to UTC's defenses." (*Id.* ¶¶ 85–87.) UTC further alleges "Sandoz intentionally delayed searching [Executive 1's] Sandoz-issued phone until July 2020—over a year after this litigation began—with the intent of depriving UTC of relevant evidence." (*Id.* ¶ 88.) Despite recognizing Executive 1 had relevant evidence by placing Executive 1 on a litigation hold in April 2019, "Sandoz intentionally declined to take an image of [Executive 1's] Sandoz-issued phone until July 2020," and "[p]romptly imaging [Executive 1's] Sandoz-issued phone would have ensured that relevant evidence was not destroyed." (*Id.* ¶ 89.) UTC alleges the deletion of information from Executive 1, 2, and 3's phones "were undertaken in order to disrupt this litigation" and "violated Sandoz's policies." (*Id.* ¶¶ 90–91.) As a result, UTC alleges it has been prejudiced "by having to rely on an evidentiary record that lacks the material information deleted from" Executive 1, 2, and 3's phones and "by Sandoz concealing the destruction of [Executive 2's] text messages for over a year." (*Id.* ¶¶ 92–95.) This destruction of evidence has "thwarted UTC's ability to obtain relevant discovery by short-circuiting the discovery process, caused UTC to incur significant litigation-related costs, and unnecessarily delayed the resolution of this litigation." (*Id.* ¶ 96.) In connection with Sandoz's alleged spoliation, UTC has "suffered monetary damages, including the cost of obtaining and processing alternative evidence and the expense of prolonged litigation." (*Id.* ¶ 97.)

6

### B. Procedural History

On April 16, 2019, Plaintiffs Sandoz and RareGen, LLC, filed their Complaint, asserting six claims against all Defendants, United Therapeutics Corporation and Smiths Medical ASD, Inc. ("Smiths"), for (1) restraint of trade under 15 U.S.C. § 1 (Count One), (2) monopolization under 15 U.S.C. § 2 (Count Two), (3) restraint of trade under N.J. Stat. Ann § 56:9-3 (Count Three), (4) restraint of trade under N.C. Gen. Stat. § 75-1 (Count Four), (5) unfair trade practices under N.C. Gen. Stat § 75-1.1 (Count Five), and (6) tortious interference with prospective economic advantage (Count Six). (ECF No. 1.) On May 24, 2019, Defendants filed their Motion to Dismiss. (ECF No. 53.) On June 17, 2019, Plaintiffs filed their Opposition. (ECF No. 56.) On June 24, 2019, Defendants filed their Reply. (ECF No. 59.) On October 4, 2019, Sandoz moved for a preliminary injunction. (ECF No. 106.) On October 25, 2019, UTC filed an Opposition. (ECF No. 122.) On January 29, 2020, the Court issued an opinion denying both the Motion for a Preliminary Injunction and Motion to Dismiss. (ECF No. 168.)

On February 12, 2020, Defendants answered the Complaint. (ECF No. 171.) On March 30, 2020, the Court entered a consent order allowing Plaintiffs to file a First Amended Complaint. (ECF No. 177.) On the same day, Plaintiffs filed their First Amended Complaint (ECF No. 178) in which Sandoz asserted a breach of contract claim against UTC arising from its alleged failure to carry out its obligations under the 2015 Settlement Agreement (Count Seven). (*Id.* ¶¶ 107–21.) On April 17, 2020, Defendants filed a Motion to Dismiss Count Seven of Plaintiff's First Amended Complaint. (ECF No. 179, 181.) On May 11, 2020, Plaintiffs filed an Opposition to Defendants' Motion to Dismiss. (ECF No. 184.) On May 18, 2020, Defendants filed their Reply to Plaintiffs' Opposition. (ECF No. 187.) On November 13, 2020, Plaintiffs settled with Smiths (ECF No. 246), and all claims against Smiths were dismissed with prejudice (ECF No. 247). On November 18,

2020, this Court denied UTC's Motion to Dismiss Count Seven of Sandoz's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 251, 252.) On December 16, 2020, UTC answered Sandoz's Amended Complaint, and asserted a counterclaim for "fraudulent concealment—spoliation" against Sandoz. (ECF No. 258 ¶¶ 72–97.) On January 6, 2021, Sandoz filed a motion to dismiss UTC's spoliation counterclaim. (ECF No. 264.) On January 19, 2021, UTC opposed the motion (ECF No. 269) and on January 25, 2021, Sandoz replied (ECF No. 270).

## II.   LEGAL STANDARD

"In evaluating the sufficiency of counterclaims, the Court employs the familiar Rule 12(b)(6) standard." *In re Invs. Warranty of Am., Inc. v. B.W.E. Dev., L.L.C.*, Civ. A. No. 09-4490, 2010 WL 2557559, at *2 (D.N.J. June 23, 2010). In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *Burlington Coat Factory*, 114 F.3d at 1426 (quoting

9

*Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

### III. DECISION

Sandoz argues UTC's counterclaim for "Fraudulent Concealment—Spoliation" should be dismissed because it is not legally cognizable under New Jersey law, but even if it is cognizable, UTC cannot establish plausible factual allegations to support its claim. (ECF No. 265 at 9–16.) UTC argues its counterclaim is legally cognizable and supported by sufficient factual allegations to withstand Sandoz's Motion to Dismiss. (ECF No. 273 at 8–18.)

To invoke the tort of fraudulent concealment in the spoliation context, the following elements must be established:

> (1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;
>
> (2) That the evidence was material to the litigation;
>
> (3) That plaintiff could not reasonably have obtained access to the evidence from another source;
>
> (4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation;
>
> (5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

*Tartaglia v. UBS PaineWebber Inc.*, 961 A.2d 1167, 1188 (N.J. 2008) (quoting *Rosenblit v. Zimmerman*, 766 A.2d 749, 758 (N.J. 2001)).

An analysis of a spoliation claim "begins with identifying the spoliator, because that, in and of itself, will impact on the available and appropriate remedies." *Robertet Flavors, Inc. v. Tri-Form Const., Inc.*, 1 A.3d 658, 670 (N.J. 2010) (citing *Tartaglia*, 961 A.2d at 1189). "The spoliation and concealment tort remedy of money damages is inapplicable, however, where the

destruction of evidence, or its concealment, occurs in the context of a defendant's ability to defend against a plaintiff's cause of action." *Hewitt v. Allen Canning Co.*, 728 A.2d 319, 322 (N.J. Super. Ct. App. Div. 1999) (citing *Fox v. Mercedes–Benz Credit Corp.*, 658 A.2d 732, 736 (N.J. Super. Ct. App. Div. 1995)). The Supreme Court of New Jersey has recognized a separate claim for spoliation "if the spoliator is not a party to the litigation." *Robertet Flavors*, 1 A.3d at 670 (citing *Jerista v. Murray*, 883 A.2d 350, 366–67 (N.J. 2005)). "If, on the other hand, the spoliator is a plaintiff, the remedy of a separate cause of action for fraudulent concealment would not necessarily serve any purpose." *Id.* (citing *Hirsch v. Gen. Motors Corp.*, 628 A.2d 1108, 1119 (N.J. Super. Ct. Law. Div. 1993)); *Laufenberg v. Ne. Carpenters Pension Fund*, Civ. A. No. 17-1200, 2019 WL 6975090, at *18 (D.N.J. Dec. 19, 2019) ("In declining to recognize a cause of action for the party defending against a claim, the New Jersey Supreme Court reasoned that the preclusion of the spoliator's evidence is generally the appropriate sanction." (citing *Robertet Flavors*, 1 A.3d at 671)). However, when a defendant asserts an independent and substantive counterclaim against a plaintiff, and is effectively acting as a plaintiff through those counterclaims, that defendant can assert a fraudulent concealment claim. *Lucia v. McClain & Co.*, Civ. A. No. 11-930, 2013 WL 4517976, at *14 (D.N.J. Aug. 23, 2013) (rejecting plaintiff's argument that "[d]efendants' fraudulent concealment claim . . . is categorically unavailable to defendants" because defendants "also asserted counterclaims against [p]laintiffs . . . seeking to recover an alleged overpayment of wages" and "[w]ith respect to the dangers of spoliation, the Court finds no distinction between a plaintiff . . . and a counterclaimant"); *Hirsch*, 628 A.2d at 1119 ("The protective function of the spoliation tort, however, may be applicable where there are counterclaimants.").

UTC argues, based on *Tartaglia* and *Rosenblit*, "no binding decision limits the availability of a fraudulent concealment claim only to *plaintiffs* who suffer spoliation at the hands of an

11

opposing party." (ECF No. 273 at 9.) *Rosenblit* involved "a physician who deliberately destroyed and altered medical records in anticipation of a patient's malpractice lawsuit against him." 766 A.2d at 752. That is, the case concerned alleged spoliation by the defendant. *See id.* Regardless, UTC argues *Rosenblit* "left open the possibility" that a defendant could invoke the fraudulent concealment tort. (ECF No. 273 at 9–10.) The court in *Rosenblit* held "the tort of fraudulent concealment, as adopted, may be invoked as a remedy for spoliation where those elements exist," 766 A.2d at 758, and noted "[s]uch conduct cannot go undeterred and unpunished and those aggrieved by it should be made whole with compensatory damages," *id.*, without clarifying whether the tort can only be invoked by plaintiffs. However, the issue of whether defendants could also bring claims for fraudulent concealment was not before the court. *Id.* at 758 n.3 (citations omitted) ("We are not called upon here to determine what circumstances, if any, would entitle a defendant who has suffered destruction of evidence in the underlying litigation to invoke the fraudulent concealment tort remedy."). In the same footnote, the court cited two cases—*Hewitt* and *Fox*—that outline a defendant's ability to bring spoliation claims. *Hewitt* noted while "damages are not ordinarily available to a defendant who is prejudiced by spoliation, a defendant who has been deprived of the ability to defend an action brought by a plaintiff because a third party has destroyed evidence may have an action for money damages against the spoliator." 728 A.2d at 322. However, the court clarified "in such instances, the spoliator is neither the plaintiff, nor an agent of plaintiff, nor plaintiff's subrogor." *Id.* In *Fox*, the court explained "[t]he concealment tort [] is directed only at protecting prospective claims of plaintiffs" and is "inapplicable to [a] defendant's ability to defend a lawsuit." 658 A.2d at 736 (citations omitted). Based on the *Rosenblit* court's citation of *Hewitt* and *Fox*, the court only recognized that a defendant may bring

12

a claim against a third-party spoliator but may not use a concealment tort claim when it applies to its ability to defend a lawsuit.

*Tartaglia* also concerned spoliation claims brought by a plaintiff and required the court to review the *Rosenblit* decision "in full." 961 A.2d at 1187. The court noted "there is a distinction to be drawn based on the identity of the alleged spoliator." *Tartaglia*, 961 A.2d at 1189. The court then elaborated, "acts of spoliation by parties may give rise to the court's use of discovery and evidentiary sanctions and may also support separate counts in the nature of fraudulent concealment claims that are bifurcated for determination after the verdict is returned on the other substantive claims." *Id.* However, the *Tartaglia* court also clarified in a footnote, "there is nothing in theory that would preclude an adversely affected defendant from proceeding on the independent fraudulent concealment theory as we describe it herein." *Id.* at 1189 n.5.

Here, UTC's counterclaim is only for spoliation and does not involve an independent substantive counterclaim. (*See* ECF No. 258 ¶¶ 72–97.) UTC alleges, on information and belief, that the text messages deleted from Executive 1's Sandoz-issued cell phone contained information helpful to UTC's defenses. (*Id.* ¶ 86 ("Sandoz Executive 1 switched her phone settings to auto-delete text messages in order to prevent UTC from obtaining additional text messages harmful to Sandoz's claims in this litigation and helpful to UTC's defenses.").) Additionally, UTC alleges Sandoz allowed this destruction of evidence. (*Id.* ¶ 87 ("Sandoz allowed the destruction of the relevant evidence contained on Executive 1's Sandoz-issued phone in order to prevent UTC from obtaining additional text messages harmful to Sandoz's claims in this litigation and helpful to UTC's defenses.").) The evidence deleted from Executive 2 and 3's Sandoz-issued cell phones also would have supported UTC's defenses. (*Id.* ¶ 92 ("UTC is prejudiced by having to rely on an evidentiary record that lacks the material information deleted from the Sandoz-issued cell phones

of Sandoz Executive 1, Sandoz Executive 2, and Sandoz Executive 3, which would have undercut Plaintiffs' claims and established UTC's defenses to Plaintiffs' claims.").) That is, UTC's fraudulent concealment claim is raised in the context of its defenses and does not involve an independent and substantive counterclaim such that its claim is a prospective claim. *See Lucia*, 2013 WL 4517976, at *14.

In *Laufenberg*, the plaintiff's operative complaint before the court—plaintiff's third amended complaint—included two new claims that were not previously pled. One of the new claims, Count Thirteen, was a claim for fraudulent concealment. 2019 WL 6975090, at *7. The defendants filed an answer, along with two counterclaims. *Id.* The plaintiff argued, similar to UTC here, that defendants "destroyed evidence to prevent [p]laintiff from accessing documents that would have placed him in a better position to answer the allegations raised by [defendants] in [their] Counterclaim." *Id.* at *18 (record citation omitted). That is, plaintiff's fraudulent concealment claim alleged defendants spoliated evidence that would aid plaintiff's defense. *See id.* The court denied plaintiff's claim with prejudice based on the spoliation principles established in *Rosenblit*, *Hirsch*, and *Robertet Flavors*. *Id.* ("The Court will dismiss Count Thirteen with prejudice for failure to state a claim upon which relief may be granted."). The court reasoned "[p]laintiff's fraudulent concealment claim cannot lie based on the alleged destruction of evidence that is material to [p]laintiff's *defense* against the First Counterclaim," because "the claim is not legally cognizable under New Jersey law." *Id.* at *19.

UTC argues *Laufenberg* "is an unpublished case applying New Jersey law that entirely fails to consider *Tartaglia*," but does not otherwise argue that case is inapplicable. (ECF No. 273 at 14 n.4.) While *Laufenberg* is an unpublished case, it considered several other cases that are binding on this Court and presents facts similar to those before the Court, so the Court will consider

14

it persuasive here. *See e.g.*, *New Hampshire Ins. Co. v. Diller*, 678 F. Supp. 2d 288, 312 (D.N.J. 2009), *as amended* (Jan. 13, 2010) (noting unpublished case was "not binding" but supported the court's decision because it was "consistent with settled New Jersey precedent"); *Caissie v. City of Cape May*, 619 F. Supp. 2d 110, 124 (D.N.J. 2009) (noting two unpublished cases were not binding but helped inform the court's decision). Therefore, because UTC's spoliation claim is an independent claim used only to support its defenses, it is not a legally cognizable claim under binding New Jersey precedent pursuant to *Robertet Flavors*, *Hewitt*, *Hirsch*, *Fox*, and *Rosenblit*. Accordingly, UTC's counterclaim for spoliation is **DISMISSED**.

If the Court does not recognize UTC's claim for fraudulent concealment, UTC argues discovery and evidentiary sanctions are inappropriate here, "where the spoliated evidence undermines, rather than supports, Sandoz's claims, and UTC has incurred monetary damages as a result of the spoliation." (ECF No. 273 at 12.) If the Court dismisses UTC's counterclaim, UTC asserts "that still would leave unremedied the damage already caused to UTC in the form of costs incurred." (*Id.* at 12–13.)

As UTC highlights, courts have a wide range of remedies in addressing spoliation claims and "selecting the one that is appropriate under the circumstances must be guided by the essential purposes that all of the sanctions are designed to achieve." *Robertet Flavors*, 1 A.3d at 671. The remedy selected by a court depends on the identity of the spoliator. *See id.* at 670. The typical remedy when the alleged spoliator is the plaintiff, as here, is not a separate cause of action for fraudulent concealment, but rather the "preclusion of plaintiff's evidence that had been, or could have been, derived from the spoliated material or item." *Id.* at 671 (citing *Hirsch*, 628 A.2d at 1130); *see also Martha Valdez & Jose Valdez v. Brooklyn's Coal Burning Brick Oven Pizzeria, LLC, John Grimaldi, & Julie Grimaldi Realty Group*, Civ. A. No. 3294-19, 2021 WL 3354856, at

\*3 (N.J. Super. Ct. App. Div. Aug. 3, 2021) ("Remedies for spoliation of evidence include use of discovery sanctions, an adverse inference, or a separate cause of action for fraudulent concealment." (citing *Robertet Flavors*, at 671)); *Del Mastro v. Grimado*, Civ. A. No. 1433-11T4, 2013 WL 4746486, at \*14 (N.J. Super. Ct. App. Div. Sept. 5, 2013) ("Possible remedies include drawing an adverse inference, limiting the person committing spoliation from presenting evidence shown by the destroyed evidence, and sanctions.")

In addition to the identity of the spoliator, courts also consider the timing of spoliation in determining the adequate remedy. *See id.* ("[W]e have observed that selecting the appropriate remedy for spoliation depends in part on the timing of when the act of spoliation is discovered."). When the alleged spoliation occurs during discovery, as here, preclusion or adverse inferences are the appropriate remedy. *Id.* ("Spoliation that becomes apparent during discovery or trial can often be addressed effectively through the use of ordinary discovery sanctions, such as preclusion, or through adverse inferences." (citing *Rosenblit*, 766 A.2d at 754–55)). However, spoliation that is discovered after trial "will generally result in a 'cause of action for fraudulent inducement [that] will be entirely separate.'" *See id.* (quoting *Tartaglia*, 961 A.2d at 1190). "[T]he focus in selecting the proper sanction is 'evening the playing field,' *Rosenblit*, 766 A.2d at 755, or rectifying the prejudice caused by the spoliation so as to 'place[] the parties in equipoise,' *Hirsch*, 628 A.2d at 1130." *Id.*

Relying on *Tartaglia*, UTC argues money damages should be awarded here to address the damages it allegedly incurred from the deleted text messages. (ECF No. 273 at 13.) However, Federal Rule of Civil Procedure 37 provides the appropriate avenue for seeking these litigation-related costs, not an independent fraudulent concealment claim used to bolster UTC's defenses. Under Federal Rule of Civil Procedure 37(e), "[i]f electronically stored information that should

16

have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," a court may issue measures to cure the prejudice resulting from that lost information. Fed. R. Civ. P. 37(e)(1). Rule 37 was recently amended to specifically address spoliation sanctions. *See Bistrian v. Levi*, 448 F. Supp. 3d 454, 464 (E.D. Pa. 2020) ("In 2015, however, Federal Rule of Civil Procedure 37 was amended to provide a uniform standard governing spoliation sanctions for the loss of electronically stored information."). That is, if UTC seeks litigation related costs it incurred as a result of the allegedly spoliated text messages, it may file a separate motion under Rule 37. *See Greg Manning v. Safelite Fulfillment, Inc., et al.*, Civ. A. No. 17-2824, 2021 WL 3557582, at *1 (D.N.J. Apr. 29, 2021), *report and recommendation adopted sub nom. Manning v. Safelite Fulfillment, Inc.,* Civ. A. No. 17-2824, 2021 WL 3542808 (D.N.J. Aug. 11, 2021) (reviewing defendants' allegations that plaintiff failed to preserve certain emails and Facebook messages under Federal Rule of Civil Procedure 37); *Sinclair v. Cambria Cty.*, Civ. A. No. 3:17-149, 2018 WL 4689111, at *3 (W.D. Pa. Sept. 28, 2018) (in deciding Rule 37 motion, awarding "attorney's fees and costs [d]efendants incurred in obtaining [certain deleted text messages], filing the instant Motion for Sanctions, and appearing for oral argument" in connection with plaintiff's failure to preserve text messages during the course of litigation). The Court is convinced Federal Rule of Civil Procedure 37 provides the appropriate avenue for UTC here because, "[w]hen plaintiffs have concealed evidence causing interference with discovery, the rules of court provide more than sufficient remedy." *Fox*, 658 A.2d at 736. Accordingly, UTC's counterclaim for fraudulent concealment is dismissed, but UTC may file a separate motion for sanctions under Federal Rule of Civil Procedure 37 to address Sandoz's alleged spoliation of evidence in connection with this litigation. *See Laufenberg*, 2019 WL 6975090, at *19 ("That said, nothing precludes Plaintiff from

exploring any perceived spoliation during discovery and availing himself of alternative remedies such as discovery sanctions by way of a spoliation motion.").

Accordingly, UTC's Counterclaim for Fraudulent Concealment—Spoliation is **DENIED.**

### IV.   CONCLUSION

For the reasons set forth above, Sandoz's Motion to Dismiss is **GRANTED** and UTC's First Counterclaim for Spoliation is **DISMISSED**. An appropriate order will follow.


**Date: August 31, 2021**                                                 */s/ Brian R. Martinotti*
                                                                          **HON. BRIAN R. MARTINOTTI**
                                                                          **UNITED STATES DISTRICT JUDGE**