**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

SANDOZ INC., *et al.*,

Plaintiffs,

v.

UNITED THERAPEUTICS CORPORATION,

Defendant.

Case No. 2:19-cv-10170 (BRM) (JSA)

**REDACTED OPINION**

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Plaintiff Sandoz Inc.'s ("Sandoz") Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 319.) Defendant United Therapeutics Corporation ("UTC") filed an opposition to the motion (ECF No. 341), and Sandoz filed a reply (ECF No. 364). Also before the Court is UTC's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 321.) Plaintiff RareGen, LLC ("RareGen") and Sandoz (collectively, "Plaintiffs") filed an opposition to UTC's motion (ECF No. 336), and UTC filed a reply (ECF No. 365). Further, before the Court is UTC's Motion to Exclude the damages opinion of Dr. Anupam Jena offered by Plaintiffs. (ECF No. 333.) Plaintiffs filed an opposition to the motion (ECF No. 348), and UTC filed a reply (ECF No. 358). Having reviewed the parties' submissions filed in connection with the Motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, Sandoz's Motion for Partial Summary Judgment is **GRANTED**, UTC's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, and UTC's Motion to Exclude is **DENIED.**

# I. Background[1]

## A. Factual Background

This matter concerns the sale of brand name and generic treprostinil, a medication used to treat patients with pulmonary arterial hypertension ("PAH").[2] (UTC's Statement of Material Facts ("SMF") (ECF No. 322-1) ¶¶ 1–3; Sandoz's Resp. to UTC's SMF (ECF No. 336-1) ¶¶ 1–3.) UTC manufactures and sells the brand name medication, Remodulin, and Sandoz manufactures and sells generic treprostinil.[3] (Sandoz's SMF (ECF No. 320-1) ¶¶ 2–3; UTC's Resp. to SMF (ECF No. 362-1) ¶¶ 2–3.) Treprostinil is an injectable medication administered either intravenously or subcutaneously.[4] (ECF No. 320-1 ¶¶ 20–21; ECF No. 362-1 ¶¶ 20–21.) Subcutaneous administration of treprostinil requires a pump, such as the CADD-MS 3 pump, and a three-milliliter medical cartridge. (ECF No. 322-1 ¶¶ 4, 9–10; ECF No. 336-1 ¶¶ 4, 9–10.) In administering treprostinil, the medication is placed in a disposable medical cartridge that is then loaded into the pump. (ECF No. 320-1 ¶ 23; ECF No. 362-1 ¶ 23.)

Until 2019, Smiths Medical ASD Inc. ("Smiths") was the only manufacturer of the CADD-MS 3 pump and medical cartridge used to administer Remodulin. (ECF No. 320-1 ¶ 23; ECF No. 362-1 ¶ 23.) Smiths's CADD-MS 3 pump is only compatible with Smiths's three-milliliter medical

---

[1] The factual and procedural background of this matter are well-known to the parties and were previously recounted by the Court in its January 29, 2020 Opinion (ECF No. 168) as well as its November 18, 2020 Opinion (ECF No. 251). Therefore, in the interest of judicial economy, the Court refers to those Opinions for a full recitation of the factual background of this dispute and only includes the facts and procedural background relevant to these Motions.

[2] PAH is a disease "that causes high blood pressure in the arteries that run from the heart to the lungs." (ECF No. 322-1 ¶ 1; ECF No. 336-1 ¶ 1.)

[3] Because Remodulin is the branded version of treprostinil, unless otherwise specified, the Court refers to the medication by its generic name when discussing the medication generally.

[4] Treprostinil is a synthetic form of prostacyclin. (ECF No. 178 ¶ 57.)

cartridge. (ECF No. 322-1 ¶¶ 12–13; ECF No. 336-1 ¶¶ 12–13.) Smiths sold its CADD-MS 3 pumps and medical cartridges to two specialty pharmacy distributors, Accredo Health Group ("Accredo") and CVS Specialty (collectively, the "Specialty Pharmacies"), who in turn provided the injectable medication to patients. (ECF No. 320-1 ¶¶ 24–26; ECF No. 362-1 ¶¶ 24–26.)

According to Sandoz, UTC allegedly cornered the market for cartridges needed for subcutaneous injection of Remodulin and generic treprostinil, effectively blocking the entry of Sandoz's generic product to the market. (*See generally,* ECF No. 336.) Sandoz further alleges UTC's conduct—allegedly blocking entry of generic treprostinil—was a breach of the parties 2015 settlement agreement ("2015 Settlement Agreement"). (*See generally*, ECF No. 320.)

UTC moves for summary judgment as to all of Sandoz's claims, and Sandoz moves for summary judgment on its breach of contract claim.

**1. The 2015 Settlement Agreement**

UTC launched its branded Remodulin in 2002. (ECF No. 322-1 ¶ 3; ECF No. 336-1 ¶ 3.) In 2011, Sandoz submitted an abbreviated new drug application ("ANDA") with the Food and Drug Administration ("FDA"), seeking approval to market its generic treprostinil. (ECF No. 320-1 ¶ 3; ECF No. 362-1 ¶ 3.) Shortly thereafter, UTC sued Sandoz, contending the generic version infringed on its patent. (ECF No. 320-1 ¶ 5; ECF No. 362-1 ¶ 5.) Ultimately, on September 29, 2015, UTC and Sandoz entered into the 2015 Settlement Agreement to resolve the litigation. (ECF No. 320-1 ¶¶ 8–9; ECF No. 362-1 ¶¶ 8–9.)

Under the 2015 Settlement Agreement, UTC granted Sandoz the right to make and market its generic treprostinil beginning June 2018.[5] (ECF No. 320-1 ¶ 10; ECF No. 362-1 ¶ 10.) Pursuant

[5] The FDA tentatively approved Sandoz's ANDA in October 2014. (ECF No. 320-1 ¶ 18; ECF No. 362-1 ¶ 18.) The FDA granted Sandoz final approval in November 2017. (ECF No. 320-1 ¶ 19; ECF No. 362-1 ¶ 19.)

to Section 11(b) of the 2015 Settlement Agreement, UTC agreed "[n]ot to take any action directly or indirectly to prevent, delay, limit, or otherwise restrict the launch, manufacture, use, sale, offer for sale, importation or distribution of the Sandoz ANDA Product in [the United States]." (ECF No. 320-1 ¶ 11; ECF No. 362-1 ¶ 11.) Section 4(l) defines the "Sandoz ANDA Product" as "the treprostinil injection for subcutaneous or intravenous use pharmaceutical products that are described in, and are the subject of, the Sandoz ANDA . . . [but] shall expressly not include . . . any technology associated with any UTC product(s)." (Sandoz's Mot. Br., 2015 Settlement Agreement (ECF No. 320-8) at 7 of 26; ECF No. 362-1 ¶ 84.)

Section 15 of the 2015 Settlement Agreement provides

> UTC . . . shall not, and shall not cause any Third Party to: (a) initiate or otherwise undertake any activity . . ., directly or indirectly, against the Sandoz ANDA or the Sandoz ANDA Product to . . . (ii) interfere with Sandoz's efforts to launch the Sandoz ANDA Product . . . as of the Effective Launch Date under the terms provided by this Agreement.

(ECF No. 320-8 at 15 of 26; ECF No. 320-1 ¶ 12; ECF No. 362-1 ¶ 12.) Section 13(c) of the 2015 Settlement Agreement disclaimed any right to delivery devices, stating "[n]othing in this agreement shall be construed to grant any right to any Third Party proprietary technology, including Remodulin Implantable System, the DEKA pre-filled semi-disposable pump system, any other pump or delivery system for the Sandoz ANDA Product or any other form of treprostinil." (ECF No. 320-8 at 13 of 26.)

**2. 2016 Supply Agreement**

In January 2005, Smiths started developing the CADD-MS 3 pump, which is a modified insulin pump.[6] (ECF No. 322-1 ¶¶ 7, 9; ECF No. 336-1 ¶¶ 7, 9.) The CADD-MS 3 pump can be

---

[6] Prior to the introduction of the CADD-MS 3, UTC used the MiniMed 407c pump. (ECF No. 322-1 ¶¶ 6–9; ECF No. 336-1 ¶¶ 6–9.) In 1997, five years prior to launching Remodulin, UTC

used to administer treprostinil intravenously or subcutaneously. (ECF No. 322-1 ¶ 10; ECF No. 336-1 ¶ 10.) Essentially, Smiths reprogrammed an insulin pump's software so the pump would dispense medicine by milliliters instead of units of insulin. (ECF No. 322-1 ¶¶ 7, 9; ECF No. 336-1 ¶¶ 7, 9.)

In 2015, Smiths decided to discontinue making the CADD-MS 3 pump "primarily due to the lack of ongoing availability of critical components from third party suppliers." (ECF No. 322-1 ¶¶ 18–19; ECF No. 336-1 ¶¶ 18–19.) On August 25, 2015, Smiths sent an end-of-life notice for the CADD-MS 3 pump to the Specialty Pharmacies dispensing treprostinil to patients. (ECF No. 322-1 ¶ 21; ECF No. 336-1 ¶ 21.) The end-of-life notice stated Smiths "is discontinuing the sale of CADD-MS 3 [pumps] effective immediately," but "is continuing to supply the 3mL Medication Cartridge, . . . to be available for use with the CADD-MS 3 pump, for at least three years." (*Id.*) By October 2015, Smiths shut down its manufacturing line for CADD-MS 3 pumps. (ECF No. 322-1 ¶ 24; ECF No. 336-1 ¶ 24.) Smiths discussed the discontinuation of the CADD-MS 3 pump with UTC before making the announcement. (ECF No. 322-1 ¶ 28; ECF No. 336-1 ¶ 28.)

Around this time, UTC was investigating alternatives to the CADD-MS 3 pump while trying to develop the "next generation" drug delivery technology for new ways to administer Remodulin. (ECF No. 322-1 ¶¶ 30, 33; ECF No. 336-1 ¶¶ 30, 33.) These new delivery systems include an implantable pump and a pump using "acoustic volume sensing technology," but those

---

contracted with Medtronic, a device manufacturer, to develop delivery devices for Remodulin exclusively. (ECF No. 322-1 ¶ 5; ECF No. 336-1 ¶ 5.) By 1999, Medtronic produced and cleared with the FDA the MiniMed 407c pump to deliver Remodulin subcutaneously to patients. (ECF No. 322-1 ¶ 6; ECF No. 336-1 ¶ 6.) In 2006, Medtronic discontinued manufacturing its pump and cartridge platform. (ECF No. 322-1 ¶ 8; ECF No. 336-1 ¶ 8.) Thereafter, UTC engaged Smiths for its CADD-MS 3 pump and cartridge platform for administering Remodulin. (ECF No. 322-1 ¶¶ 9–10; ECF No. 336-1 ¶¶ 9–10.)

alternatives were not ready for market.[7] (ECF No. 322-1 ¶ 33; ECF No. 336-1 ¶ 33.) UTC was concerned there may not be delivery platforms available for commercial use by the time Smiths exhausted its remaining supply of CADD-MS 3 pumps. (ECF No. 322-1 ¶ 34; ECF No. 336-1 ¶ 34.) Smiths understood UTC could "not afford any gaps in supplying [UTC's] $300M business to life-critical patients." (ECF No. 322-1 ¶ 35; ECF No. 336-1 ¶ 35.)

In late 2015, seeking to ensure a supply of pumps and cartridges were available until its "next generation" delivery systems were ready for market, UTC discussed with Smiths a "program to extend [the CADD-]MS 3 pump platform." (ECF No. 322-1 ¶¶ 36–37; ECF No. 336-1 ¶¶ 36–37.) Ultimately, Smiths agreed to restart production and develop a partially updated version of the CADD-MS 3 pumps. (ECF No. 322-1 ¶ 39; ECF No. 336-1 ¶ 39.)

In March 2016, UTC and Smiths executed a supply agreement for the CADD-MS 3 pumps ("2016 Supply Agreement") to "ensure continued availability of a pump capable of delivering Remodulin subcutaneously[.]" (ECF No. 322-1 ¶ 45; ECF No. 336-1 ¶ 45.) Under the 2016 Supply Agreement, Smiths committed to producing [REDACTED] CADD-MS 3 pumps and [REDACTED] cartridges. (*Id.*) UTC agreed to pay [REDACTED] immediately, and a total of [REDACTED] for the pumps and [REDACTED] for the cartridges. (*Id.*) The Parties dispute whether the 2016 Supply Agreement provided UTC with exclusivity over both pumps and cartridges or pumps only.[8] (*Id.*) However, the 2016

---

[7] The implantable pump was not released and development discontinued in 2021, and the acoustic volume sensing pump did not launch until February 2021. (ECF No. 322-1 ¶ 33; ECF No. 336-1 ¶ 33.)

[8] The 2016 Supply Agreement states,

> [I]n order to ensure continued availability of a pump capable of delivering Remodulin subcutaneously to PAH patients, Smiths is willing to produce a final manufacturing run of [REDACTED] Pumps, and UT[C] is willing to purchase any Pumps unsold by Smiths . . . .

Supply Agreement allowed Smiths to accept other offers to produce additional pumps or cartridges, though UTC had the right of first refusal to match any offer. (*Id.*) Smiths was also allowed to sell approximately [redacted] "residual pumps" to its legacy customers. (*Id.*) The 2016 Supply Agreement further required Smiths to track its inventory of pumps and cartridges and provide UTC with pump inventory details each month. (ECF No. 322-1 ¶ 46; ECF No. 336-1 ¶ 46.)

In November and December 2017, because UTC effectively became the owner of all remaining CADD-MS 3 pumps pursuant to the 2016 Supply Agreement, UTC sought to directly contract with the Specialty Pharmacies to distribute the CADD-MS 3 pumps it purchased from Smiths. (ECF No. 322-1 ¶ 77; ECF No. 336-1 ¶ 77.) The agreement between UTC and the Specialty Pharmacies provided the Specialty Pharmacies would serve as non-exclusive distributors of the pumps "solely for supplying patients who have been dispensed Remodulin." (*Id.*)

**3. 2017 Amended Supply Agreement**

In November 2016, Smiths assessed the "resin amount" required to produce additional cartridges. (ECF No. 322-1 ¶ 58; ECF No. 336-1 ¶ 58.) Smiths located another company that had

---

> . . .
>
> Smiths shall manufacture and make available for sale [redacted] Cartridges, and shall use its commercially reasonable efforts to sell Cartridges to [Smiths] Customers and to UT[C] Customers in the ordinary course of its business . . . . On the date that is 6 (six) years following the Supply Commencement Date, UT[C] shall purchase and take title of all unsold, unexpired Cartridges which are in good, saleable condition.

(UTC's Mot. Br., 2016 Supply Agreement, (ECF No. 323-3) at 2, 4 of 13.) The parties do not dispute the 2016 Supply Agreement provided UTC with exclusivity over Smiths's pumps. (ECF No. 322-1 ¶ 45; ECF No. 336-1 ¶ 45.) Rather, the parties dispute whether the 2016 Supply Agreement provided exclusivity over Smiths's cartridges. (*Id.*) While the 2016 Supply Agreement does not expressly provide UTC exclusivity over Smiths's cartridges, UTC maintains the understanding of Smiths and UTC at the time was exclusivity extended to cartridges. (ECF No. 320-1 ¶ 48; ECF No. 362-1 ¶ 48.)

the same resin Smiths had used to produce its cartridges. (ECF No. 322-1 ¶ 59; ECF No. 336-1 ¶ 59.) Smiths purchased the additional resin from the company, ultimately buying more than it thought was needed to deliver on its commitment to UTC. (*Id.*) Smiths expended over [redacted] to purchase the additional resin to make the cartridges. (ECF No. 322-1 ¶ 61; ECF No. 336-1 ¶ 61.)

In January 2017, Smiths informed UTC that customers had been buying large quantities of cartridges for use with drugs other than Remodulin. (ECF No. 322-1 ¶ 62; ECF No. 336-1 ¶ 62.) In February 2017, UTC advised Smiths it wished to amend the arrangement with the cartridges so that it "mirror[ed] the deal with respect to the pumps," whose ownership was transferred from Smiths to UTC on a monthly basis, giving UTC full discretion on pump usage. (ECF No. 322-1 ¶ 66; ECF No. 336-1 ¶ 66.) Smiths did not agree to police how the Specialty Pharmacies used cartridges but committed to seek an agreement from the Specialty Pharmacies to use the cartridges for Remodulin only. (ECF No. 322-1 ¶ 73; ECF No. 336-1 ¶ 73.)

In July 2017, UTC and Smiths entered into a second amended agreement to the 2016 Supply Agreement ("2017 Amended Supply Agreement"). (ECF No. 322-1 ¶ 71; ECF No. 336-1 ¶ 71.) Under the 2017 Amended Supply Agreement, Smiths agreed "to use commercially reasonable efforts to amend its existing agreements with [the Specialty Pharmacies] to include a requirement that Cartridges sold . . . by Smiths . . . be used only with Remodulin." (ECF No. 322-1 ¶ 73; ECF No. 336-1 ¶ 73.) To that end, Smiths sent the Specialty Pharmacies draft agreements to restrict cartridges to Remodulin only. (ECF No. 322-1 ¶ 79; ECF No. 336-1 ¶ 79.) Smiths also agreed under the 2017 Amended Supply Agreement to "provide enhanced reporting to UT[C] regarding its manufacturing, inventory, purchases and sale of cartridges" on a monthly basis. (ECF No. 322-1 ¶ 72; ECF No. 336-1 ¶ 72.)

In January 2018, UTC asked Smiths for an update on the agreements with the Specialty Pharmacies to restrict cartridges to Remodulin only. (ECF No. 322-1 ¶ 78; ECF No. 336-1 ¶ 78.) In late 2018, Smiths emailed a Specialty Pharmacy distributor, requesting it sign the amended agreement "that requires us to only sell [CADD-]MS3 cartridges to UTC designated customers," adding, "[t]his is not a lot of dollars, but is very important to UTC to prevent generic drug users, and to manage a tight supply chain." (ECF No. 320-1 ¶ 32; ECF No. 362-1 ¶ 32.) However, in December 2018, UTC learned Smiths's agreements with the Specialty Pharmacies limiting cartridges for Remodulin only were never executed. (ECF No. 322-1 ¶ 81; ECF No. 336-1 ¶ 81.) UTC also learned at the time that Sandoz was preparing to launch its generic treprostinil. (*Id.*) UTC repeated its request for Smiths to execute agreements with the Specialty Pharmacies to restrict sale of the cartridges to Remodulin only.[9] (ECF No. 320-1 ¶ 33; ECF No. 362-1 ¶ 33.) Faced with the prospect the cartridges could be siphoned for other uses, including sudden large purchases, because the Specialty Pharmacies had yet to execute amended agreements with Smiths, UTC requested Smiths place the cartridges "on allocation." (ECF No. 322-1 ¶ 82; ECF No. 336-1 ¶ 82; ECF No. 320-1 ¶ 35; ECF No. 362-1 ¶ 35.) As a result, Smiths agreed UTC could approve every cartridge sale by Smiths to the Specialty Pharmacies until they agreed to limit cartridge sale to Remodulin patients only. (ECF No. 322-1 ¶ 82; ECF No. 336-1 ¶ 82.)

[9] In a December 27, 2018 email, Smiths requested from Accredo: "UT[C] has asked Smiths to ask their US based customers to restrict the sale of the cartridges for Remodulin use only. As such, please review the attached, sign and return." (ECF No. 320-1 ¶ 33; ECF No. 362-1 ¶ 33.) In another December 2018 email, Smiths wrote to CVS Specialty that "[i]t is reaching the point that the product will go on allocation if these agreements are not received." (*Id.*)

**4. 2019 Amended Supply Agreement**

UTC requested the cartridges remain on allocation until restrictions were put on the Specialty Pharmacies to limit cartridge use.[10] (ECF No. 320-1 ¶ 37; ECF No. 362-1 ¶ 37.) While on allocation, UTC would approve the release of cartridges provided that it received confirmation the cartridges were going to only Remodulin patients. (ECF No. 320-1 ¶ 39; ECF No. 362-1 ¶ 39.) By March 2019, the Specialty Pharmacies agreed to sign the amended agreements with Smiths to restrict use of the cartridges to Remodulin only.[11] (ECF No. 320-1 ¶¶ 49–50; ECF No. 362-1 ¶¶ 49–50.) Ultimately, Smiths opted out of counter-signing the agreements with the Specialty Pharmacies. (ECF No. 320-1 ¶ 51; ECF No. 362-1 ¶ 51.) Instead, in April 2019, Smiths entered into a third amended supply agreement with UTC. ("2019 Supply Agreement"). (ECF No. 322-1 ¶ 85; ECF No. 336-1 ¶ 85.) The 2019 Supply Agreement provided, in relevant part,

> On a monthly basis, UT[C] shall purchase all Cartridges manufactured by Smiths [] in the previous month, for the price set forth in Exhibit A. Within ten (10) business days following the end of each month, Smiths [] will invoice UT[C] for the number of Cartridges manufactured during the preceding month. . . . Smiths [] hereby sells and transfers to UT[C] the Existing Cartridge Inventory net of the Smiths Allocation for the price set forth in Exhibit A.

---

[10] UTC's president testified UTC's decision to put cartridges on allocation was "negotiating leverage" while UTC was "trying to get people to move more quickly to sign agreements." (ECF No. 320-1 ¶ 38; ECF No. 362-1 ¶ 38.)

[11] In February 2019, CVS Specialty signed the amended agreement with Smiths, in which CVS Specialty "agree[d] to restrict use and/or sale of the Cartridges to patients or customers using the Cartridge in the delivery of [Remodulin] regardless of whether repurchased directly from Smiths [] or indirectly through third parties." (ECF No. 320-1 ¶ 49; ECF No. 362-1 ¶ 49.) In March 2019, Accredo signed its amended agreement with Smiths, in which Accredo "agree[d] that it will only sell and/or use, as applicable, that Cartridges for the sole purpose of delivering [UTC]'s Remodulin [] drug to PAH patients, regardless of whether the Cartridges are purchased directly from Smiths [] of [sic] indirectly through third parties." (ECF No. 320-1 ¶ 50; ECF No. 362-1 ¶ 50.)

(ECF No. 320-1 ¶ 53; ECF No. 362-1 ¶ 53.) Essentially, pursuant to the 2019 Supply Agreement, UTC took title to all Smiths's cartridges and became the sole distributor of cartridges compatible with the CADD-MS 3 pump. (ECF No. 320-1 ¶ 54; ECF No. 362-1 ¶ 54.)

Thereafter, UTC contracted with the Specialty Pharmacies to reflect that UTC took title to the cartridges and to specify the terms and conditions for purchasing the cartridges from UTC. (ECF No. 322-1 ¶ 86; ECF No. 336-1 ¶ 86.) The agreement with the Specialty Pharmacies provides the parties "wish to amend the Agreement to appoint [each specialty pharmacy distributor] as a non-exclusive distributor of Cartridges solely for supplying patients who have been dispensed Remodulin." (ECF No. 322-1 ¶ 86; ECF No. 336-1 ¶ 86.)

**5. Sandoz's March 2019 Generic Launch**

Sandoz first learned about the potential limitation on access to cartridges in early 2019. (ECF No. 320-1 ¶ 55; ECF No. 362-1 ¶ 55.) On March 25, 2019, Sandoz launched its generic treprostinil for intravenous use only, not subcutaneous use. (ECF No. 320-1 ¶¶ 55–56; ECF No. 362-1 ¶¶ 55–56.) Sandoz maintains it could not launch its generic treprostinil for subcutaneous use because UTC restricted cartridges to Remodulin only. (ECF No. 320-1 ¶ 57; ECF No. 362-1 ¶ 57.) According to Sandoz, before UTC had an agreement with the Specialty Pharmacies to restrict use of the cartridges, the Specialty Pharmacies were free to use the cartridges with any medication. (ECF No. 320-1 ¶¶ 27, 30.) UTC does not dispute it did not have an agreement with the Specialty Pharmacies to restrict use of the cartridges until 2019, but it disputes whether the Specialty Pharmacies could have sold the cartridges with any medication other than Remodulin prior to 2019.[12] (ECF No. 362-1 ¶¶ 27, 30.)

---

[12] UTC maintains the 2016 Supply Agreement, as well as the 2017 Amended Supply Agreement, contained measures that effectively prevented the Specialty Pharmacies from selling the cartridges to anyone other than Remodulin patients. (ECF No. 362-1 ¶ 27.) UTC points to the 2017 Amended

In August 2018, Sandoz entered into a Promotion Agreement with RareGen for the marketing of generic treprostinil. (ECF No. 322-1 ¶ 126; ECF No. 336-1 ¶ 126.) In October 2018, RareGen learned from Smiths that UTC had all of Smiths's stock of CADD-MS 3 pumps and UTC had to give permission for any of it to be sold. (ECF No. 322-1 ¶ 139; ECF No. 336-1 ¶ 139.) Notwithstanding, Plaintiffs were still able to obtain CADD-MS 3 pumps from one of the Specialty Pharmacies. (ECF No. 322-1 ¶ 147; ECF No. 336-1 ¶ 147.) There were more than [redacted] CADD-MS 3 pumps owned by Accredo that were available for generic treprostinil. (*Id.*) According to Sandoz, the availability of CADD-MS 3 pumps was not a limiting factor to its launch. (*Id.*) Plaintiffs maintain Accredo had sufficient supplies of CADD-MS 3 pumps to support Sandoz's launch of generic treprostinil, despite Smiths's discontinuation. (ECF No. 336-1 ¶ 147.) However, Sandoz was unable to secure the cartridges required for subcutaneous use of its generic treprostinil.

In January 2019, Accredo informed Sandoz the cartridges can only be used with Remodulin. (ECF No. 322-1 ¶ 151; ECF No. 336-1 ¶ 151.) As a result, in March 2019, Sandoz launched generic treprostinil for intravenous use only "while the cartridge issue is sorted out." (ECF No. 322-1 ¶¶ 162–63; ECF No. 336-1 ¶¶ 162–63.)

In an effort to obtain cartridges, Plaintiffs contacted Smiths to discuss potential options. (ECF No. 322-1 ¶¶ 164–65; ECF No. 336-1 ¶¶ 164–65.) During a January 15, 2019 telephone call between Plaintiffs and Smiths, Smiths referenced the exclusive arrangement with UTC for the manufacture of cartridges through 2022. (ECF No. 322-1 ¶ 164; ECF No. 336-1 ¶ 164.) However,

---

Supply Agreement where Smiths was required to use commercially reasonable efforts to enter into agreements with the Specialty Pharmacies to require them to sell the cartridges to Remodulin patients only. (*Id.*) UTC also points to Smiths agreement under the 2017 Supply Agreement to provide UTC with cartridge inventory reports so UTC could monitor the volume of cartridges sold by Smiths. (*Id.*) According to UTC, when it identified deviations in cartridge purchasing trends in the cartridge inventory report, UTC took steps to ensure exclusivity over the cartridges. (*Id.*)

Smiths suggested Plaintiffs "could potentially license" Smiths's "design for the MS-3 cartridge so that [Plaintiffs] could go and make it on [their] own." (ECF No. 322-1 ¶ 165; ECF No. 336-1 ¶ 165.) On March 26, 2019, Smiths sent Sandoz a proposed licensing agreement with terms Sandoz requested. (ECF No. 322-1 ¶ 169; ECF No. 336-1 ¶ 169.) Sandoz responded with an additional demand, requesting Smiths provide "an interim supply of cartridges for the period during which we are negotiating the license agreement[.]" (ECF No. 322-1 ¶ 170; ECF No. 336-1 ¶ 170.) Unable to accommodate Sandoz's demand, Smiths and Sandoz ended their proposed licensing agreement discussions. (ECF No. 322-1 ¶ 171; ECF No. 336-1 ¶ 171.)

In May 2019, RareGen entered into a Joint Development Agreement with Carelife, a device manufacturer, to produce alternative cartridges, as well as provide Plaintiffs with exclusivity over those alternative cartridges. (ECF No. 322-1 ¶ 174; ECF No. 336-1 ¶ 174.) In June 2020, Plaintiffs submitted an application to the FDA for clearance of its alternative cartridges manufactured by Carelife. (ECF No. 322-1 ¶¶ 181–82; ECF No. 336-1 ¶¶ 181–82.) However, the FDA rejected Plaintiffs' application for an alternative cartridge because Smiths's user manual for its CADD-MS 3 pump provides the CADD-MS 3 pump is only compatible for use with Smiths's medical cartridge.[13] (ECF No. 322-1 ¶ 183; ECF No. 336-1 ¶ 183.) Ultimately, Smiths worked with Plaintiffs to facilitate FDA clearance of Sandoz's alternative cartridges for use with the CADD-MS 3 pump. (ECF No. 322-1 ¶¶ 184–85; ECF No. 336-1 ¶¶ 184–85.) The FDA cleared the alternative cartridges in March 2021, and Sandoz launched its generic treprostinil in the United States for subcutaneous administration in May 2021. (ECF No. 322-1 ¶¶ 186–87; ECF No. 336-1

[13] The FDA noted the CADD-MS 3 pump manual states, "Use only Smiths [] 3ml Medication Cartridges; other manufacturers' products will not work with the CADD-MS 3 Pumps." (ECF No. 322-1 ¶ 183; ECF No. 336-1 ¶ 183.) Therefore, the FDA advised Plaintiffs "to either work with Smiths [] to submit a new 510(k) allowing the use of this cartridge with their device or identify a different pump which allows 3rd party cartridges to be used with it." (*Id.*)

¶¶ 186–87.) In total, Plaintiffs' efforts to develop an alternative cartridge cost approximately [redacted]. (ECF No. 322-1 ¶ 188; ECF No. 336-1 ¶ 188.)

**6. Dr. Anupam Jena's Damages Opinion**

Plaintiffs retained Dr. Anupam Jena ("Dr. Jena") as their healthcare economics expert to opine on damages. (Glass Decl., Ex. 2, Jena Report (ECF No. 348-3).) Dr. Jena asserts UTC's conduct caused Plaintiffs to lose sales in both the intravenous and subcutaneous markets. (*Id.*)

In forming his opinion, Dr. Jena produced a damages model to estimate the lost profits incurred by Plaintiffs stemming from lost sales for those patients who were prescribed intravenous or subcutaneous treprostinil and would have purchased the generic product absent UTC's conduct. (ECF No. 348-3 at 9.) The inputs Dr. Jena used in his damages model for the breach of contract claim are the same inputs used in his damages model for the antitrust claims. (*Id.* at 16.) For the inputs to the damages model, Dr. Jena looked to actual world experience when applicable, as well as forecasts and projections prepared by Plaintiffs "during the ordinary course of business." (*Id.* at 10.) One of the inputs used in Dr. Jena's damages model is a Generic Penetration Rate. (*Id.* at 13.) The Generic Penetration Rate is the percentage of all treprostinil sales that would have been comprised of generic treprostinil but for UTC's challenged conduct. (*Id.* at 12–13.)

To estimate the Generic Penetration Rate, Dr. Jena relied on the projected sales forecasts, included an internal forecast prepared by RareGen (the "RareGen Forecast"). (*Id.*) According to Dr. Jena, he reviewed thirty-three files containing forecast models but selected the RareGen Forecast for three reasons: (1) the forecast does not include or account for the challenged conduct; (2) the model was the most recently updated forecast file; and (3) the model provided specific detail into the individual assumptions being made to calculate the overall Generic Penetration Rate and Plaintiffs' share of generic treprostinil volume. (*Id.*)

### B. Procedural History

On April 16, 2019, Plaintiffs filed their Complaint, asserting six claims against UTC and Smiths: (1) restraint of trade under 15 U.S.C. § 1 of the Sherman Antitrust Act (Count One); (2) monopolization under 15 U.S.C. § 2 of the Sherman Antitrust Act (Count Two); (3) restraint of trade under N.J. Stat. Ann § 56:9-3 (Count Three); (4) restraint of trade under N.C. Gen. Stat. § 75-1 (Count Four); (5) unfair trade practices under N.C. Gen. Stat § 75-1.1 (Count Five); and (6) tortious interference with prospective economic advantage (Count Six). (ECF No. 1.)

On April 19, 2019, Plaintiffs filed an application pursuant to L.Civ.R. 65.1 seeking expedited discovery. Discovery parameters were set by a May 8, 2019 Stipulated Scheduling Order. (ECF No. 49.) The application terminated on August 9, 2019. (*See* Docket Entry for 9/2019.) On May 24, 2019, Defendants filed a Motion to Dismiss. (ECF No. 53.) On June 17, 2019, Plaintiffs filed their Opposition. (ECF No. 56.) On October 4, 2019, Sandoz moved for a preliminary injunction. (ECF No. 106.) On October 25, 2019, UTC filed an Opposition. (ECF No. 122.) The Court issued an opinion denying both the Motion for a Preliminary Injunction and Motion to Dismiss. (ECF No. 168.)

On February 12, 2020, Defendants answered the Complaint. (ECF No. 171.) On March 30, 2020, the Court entered a consent order allowing Plaintiffs to file a First Amended Complaint. (ECF No. 177.) On the same day, Plaintiffs filed their First Amended Complaint (ECF No. 178) in which Sandoz asserted a breach of contract claim against UTC arising from its alleged failure to carry out its obligations under the 2015 Settlement Agreement (Count Seven). (*Id.* ¶ 107–21.) On April 17, 2020, Defendants filed a Motion to Dismiss Count Seven of Plaintiffs' First Amended Complaint. (ECF Nos. 179, 181.) On May 11, 2020, Plaintiffs filed an Opposition to Defendants' Motion to Dismiss. (ECF No. 184.) On September 14, 2020, the Court appointed the Honorable

Jose L. Linares, U.S.D.J. (ret.) as special master to address discovery disputes. (ECF No. 234.) On November 13, 2020, Plaintiffs settled with Smiths (ECF No. 246), and all claims against Smiths were dismissed with prejudice (ECF No. 247).

On November 18, 2020, this Court denied UTC's Motion to Dismiss Count Seven of Sandoz's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 251, 252.) On December 16, 2020, UTC answered Sandoz's Amended Complaint and asserted a counterclaim for "fraudulent concealment—spoliation" against Sandoz. (ECF No. 258 ¶¶ 72–97.)

On September 10, 2021, Sandoz filed a Motion for Partial Summary Judgement (ECF No. 319; Sandoz's Mot. Br. (ECF No. 320)), and UTC filed its Motion for Summary Judgement (ECF No. 321; UTC's Mot. Br. (ECF No. 322)). On October 22, 2021, UTC filed its opposition to Sandoz's motion (ECF No. 341),[14] and on November 1, 2021, Sandoz filed its opposition to UTC's motion (ECF No. 348). On December 3, 2021, UTC filed its reply in support of its motion for summary judgment (ECF No. 365), and Sandoz filed its reply in support of its summary judgment motion (ECF No. 364).[15]

---

[14] On December 1, 2021, UTC filed an amended brief in opposition to Sandoz's Motion for Partial Summary Judgment, which was accompanied by an amended response to Sandoz's statement of material facts and supplemental statements of disputed material facts. (ECF No. 362.) On February 17, 2022, Plaintiffs filed a correction to papers submitted in support of Plaintiffs' opposition to UTC's motion for summary judgment, replacing an exhibit that was previously submitted. (ECF Nos. 377, 378.) Plaintiffs also filed two corrections to papers submitted in support of Sandoz's reply in support of its motion for partial summary judgment, correcting clerical errors to citations in its brief and supplemental statement of disputed material facts. (ECF Nos. 377, 379.)

[15] The Court refrained from addressing the parties' summary judgment motions to allow the parties an opportunity to resolve the litigation. The parties appeared for mediation before the Honorable Joseph A. Dickson (ret.) but were unsuccessful.

On October 20, 2021, UTC filed its motion to exclude damages opinions of Dr. Anupam Jena. (ECF No. 333.) On November 1, 2021, Plaintiffs filed an opposition (ECF No. 348), and on November 22, 2021, UTC filed its reply (ECF No. 358).

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp.*, 477 U.S. at 323. "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id*. at 331 (citing 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2727 (2d ed. 1983)). On the other hand, if the burden of persuasion at

trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either: (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim," or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*. (citations omitted). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (quotation marks omitted). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[.]" *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial[.]" *Id*. at 323. Summary judgment is not disfavored in the antitrust context. *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp,* 614 F.3d 57, 73 (3d Cir. 2010) ("The entry of summary judgment in favor of an antitrust defendant may actually be required in order to prevent lengthy and drawn-out litigation, which may have a chilling effect on competitive market forces."). "To avoid summary judgment, an antitrust plaintiff must come forward with economically plausible evidence supporting the elements of its claim." *Id.*; *see, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468–69 (1992); *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005). The Third Circuit explained "[w]hen the evidence in the record is as consistent with permissible competition as it is with an illegal conspiracy, such evidence, standing alone, fails to support an inference of an illegal conspiracy." *Id.* Therefore, "the plaintiff in an antitrust case responding to a summary judgment motion must overcome a 'higher threshold,' which is imposed in order 'to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition.'" *Id.* (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004).[16]

**B. Motion to Exclude**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993). The Third Circuit has held "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)).

> First, the witness must be qualified to testify as an expert. Qualification requires that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert as such.

[16] Plaintiffs contest the legal standard the Court should apply on summary judgment in the antitrust context. (ECF No. 336 at 20–22.) Plaintiffs argue "the 'higher standard' for evaluating circumstantial proof of antitrust conspiracies at summary judgment is inapplicable, and Plaintiffs need only exceed the 'mere scintilla' standard to raise a genuine issue for trial." (*Id*. at 22.) The standards are not mutually exclusive. *See Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 468 (1992) ("The [Supreme] Court's requirement . . . that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases."). In the antitrust context, opposing summary judgment "demands only that the nonmoving party's inferences be reasonable in order to reach the jury." *Id*. "If the plaintiffs' theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.*; *see also, Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

> Second, the testimony must be reliable. In other words, the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief. An assessment of the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Third, the expert testimony must fit, meaning the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.

*Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quotations and citations omitted).

## III. DECISION

UTC moves for summary judgment as to Plaintiffs' antitrust claims under Section 1 and Section 2 of the Sherman Antitrust Act (Counts One and Two), restraint of trade (Counts Three and Four), unfair trade practices (Count Five), tortious interference (Count Six), and breach of contract (Count Seven). (ECF No. 322 at 23, 44.) Sandoz moves for summary judgment as to liability on its breach of contract claim. (ECF No. 320 at 1.) The Court addresses each in turn.

### A. Antitrust Claims

UTC argues summary judgment should be granted as to Plaintiffs' federal antitrust claims because: (1) Plaintiffs cannot meet their burden to show UTC's conduct was anticompetitive under the rule of reason; and (2) Plaintiffs lack antitrust injury because any purported harm was self-inflicted. (ECF No. 322 at 23–40.) UTC also contends RareGen lacks antitrust standing. (*Id.* at 42–44.) Sandoz counters UTC is not entitled to summary judgment because: (1) there are issues of fact concerning the anticompetitive effects of UTC's cartridge restriction; and (2) no procompetitive benefit justifies the cartridge restraints, or alternatively, the reasonableness of the restraints to achieve any procompetitive benefit is a question for the jury. (ECF No. 336 at 23–41.)

Plaintiffs further contend they suffered an antitrust injury and have standing to assert their antitrust claims. (*Id*. at 41–44.)

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States" 15 U.S.C. § 1. A literal reading suggests "every" contract, combination or otherwise that restrains trade is actionable, but the Supreme Court has made clear only unreasonable restraints are proscribed. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 98 (1984). To prevail on a Section 1 claim, a plaintiff must prove "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997) (citing *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 639 (3d Cir. 1996)) (additional citations omitted).

Section 2 of the Sherman Act "makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306 (3d Cir. 2007) (citing 15 U.S.C. § 2). To prevail on a Section 2 claim, a plaintiff must show the defendant: (1) possesses monopoly power in the relevant market; and (2) has willfully maintained or acquired that power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596 n.19 (1985) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71 (1966)). Monopoly power is the power to control prices or exclude competition. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 389 (1956). "A monopolist willfully acquires or maintains monopoly power when it competes on some basis other

than the merits." *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003) (en banc) (citing *Aspen Skiing*, 472 U.S. at 605 n.32). Therefore, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

In order to establish an actionable antitrust violation under Section 1 or Section 2, a plaintiff "must show both that [the defendant] engaged in anticompetitive conduct and that [the plaintiff] suffered antitrust injury as a result." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269 n.9 (3d Cir. 2012). Because a lack of anticompetitive conduct precludes a finding of antitrust injury, the key question is whether UTC engaged in anticompetitive conduct. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) ("Antitrust injury does not arise . . . until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct.").

**1. Anticompetitive Conduct**

UTC argues Plaintiffs' antitrust claims fail because "no reasonable jury could find, on this record, that Plaintiffs were substantially foreclosed from an opportunity to compete, which is required to show harm to competition." (ECF No. 322 at 24.) UTC also asserts there is no genuine dispute UTC's challenged agreements are procompetitive. (*Id*. at 32.) UTC argues Plaintiffs have "adduced no evidence of a substantially less restrictive means" for UTC to achieve its procompetitive goals. (*Id.* at 24.) Plaintiffs counter UTC is not entitled to summary judgment because Plaintiffs have sufficiently advanced direct and indirect evidence of anticompetitive effects as a result of UTC's cartridge restriction. (ECF No. 336 at 23–26.) Plaintiffs also argue UTC has not met its burden to establish procompetitive benefits because the benefits UTC asserts do not flow from the challenged restraints—the 2019 cartridge restriction with the Specialty

Pharmacies. (*Id*. at 37–39.) Plaintiffs further contend that whether the procompetitive benefits to the restraints could have been achieved through a less restrictive alternative is a question of fact for a jury. (*Id.* at 40.)

The rule of reason is the default for assessing the reasonableness of a restraint on competition.[17] *See Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006). "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (citing *Cont'l T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49 (1977)). Applying the rule of reason requires an accurate definition of the relevant market. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.").

One potential form of restraint on competition assessed under the rule of reason is an exclusive dealing arrangement. *See LePage's*, 324 F.3d at 157 (explaining exclusive dealing claims are cognizable under Sections 1 and 2 of the Sherman Act and evaluated under the same rule of reason standard). "An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *ZF Meritor*, 696 F.3d at 270. "The primary antitrust concern with exclusive dealing

[17] There are three primary lenses through which a court examines antitrust claims: the *per se* rule, the quick-look approach, and the rule of reason. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 594 (1st Cir. 1993); *Texaco, Inc.*, 547 U.S. at 5. In its November 2020 Opinion, the Court determined the *per se* and quick-look approaches do not apply to Plaintiffs' claims. (ECF No. 170 at 15–16.) The Court adopted the rule of reason standard for examining the allegedly anticompetitive conduct. (*Id*.) The Parties do not dispute the rule of reason is the appropriate standard. (ECF No. 322 at 23; ECF No. 336 at 4.) Indeed, the rule of reason governs exclusive dealing claims under Section 1 and Section 2 of the Sherman Antitrust Act. *See LePage's*, 324 F.3d at 157.

arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition." *Id*. (citing *United States v. Dentsply Int'l*, 399 F.3d 181, 191 (3d Cir. 2005). However, "[a]n exclusive dealing agreement is illegal under the rule of reason 'only if the "probable effect" of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals.'" *Eisai*, 821 F.3d at 403 (citing *ZF Meritor*, 696 F.3d at 270–71) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961)).

In evaluating the legality of an exclusive dealing arrangement, courts consider: (1) "whether a plaintiff has shown substantial foreclosure of the market for the relevant product"; and (2) "the likely or actual anticompetitive effects of the exclusive dealing arrangement, including whether there was reduced output, increased price, or reduced quality in goods or services." *Id*. at 403; *Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*, 841 F. App'x 399, 404 n.12 (3d Cir. 2021). "Substantial foreclosure allows the dominant firm to prevent potential rivals from ever reaching 'the critical level necessary' to pose a real threat to the defendant's business." *ZF Meritor*, 696 F.3d at 286 (citing *Dentsply*, 339 F.3d at 191). To demonstrate substantial foreclosure, a "plaintiff must both define the relevant market and prove the degree of foreclosure." *Id.* (quoting *United States v. Microsoft Corp*., 253 F. 3d 34, 69 (D.C. Cir. 2001)). While "[t]he test [for determining anticompetitive effect] is not total foreclosure," the challenged practices must "bar a substantial number of rivals or severely restrict the market's ambit." *Id*. (quoting *Dentsply*, 399 F.3d at 191) (second alteration in original). "In conducting this analysis, courts consider not only the percentage of the market foreclosed, but also take into account 'the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market.'" *Id.* at 271 (quoting *Barr Labs., Inc. v. Abbot Labs.*, 978 F.2d 98, 110–11 (3d Cir. 1992)). "The share of the market foreclosed is important because, for the contract to have an adverse effect

upon competition, 'the opportunities for other[s] . . . to enter into or remain in that market must be significantly limited.'" *Microsoft*, 253 F.3d at 69 (citing *Tampa Elec.*, 365 U.S. at 328).

With respect to assessing the "likely or actual anticompetitive effects", courts employ a burden-shifting approach to determine whether the exclusive dealing arrangement violates the rule of reason. *Eisai*, 821 F.3d at 403, 407. In *Ohio v. American Express*, the Supreme Court explained,

> the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

138 S. Ct. at 2284 (internal citations omitted). In other words, courts must "distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Id.* (citing *Leegin Creative Leather Prods.,* 551 U.S. at 886). Because exclusive dealings are often entered into for procompetitive reasons, courts consider the procompetitive justification of the challenged restraint. *See Race Tires*, 614 F.3d at 76 ("[I]t is widely recognized that in many circumstances, [exclusive dealing arrangements] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all.") (second alteration in original) (quotation omitted). As the Supreme Court explained:

> [I]t is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein[.]

*Tampa Elec.*, 365 U.S. at 329.

However, "[e]xclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods[.]" *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984). Moreover, "[e]xclusive dealing arrangements are of special concern when imposed by a monopolist." *ZF Meritor*, 696 F.3d at 271; *Dentsply*, 399 F.3d at 187 ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist."). While there is no set formula for evaluating the legality of an exclusive dealing arrangement, the Third Circuit teaches:

> [M]odern antitrust law generally requires a showing of significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects. Courts will also consider whether there is evidence that the dominant firm engaged in coercive behavior, and the ability of customers to terminate the agreements. The use of exclusive dealing by competitors of the defendant is also sometimes considered.

*Id.* at 271–72 (internal citations omitted). A court should also consider "the nature of the market in which the parties compete." *Id*. at 284. Therefore, in assessing an alleged antitrust violation, "[m]arket share is not all determinative" and may be offset by other evidence, including "proof that the market remains highly competitive, that the defendant controls key materials or technology, and the presence or absence of other barriers to new market entry or expansion by existing competitors." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 660 F. Supp. 2d 590, 603 (W.D. Pa. 2009).

Here, Plaintiffs define the relevant market as subcutaneous treprostinil in the United States. (ECF No. 336 at 24; ECF No. 178 ¶ 87.) There are only two products in this relevant market—UTC's branded Remodulin and Sandoz's generic treprostinil. UTC launched its branded

Remodulin in 2002.[18] (ECF No. 322-1 ¶ 3; ECF No. 336-1 ¶ 3.) According to Plaintiffs, the challenged restraint is the cartridge restrictions UTC imposed on the Specialty Pharmacies in 2019. (ECF No. 336 at 4.)

Sandoz first learned UTC was seeking to restrict the cartridges compatible with the CADD-MS 3 pumps for use with only branded Remodulin in January 2019. (ECF No. 320-1 ¶ 55; ECF No. 362-1 ¶ 55.) Sandoz had planned to launch its subcutaneous treprostinil in March 2019. (ECF No. 320-1 ¶ 59; ECF No. 362-1 ¶ 59.) It was not until April 2019 when UTC took title to the cartridges—becoming the sole cartridge distributor—and in April and May 2019 when UTC executed the "restrictive agreements" with the Specialty Pharmacies at issue. (ECF No. 320-1 ¶ 54; ECF No. 362-1 ¶ 54.) Based on the information Sandoz learned in January 2019, Sandoz made a business decision to not launch its generic treprostinil for subcutaneous use. (ECF No. 320-1 ¶¶ 54, 57; ECF No. 362-1 ¶¶ 54, 57.) Indeed, generic subcutaneous treprostinil did not even enter the relevant market until May 2021—when Sandoz secured its own supply of cartridges to sell its generic treprostinil to patients receiving the medication subcutaneously. (ECF No. 322-1 ¶ 187; ECF No. 336-1 ¶ 187.)

Plaintiffs have not demonstrated that the probable effect of UTC's exclusive dealing arrangement was to "substantially lessen competition in the relevant market, rather than merely disadvantage rivals." *ZF Meritor*, 696 F.3d at 281 (citing *Tampa Elec.*, 365 U.S. at 328–29). In essence, UTC secured all commercially available cartridges compatible with the CADD-MS 3

[18] In 1997, five years prior to launching Remodulin, UTC contracted with Medtronic, a device manufacturer, to develop delivery devices for Remodulin exclusively. (ECF No. 322-1 ¶ 5; ECF No. 336-1 ¶ 5.) By 1999, Medtronic produced and cleared with the FDA a pump and cartridge platform to deliver Remodulin subcutaneously. (ECF No. 322-1 ¶ 6; ECF No. 336-1 ¶ 6.) In 2006, Medtronic discontinued manufacturing its pump and cartridge platform. (ECF No. 322-1 ¶ 8; ECF No. 336-1 ¶ 8.) As a result, UTC began engaging Smiths to use Smiths's pump and cartridge platform for administering Remodulin. (ECF No. 322-1 ¶¶ 9–10; ECF No. 336-1 ¶¶ 9–10.)

pump around the time Sandoz was preparing to launch its generic treprostinil. UTC's intentions for securing the cartridges, however, are immaterial because for an exclusive dealing arrangement to have an adverse effect upon competition, the opportunities for competitors "to enter into or remain in th[e] market must be significantly limited[.]" *Tampa Elec.*, 365 U.S. at 328. The record shows Sandoz was not foreclosed from contracting with Smiths or other manufacturers to secure cartridges for its own use. Indeed, in January 2019, months prior to Sandoz's planned generic launch, Smiths offered to license its cartridge design to Plaintiffs so they could secure their own. (ECF No. 322-1 ¶ 165; ECF No. 336-1 ¶ 165.) Ultimately, after months of negotiations, Plaintiffs declined to pursue an arrangement with Smiths. Plaintiffs claim licensing the design was "not a workable solution" because it would require Smiths to modify instructions for the CADD-MS 3 pump with the FDA. (*Id.*) First, modifying instructions with the FDA is not a barrier so high that competitors entering the market are unable to achieve. *See Eiasi*, 821 F.3d at 406. Second, Plaintiffs ultimately entered into an agreement with another manufacturer, Carelife, to produce the cartridges compatible with the CADD-MS 3 pumps they needed for their generic treprostinil—which entailed successfully modifying instructions of the CADD-MS 3 pump with the FDA.[19]

Plaintiffs claim it could not have anticipated the cartridge restriction because throughout 2017 and 2018, the Specialty Pharmacies assured Sandoz "Plaintiffs only needed to provide vials

[19] Plaintiffs assert they needed to obtain FDA clearance to permit use of its alternative cartridges with the CADD-MS 3 pump. (ECF No. 336 at 31.) While Plaintiffs argue Smiths would not have agreed to work with them to achieve FDA clearance for its cartridge without this lawsuit, the record indicates otherwise. Indeed, Smiths offered to license its cartridge design to Sandoz prior to the filing of this lawsuit. (ECF No. 322-1 ¶ 165; ECF No. 336-1 ¶ 165.) Moreover, Sandoz does not offer evidence demonstrating that fixed costs were so high that competitors entering the market were unable to obtain FDA clearance. *See Eisai*, 821 F.3d at 406 (reasoning nothing in the record indicated an equally efficient competitor was unable to compete where the plaintiff "does not offer evidence demonstrating that fixed costs were so high that competitors entering the market were unable to obtain a cardiology indication").

of generic treprostinil and nothing else." (ECF No. 336 at 2–3.) Even though Sandoz received "assurances" cartridges would be available for Sandoz's generic launch, they were not available as UTC took title to the existing cartridges around the time of launch. Surely, this was an inconvenience for Sandoz at the time of its generic launch, but it did not deprive Sandoz from an opportunity to compete. *See Eisai*, 821 F.3d at 403–04 ("One competitor's inability to compete does not automatically mean competition has been foreclosed."). To be sure, Plaintiffs maintain the Specialty Pharmacies were "strong-armed" into entering in the exclusive dealing arrangement with UTC. (ECF No. 336 at 34.) However, UTC was the sole supplier of cartridges at the time. The Specialty Pharmacies would not have been able to dispense subcutaneous treprostinil, branded or generic, without the cartridges UTC was supplying. The 2019 cartridge restriction only limited the use of UTC's cartridges. There is no evidence UTC restricted the Specialty Pharmacies from dispensing generic treprostinil with non-UTC cartridges, no evidence UTC prohibited the Specialty Pharmacies from sourcing non-UTC cartridges, and no evidence UTC prevented the Specialty Pharmacies from contracting with other suppliers of cartridges. Indeed, the Specialty Pharmacies were free to use the non-UTC cartridges sourced by Plaintiffs, free to contract with the device manufacturer that Plaintiffs sponsored to produce non-UTC cartridges, and free to dispense generic treprostinil with the non-UTC cartridges. *See Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours and Co.,* 826 F.2d 1235, 1241 (3d Cir. 1987) ("[A]ntitrust law aims to protect competition, not competitors."). In other words, Plaintiffs were not prevented from "reaching 'the critical level necessary' to pose a threat to" UTC's business.[20] *See ZF Meritor*, 696 F.3d at 286

[20] To illustrate by comparison, in *United States v. Microsoft,* the District of Columbia Court of Appeals concluded that Microsoft foreclosed rivals in a "substantial percentage of the available opportunities" through the use of exclusive contracts with key distributors. 253 F.3d at 70–71. In *LePage's*, the Third Circuit acknowledged:

(citing *Dentsply*, 339 F.3d at 191.) Therefore, Plaintiffs have not shown substantial foreclosure of the subcutaneous treprostinil market.

Nothing in the record indicates that an equally efficient competitor was unable to compete with UTC. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000) ("If entry barriers to new firms are not significant, it may be difficult for even a monopoly company to control prices through some type of exclusive dealing arrangement because a new firm or firms easily can enter the market to challenge it."). Plaintiffs entered the relevant market once they secured a supply of cartridges to use with subcutaneous generic treprostinil—cartridges they secured by entering into an exclusive dealing arrangement with Carelife, which gave Plaintiffs the ability to determine how their own cartridge supply would be distributed. (ECF No. 322-1 ¶ 175; ECF No. 336-1 ¶ 175); *see ZF Meritor*, 696 F.3d at 271 ("The use of exclusive dealing by competitors of the defendant is also sometimes considered."). Although UTC entered into an exclusive dealing arrangement with the Specialty Pharmacies, Sandoz was not driven out or foreclosed from an opportunity to compete. *See Mumford v. GNC Franchising LLC,* 437 F. Supp. 2d 344, 354 (W.D. Pa. 2006) (finding a practice is not anticompetitive simply because it harms

---

> The inquiry in *Microsoft* was whether the monopolist's conduct excluded a competitor (Netscape) from the essential facilities that would permit it to achieve the efficiencies of scale necessary to threaten the monopoly. In *Microsoft*, the court of appeals determined that Microsoft had foreclosed enough distribution links to undermine the survival of Netscape as a viable competitor.

324 F.3d at 159–60 (citing *Microsoft*, 253 F.3d at 70–71). Unlike in *Microsoft*, while UTC excluded Sandoz from using the cartridges that were *supplied by UTC*, UTC did not exclude Sandoz from essential facilities—as Sandoz was not precluded from licensing the cartridge design from Smiths or contracting with other device manufacturers to produce alternative cartridges—that would permit Sandoz to achieve the efficiencies of scale necessary to threaten UTC's market power. Nor did UTC foreclose the distribution links—the Specialty Pharmacies—from sourcing other cartridges or engaging other cartridge suppliers to dispense generic treprostinil. Therefore, UTC did not undermine the survival of Sandoz as a viable competitor.

competitors, but "[r]ather, a practice is 'anticompetitive' only if it harms the competitive process" (citations omitted)).

Further, Plaintiffs have not demonstrated UTC's conduct, as a whole, caused or was likely to cause anticompetitive effects in the relevant market. Plaintiffs have not advanced evidence UTC's conduct caused "reduced output, increased prices, or reduced quality" in the subcutaneous treprostinil market.[21] *Eisai*, 821 F.3d at 407. As to output, there is no evidence of a reduction in subcutaneous treprostinil after the 2019 cartridge restriction. While the 2015 Settlement Agreement permitted Sandoz to begin marketing its generic in June 2018, and Sandoz was preparing to launch its generic in March 2019, Sandoz realized it was not ready to enter the market until May 2021 because UTC secured the existing cartridges for its own use. *See Am. Express*, 138 S. Ct. at 2284 (finding court must "distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest"). The challenged restraint, however, did not cause the availability of subcutaneous treprostinil in the market to decline. There is also no evidence of reduced quality in the subcutaneous treprostinil market as a result of the cartridge restriction. As to prices, Sandoz maintains the 2019 cartridge restriction enabled UTC to keep Remodulin prices artificially high. (ECF No. 336 at 2.) Even if Remodulin prices are high, there is no evidence UTC's 2019 cartridge restriction caused Remodulin's high prices; nor does Sandoz advance evidence reflecting the price of subcutaneous treprostinil in the relevant market increased after UTC imposed the cartridge restriction. To the extent UTC's conduct caused injury to Sandoz as a competitor, antitrust laws

[21] On occasion, Plaintiffs assert there are genuine issues of material fact whether UTC's conduct impacted cartridge supply. (*See* ECF No. 336 at 2 ("It is also disputed whether any of UTC's agreements with Smiths increased cartridge output.") However, the relevant market, as defined by Plaintiffs, is subcutaneously injected treprostinil. There are no claims in this litigation regarding alleged anticompetitive effects in the cartridge market.

are concerned with "the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). Sandoz fails to tie the delay in launching its generic with anticompetitive consequences or point to evidence in the record suggesting harm to competition to create a genuine issue of material fact. *See McQuillan v. Spectrum Sports*, 506 U.S. 447, 458 (1993) (explaining the Sherman Antitrust Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself"); *Dentsply*, 399 F.3d at 187 ("There must be proof that competition, not merely competitors, has been harmed.").

Without evidence of substantial foreclosure or anticompetitive effects, Sandoz has failed to demonstrate that the probable effect of UTC's conduct was to substantially lessen competition in the relevant market, rather than merely disadvantage rivals. *See ZF Meritor*, 696 F.3d at 281 ("Under the rule of reason, an exclusive dealing arrangement is anticompetitive only if its 'probable effect' is to substantially lessen competition in the relevant market, rather than merely disadvantage rivals.").

Additionally, the record here sufficiently establishes procompetitive justifications for the 2019 cartridge restriction. *See Race Tires*, 614 F.3d at 76 ("[I]t is widely recognized that in many circumstances, [exclusive dealing arrangements] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like— and pose no competitive threat at all.") UTC claims the procompetitive effects include "expanding output of pumps and cartridges that would not otherwise exist, ensuring supply for Remodulin patients, facilitating successful product development, and discouraging free riding." (ECF No. 322 at 32.) While exclusive dealing arrangements can exclude equally efficient competitors, and thereby harm competition, that is not the case here. *See Eisai*, 821 F.3d at 403 ("While exclusive dealing arrangements may deprive

competitors of a market for their goods, they can also offer consumers various economic benefits, such as assuring them the availability of supply and price stability."). UTC offers several good faith procompetitive justifications for its 2019 cartridge restriction, including to ensure a supply of cartridges available for use for its Remodulin patients. *See Barr Labs.*, 978 F.2d at 111 (explaining courts must "evaluate the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market") (citations omitted).

Moreover, Plaintiffs have not established there are substantially less restrictive alternatives for UTC to achieve its legitimate business objective. *See United States v. Brown Univ.*, 5 F.3d 658, 678–79 (3d Cir. 1993) ("Even if an anticompetitive restraint is intended to achieve a legitimate objective, the restraint only survives a rule of reason analysis if it is reasonably necessary to achieve the legitimate objectives proffered by the defendant."). As an alternative, Plaintiffs offer "UTC could have purchased cartridges for itself—something it didn't do until 2019." (ECF No. 336 at 41.) Ironically, this is exactly what UTC did by taking title to the cartridges before contractually engaging the Specialty Pharmacies. Plaintiffs also offer as an alternative "UTC could have paid Smiths to produce a specific volume . . . without imposing any restriction." (*Id.*) However, "courts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'" *NCAA v. Alston*, 141 S. Ct. 2141, 2161 (2021) (alteration in original) (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 227 (D.C. Cir. 1986)). Moreover, when Smiths announced its discontinuation of the CADD-MS 3 pumps, UTC responded by funding continued production of the pumps to ensure an available supply for its Remodulin patients, committing [redacted] for pumps and [redacted] for cartridges. (ECF No. 322-1 ¶ 45; ECF No. 336-1 ¶ 45.) There is no evidence any other company funded continued production of the pumps or made contractual

commitments to purchasing pumps and cartridges from Smiths to ensure the continued production of these products. The culmination of UTC's efforts to ensure it had an available supply of pumps and cartridges for patients receiving Remodulin included the 2019 cartridge restriction. The Court is not persuaded Plaintiffs met their burden of showing UTC could have employed substantially less restrictive means to achieve its objective.

In sum, reviewing Plaintiffs' claims under the rule of reason, the Court finds no evidence UTC's actions caused broad harm to the competitive nature of the subcutaneous treprostinil market. Having found no anticompetitive conduct in the relevant market, Plaintiffs cannot establish an antitrust injury to maintain their antitrust claims. *See ZF Meritor*, 696 F.3d at 269 ("[A] lack of anticompetitive conduct precludes a finding of antitrust injury."); *Atl. Richfield Co.*, 495 U.S. at 339 ("Antitrust injury does not arise . . . until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct."). Accordingly, UTC's motion for summary judgment as to Plaintiffs' antitrust claims is **GRANTED.**

**2. Injunctive Relief**

UTC seeks summary judgment as to Plaintiffs' request for injunctive relief. (ECF No. 322 at 55.) Plaintiffs' claim for injunctive relief sought to "enjoin [UTC] from denying PAH patients access to the cartridges they need to receive subcutaneous injections of generic treprostinil." (ECF No. 178 ¶ 7.) However, Plaintiffs have since secured cartridges from another manufacturer and began selling its subcutaneous treprostinil in May 2021. Moreover, because Plaintiffs' claim for

damages fails, so does their request for injunctive relief. Accordingly, UTC's motion for summary judgment as to Plaintiffs' request for injunctive relief is **GRANTED.**

### B. Restraint of Trade

The Parties do not dispute Plaintiffs' restraint of trade claim rests on the viability of Plaintiffs' antitrust claims. (ECF No. 336 at 47; ECF No. 365 at 25.) Plaintiffs' restraint of trade claim pursuant to N.J. Stat. Ann. § 56:9-3 closely tracks federal antitrust jurisprudence for Section 1. *Kugler v. Koscot Interplanetary, Inc.*, 293 A.2d 682 (N.J. Super. Ch. Div. 1972). For the reasons set forth above, *supra* III.A., Plaintiffs' restraint of trade claim fails. Accordingly, UTC's motion for summary judgment as to Plaintiffs' restraint of trade claim is **GRANTED.**

### C. Tortious Interference

UTC asserts Plaintiffs' tortious interference claim is premised on the same conduct as their antitrust claims, and therefore fails because UTC engaged in permissible competition. (ECF No. 322 at 48.) Plaintiffs counter UTC's actions are actionable independent of federal antitrust law and UTC did not engage in permissible competition. (ECF No. 336 at 47–48.) Under New Jersey law, to establish a tortious interference claim, a plaintiff must demonstrate: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages." *Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31 (N.J. 1989)). As a matter of law, while tortious interference claims can cover wrongful conduct other than antitrust activity, the only improper conduct on which Plaintiffs base their claim for tortious interference is UTC's alleged anticompetitive activity. *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 558 (D.N.J. 2019). Therefore, for the reasons Plaintiffs' antitrust claim fails, *supra* III.A., so does their tortious

interference claim. Accordingly, UTC's motion for summary judgment as to Plaintiffs' tortious interference claim is **GRANTED.**

**D. Unfair Trade Practices**

UTC argues Plaintiffs' unfair trade practices claim under N.C. Gen. Stat § 75-1.1 fails for the same reasons Plaintiffs' antitrust claims fail. (ECF No. 322 at 49.) Plaintiffs counter N.C. Gen. Stat. § 75-1.1 also sanctions conduct beyond traditional antitrust concepts. (ECF No. 336 at 49.) "When a section 75-1.1 claim derives solely from an antitrust claim, the failure of the antitrust claim also defeats liability under section 75-1.1." *Sitelink Software, LLC v. Red Nova Labs, Inc.*, 2016 NCBC 43, 87 (N.C. Super. Ct. June 14, 2016) (citing *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 396 (M.D.N.C. 2002)); *see also Sykes v. Health Network Sols., Inc.*, 828 S.E.2d 467 (N.C. 2019) (affirming dismissal of section 75-1.1 claim premised on "the same conduct that is the subject of plaintiffs' antitrust claims"). Here, Plaintiffs' unfair trade practices claim under N.C. Gen. Stat. § 75-1.1 is based on the same conduct as their antitrust claims. Accordingly, UTC's motion for summary judgment as to Plaintiffs' unfair trade practices claim under N.C. Gen. Stat. § 75-1.1 is **GRANTED.**

**E. Breach of Contract**

Sandoz seeks summary judgment as to liability on its breach of contract claim, asserting there is no genuine dispute UTC breached the plain terms of the 2015 Settlement Agreement. (ECF No. 320 at 2, 8.) Sandoz argues UTC's actions blocked Sandoz from accessing the CADD-MS 3 cartridges, preventing Sandoz from reaching consumers with its generic treprostinil, and, as a result, interfered with Sandoz's generic launch in breach of the 2015 Settlement Agreement. (*Id.* at 10, 13.) UTC argues Sandoz is not entitled to summary judgment because: (1) the parties never intended to impose any obligation on UTC relating to delivery devices; (2) UTC's acting to secure

its own pumps and cartridges for Remodulin patients should not constitute a breach of the agreement; and (3) Sandoz has not established that it sustained any damage from an alleged breach. (ECF No. 341 at 1–3.)

Under New Jersey law, if the terms of a contract are clear and unambiguous, courts must enforce those terms as written. *See City of Orange Twp. v. Empire Mortg. Svcs., Inc.*, 775 A.2d 174, 179 (N.J. Super. Ct. App. Div. 2001) (citing *Kampf v. Franklin Life Ins. Co.*, 161 A.2d 717, 720 (N.J. 1960); *Levison v. Weintraub*, 521 A.2d 909, 910 (N.J. Super. Ct. App. Div. 1987), *cert. denied*, 527 A.2d 470 (N.J. 1987)). "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." *M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 794 A.2d 141, 152 (N.J. 2002) (citation omitted). Whether the terms of a contract are clear and unambiguous is a question of law and is suitable to be considered at summary judgment. *Ramada Worldwide, Inc. v. RIP Mgmt. Grp. Corp.*, Civ. A. No. 07-1540, 2009 U.S. Dist. LEXIS 53808, at *12 (D.N.J. June 25, 2009) (citing *Driscoll Const. Co., Inc. v. State, Dept. of Transp.*, 853 A.2d 270, 276 (N.J. Super. Ct. App. Div. 2004)).

"To prevail on a breach of contract claim, a party must prove a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and the breach caused the claimant to sustain[] damages." *EnviroFinance Grp., LLC v. Env't Barrier Co., LLC*, 113 A.3d 775, 787 (N.J. App. Div. 2015) (citing *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. App. Div. 2007)). When interpreting a contract, "a court must determine the intention of the parties as revealed by the language in the agreement." *Gordon v. United Cont'l Holding, Inc.*, 73 F. Supp. 3d 472, 479 (D.N.J. 2014) (citing *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 65 (N.J. 2016)). Under New Jersey's rules for contract interpretation, "the terms of an agreement are to be given their plain and ordinary meaning." *Gordon*, 73 F. Supp. 3d at 479 (quoting *M.J. Paquet*, 794

A.2d at 152). A court "can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted is subject to only one reasonable interpretation." *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 164–65 (3d Cir. 2001) (citation and quotation marks omitted).

Here, Sandoz alleges UTC breached two provisions of the 2015 Settlement Agreement—Section 11(b) and Section 15(c), *supra* I.A.1. Under Section 11(b), UTC agreed "[n]ot to take any action directly or indirectly to prevent, delay, limit, or otherwise restrict the launch, manufacture, use, sale, offer for sale, importation or distribution of the Sandoz [treprostinil in the United States]." (ECF No. 320-1 ¶ 11; ECF No. 362-1 ¶ 11.) Section 15(c) prohibits UTC from "interfer[ing] with Sandoz's efforts to launch" its generic treprostinil. (ECF No. 320-1 ¶ 12; ECF No. 362-1 ¶ 12.) The parties do not dispute the 2015 Settlement Agreement is a valid contract. (ECF No. 320 at 11; ECF No. 341 at 20.) Rather, UTC maintains Sandoz cannot show UTC failed to perform under the 2015 Settlement Agreement because there is no defined obligation that applies to delivery devices; and UTC obtained its exclusive cartridge supply in 2016 in response to Smiths's discontinuation, not in 2019 to block Sandoz on the eve of its launch. (ECF No. 341 at 20.) In support of its assertion that there is no "defined obligation" applicable to delivery devices, UTC relies on the circumstances surrounding the 2015 Settlement Agreement to show the parties did not intend to impose any obligation on UTC related to delivery devices. (*Id.* at 21–25.) UTC also relies on Section 13(c) of the 2015 Settlement Agreement, which excludes any right to pumps, cartridges, or any other delivery system (*id.* at 27–30), as well as Section 4(l) and 7(a), which if read together, show the parties intended to secure delivery devices as they saw fit (*id.* at 31–32).[22]

[22] Section 15(c) of the 2015 Settlement Agreement provides:

> Nothing in this agreement shall be construed to grant any right to any Third Party proprietary technology, including Remodulin

However, Sandoz does not allege the 2015 Settlement Agreement conferred a right to cartridges or any other delivery devices. Sandoz claims UTC breached its promise to take no actions, directly or indirectly, to prevent, delay, limit, or otherwise restrict the launch of generic treprostinil. Based on the record, and giving the terms of the 2015 Settlement Agreement their plain and ordinary meaning, there is no genuine dispute UTC unambiguously promised not to "prevent, limit, delay, or otherwise restrict" Sandoz's generic launch.

Sandoz had planned to launch its subcutaneous treprostinil in March 2019. (ECF No. 320-1 ¶ 59; ECF No. 362-1 ¶ 59.) In April 2019, UTC took title to all commercially available cartridges—becoming the sole cartridge distributor—and entered into agreements with the Specialty Pharmacies to restrict use of its cartridges to Remodulin patients. (ECF No. 320-1 ¶ 54; ECF No. 362-1 ¶ 54.) Realizing UTC was taking steps to secure all commercially available cartridges required for administering treprostinil subcutaneously, Sandoz made a business decision to delay the launch of its generic treprostinil for subcutaneous use. (ECF No. 320-1 ¶¶ 54, 57; ECF No. 362-1 ¶¶ 54, 57.) Sandoz ultimately launched its generic in May 2021 once Sandoz secured its own supply of cartridges to sell its generic treprostinil to patients receiving the medication subcutaneously. (ECF No. 322-1 ¶ 187; ECF No. 336-1 ¶ 187.) By taking efforts to become the "sole distributor" of cartridges and entering into agreements with the Specialty Pharmacies to restrict cartridge distribution for Remodulin use only, UTC took actions that prevented, delayed,

---

> Implantable System, the DEKA prefilled semi-disposable pump system, any other pump or delivery system for the Sandoz ANDA Product or any other form of treprostinil.

(ECF No. 341 at 27; ECF No. 320-1 ¶ 11; ECF No. 362-1 ¶ 11.) Section 4(l) of the 2015 Settlement Agreement limited Sandoz's ANDA product by excluding "any technology associated with any UTC product(s)"; and Section 7(a) excludes conferring any rights to the use of any device, pump, or equipment. (*Id.*)

limited, or otherwise restricted the launch of generic treprostinil in breach of the 2015 Settlement Agreement.

To the extent UTC contends it obtained the exclusive cartridge supply in 2016, not 2019, the record indicates otherwise. While the 2017 Amended Supply Agreement provided Smiths would use commercially reasonable efforts to enter into agreements with the Specialty Pharmacies to require them to sell cartridges to Remodulin patients only, UTC did not take title to the cartridges and enter into express agreements with the Specialty Pharmacies to restrict cartridge distribution until 2019. (ECF No. 320-1 ¶¶ 37, 54; ECF No. 362-1 ¶¶ 37, 54.) Notwithstanding, regardless of whether UTC obtained exclusivity for pumps and cartridges to ensure supply, rather than block Sandoz's launch, UTC's intentions are immaterial. The Court does not doubt UTC sought to secure cartridges for its own use. However, UTC agreed to not interfere, directly or indirectly, with Sandoz's generic launch—and locking up the existing inventory by taking title to all commercially available cartridges as Sandoz was preparing to launch its generic are actions that prevented, delayed, limited, or otherwise restricted Sandoz's launch. Further, while UTC's contention that Sandoz could not access cartridges because of its own lack of diligence is not without merit, UTC unambiguously promised to refrain from engaging in the conduct that it ultimately engaged in, and therefore breached the 2015 Settlement Agreement.

With respect to damages, UTC maintains Sandoz has not established it suffered any damages.[23] However, there is no genuine dispute UTC promised to not engage in conduct that

---

[23] UTC primarily contends Sandoz fails to prove it sustained damages because the opinion of Sandoz's damages expert, Dr. Anupam Jena, should be excluded on the basis of unreliablity. (ECF No. 341 at 51 ("If the Court agrees [Dr. Anupam Jena's testimony should be excluded], Sandoz will have no evidence of damages to support its claim, and its motion for partial summary judgment should be denied on that basis.") UTC's motion to exclude damages opinions of Dr. Anupam Jena is addressed below, Section III.F. However, the Court need not reach a determination as to UTC's motion to exclude to decide the issues here concerning liability. Moreover, to the extent UTC

prevented, delayed, limited, or otherwise restricted Sandoz's launch. At the time of its generic launch, Sandoz could only sell treprostinil to patients receiving the medication intravenously because UTC's conduct limited or restricted access to the cartridges required for Sandoz to sell treprostinil to patients receiving the medication subcutaneously. Therefore, UTC made a promise to Sandoz, breached that promise, and Sandoz suffered some injury as a result. *See Tessmar v. Grosner*, 128 A.2d 467, 472 (N.J. 1957) ("[W]here it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery.") Accordingly, Sandoz motion for partial summary judgment as to liability on its breach of contract claim is **GRANTED**.[24]

### F. Expert Damages Opinion

UTC argues the testimony of Plaintiffs' damages expert, Dr. Jena, should be excluded because it is based on unreliable underlying data—*i.e.,* the RareGen Forecast.[25] (ECF No. 334 at 9.) Specifically, UTC alleges: (1) Dr. Jena did not know the identity or qualifications of the individuals who prepared the RareGen Forecast; (2) Dr. Jena did not have a basis for the assumption the RareGen Forecast was produced in the ordinary course of business; and (3) Dr.

---

argues Sandoz's claim for liability fails if the opinion of Sandoz's damages expert is excluded, the argument is unpersuasive. Under New Jersey law "[l]iability for breach of contract does not require proof of damage beyond the breach itself." *Bulboff v. King Aircraft Title, Inc.*, Civ. A. No. 19-18236, 2021 U.S. Dist. LEXIS 60677, at *14-15 (D.N.J. Mar. 29, 2021); *Interlink Grp. Corp. USA, Inc. v. Am. Trade & Fin. Corp.*, Civ. A. No. 12-6179, 2014 U.S. Dist. LEXIS 98236, at *19 (D.N.J. July 18, 2014) (explaining the Third Circuit has found in "a breach of contract [claim] the injured party is entitled to nominal damages even when its proof fails to show a substantial loss") (citation omitted).

[24] Because Sandoz is entitled to summary judgment on its breach of contract claim, UTC's motion for summary judgment to dismiss Sandoz's breach of contract claim is denied as moot.

[25] Because the parties do not dispute the qualifications or fitness of Dr. Jena, the Court focuses its inquiry on the reliability requirement under the Federal Rules of Evidence governing admissibility of expert testimony. *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

Jena did not understand the assumptions in the RareGen Forecast for his basis for damages in the intravenous segment.[26] (*Id*. at 5–9.) Plaintiffs counter Dr. Jena's damages opinion should not be excluded because he used multiple sources to formulate his opinion. (ECF No. 348 at 12.) Plaintiffs also argue Dr. Jena's damages opinion is admissible because he verified the reliability of the underlying he data used in forming his opinion, and therefore, satisfies the reliability standard under the Rules of Evidence. (*Id.* at 25.)

"Under the Federal Rules of Evidence, it is the role of the trial judge to act as a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citing *Daubert*, 509 U.S. at 589). The Third Circuit instructs district courts to evaluate the proposed expert's methodology in its review of the testimony's reliability:

> [T]he testimony must be reliable. In other words, the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief. An assessment of the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity.

*Calhoun*, 350 F.3d at 321; *McGarrigle v. Mercury Marine*, 838 F. Supp. 2d 282, 289 (D.N.J. 2011). "[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). Along with "any other[ factors] that are

---

[26] According to UTC, "Dr. Jena's damages opinions must be excluded because they rely on an internal forecast—one created during this litigation, by a litigant with no sales track record—which Dr. Jena was unfamiliar but which he adopted as his own with verifying its reliability." (ECF No. 334 at 10.)

relevant," courts consider the following factors in determining the reliability of a proposed expert's testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 742 & n.8 (3d Cir. 1994) (citing *Daubert*, 509 U.S. at 591; *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985)); *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003); *McGarrigle*, 838 F. Supp. 2d at 290. The party offering the expert's testimony carries the burden to establish admissibility by a preponderance of the evidence. *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999). Nonetheless, the "Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (citation omitted); *see also Kannankeril*, 128 F.3d at 806 (explaining Rule 702 "has a liberal policy of admissibility").

Generally, as to the basic approach to calculating damages, "an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities." *LePage's,* 324 F.3d at 165. "In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *ZF Meritor*, 696 F.3d at 292 (citing Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592–95; *Paoli*, 35 F.3d at 748 n.18 ("Arguably, [third-party

estimates] that an expert relies on are not his underlying data, but rather the data that went into the [third-party estimates] in the first place are his underlying data.")). While "internal projections for future growth" may serve as a basis for an expert's damages opinion, *Lepage's*, 324 F.3d at 165, "district courts must perform a case-by-case inquiry to determine whether the expert's reliance on the business plan in a given case is reasonable." *ZF Meritor*, 696 F.3d at 292.

An expert's reliance on a business plan is unreasonable if the expert "lack[s] critical information that would be necessary for [the opposing party] to effectively cross-examine him." *Id*. at 293. Therefore, "[a]n expert's 'lack of familiarity with the methods and the reasons underlying [someone else's] projections virtually preclude[s] any assessment of the validity of the projections through cross-examination.'" *Id.* at 293 (alterations in original) (quoting *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993); *cf. Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 566 (2d Cir. 1970) (holding projections of company officials are admissible where such officials "set out at length the bases from which they derived their figures, and consequently, [the opposing party] was able to cross-examine them vigorously"). However, "the existence of conflicting evidence [is] not a basis on which to exclude" an expert's testimony. *Id*. at 290. Rather, the credibility of an expert is a question for the jury to determine. *LePage's*, 324 F.3d at 165.

Here, Dr. Jena developed a damages model to calculate alleged damages by comparing Plaintiffs' actual financial performance with Plaintiffs' expected financial performance in a "but-for world" absent UTC's challenged conduct. (ECF No. 348-3 at 8, 16.) UTC does not contest the methodology of Dr. Jena's damages model or the types of inputs used to formulate the model. Rather, UTC challenges one source of underlying data—the RareGen Forecast—that Dr. Jena relied on in calculating a specific input—the Generic Penetration Rate—used in his damages model. While UTC maintains Dr. Jena's reliance on the RareGen Forecast was unreasonable, the

record indicates Dr. Jena did not lack critical information that would be necessary for UTC to effectively cross-examine him, *ZF Meritor*, 696 F.3d at 293, and therefore UTC has not demonstrated his opinion should be excluded as unreliable.

UTC relies heavily on *ZF Meritor*, asserting Dr. Jena's testimony should be excluded because he did not know the qualifications of who prepared the RareGen Forecast or its underlying assumptions. (ECF No. 334 at 10–11 (citing 696 F.3d at 290–93).) In *ZF Meritor*, the court excluded the damages opinion because the expert "relied on a one-page set of profit and volume projections" to calculate damages. 696 F.3d at 292. The Third Circuit held the expert's reliance on a strategic business plan was "improper because he did not know either the qualifications of the individuals who prepared the [business plan] estimates or the assumptions upon which the estimates were based." 696 F.3d at 291. However, the Third Circuit clarified "[i]n some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *In re SemCrude L.P.*, 648 F. App'x 205, 213 (3d Cir. 2016) (citing *ZF Meritor*, 696 F.3d at 292).

As is the case here, Dr. Jena explained why he relied on the RareGen Forecast and demonstrated why he believed the estimates were reliable. As to his reliance on the RareGen Forecast, Dr. Jena provided three reasons: (1) the forecast does not include or account for the challenged conduct; (2) the model was the most recently updated forecast file; and (3) the model provided specific detail into the individual assumptions being made to calculate the overall Generic Penetration Rate and Plaintiffs' volume share of generic treprostinil. (ECF No. 348-3 at 12–13.) Dr. Jena also demonstrated why he believed the estimates were reliable by citing corroborating material to validate the reliability of the RareGen Forecast. By way of example, Dr. Jena compared

the estimated Generic Penetration Rate predicated in the RareGen Forecast with the Generic Penetration Rates found in other economic studies, citing to two authorities as reference.[27] Dr. Jena also reviewed literature of industry analysts predicting the percentage of intravenous and subcutaneous treprostinil sales that would be converted to the generic product,[28] further validating his reliance on the RareGen Forecast with corroborating material. Therefore, Dr. Jena's report demonstrates he considered the reliability of the market projections and provided detailed explanations as to why he found its use appropriate. *See Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 233 (E.D. Pa. 2017) (finding *ZF Meritor* to be distinguishable and admitting an expert's damages opinion where "he considered the reliability of the market projections, that he understood how they were created, and that he will be able to provide detailed explanations as to why he found their use appropriate").

Moreover, UTC contends Dr. Jena's damages opinion is unreliable because he did not know the identity or qualifications of who prepared the RareGen Forecast. While not knowing who specifically created the RareGen Forecast may weigh in favor of exclusion, UTC has not demonstrated Dr. Jena "lack[ed] . . . familiarity with the methods and reasons underlying" the RareGen Forecast to warrant exclusion. *ZF Meritor*, 696 F.3d at 283 (citing *TK-7 Corp.*, 993 F.2d

---

[27] In Dr. Jena's report, he noted the Generic Penetration Rate predicated in the RareGen Forecast reached a maximum of ██ percent by 2020 and explained that economic studies have generally found recent generic penetration rates reaching maximums in the 80 to 90 percent range, citing the following two authorities, Grabowski, H. et al., "Updated Trends in U.S. Brand-name and Generic Drug Competition," Journal of Medical Economics, Vol. 19, No. 9, 2016 and Saha, A. and H. Roberts, "Pharmaceutical Industry's Changing Market Dynamics," International Journal or the Economics of Business, Vol. 27, No. 2, 2020. (ECF No. 348-3 at 13.)

[28] According to Dr. Jena's report, prior to generic entry, industry analysts were predicting that between 50 and 90 percent of intravenous and subcutaneous sales would be converted to the generic product, citing United Therapeutics Corp., *Credit Suisse Equity Research*, September 25, 2018. (ECF No. 348-3 at 6.)

at 732). Indeed, Dr. Jena constructed his own "but-for world" absent the challenged conduct in order to calculate alleged damages, used actual financial data to develop his estimates, applied his assumptions to the financial data, and utilized corroborating material to validate the reliability of the RareGen Forecast. *See e.g., In re SemCrude L.P.*, 648 F. App'x at 214 (finding expert's use of a valuation report reliable where the expert explained his reliance on the valuation and adjusted it based on his own analysis). Because there is a sufficient factual basis underlying Dr. Jena's damages opinion, his opinion is admissible under the Rules of Evidence. *See Elcock,* 233 F.3d at 754–55 (explaining an expert's testimony must be based on sufficient factual foundation).

Further, although UTC contends Dr. Jena's damages opinion should be excluded because the RareGen Forecast he relied on was purportedly created during this litigation (ECF No. 334 at 19), the record indicates otherwise. The metadata, which was reviewed by Dr. Jena, discloses that the RareGen Forecast was created a year prior to litigation and earlier versions of the RareGen Forecast containing the same data were modified prior to litigation. (Glass Decl., Metadata, Ex. 6 (ECF 348-7); Glass Decl., RareG0024775, Ex. 7 (ECF No. 348-8).) In his report, Dr. Jena stated the RareGen Forecast was created in the ordinary course of business and the record indicates RareGen employees were updating their forecast based on actual sales information. (ECF No. 348-3 at 10; Glass Decl., Email, Ex. 5 (ECF No. 348-6).)

Additionally, to the extent UTC asserts it was unreasonable for Dr. Jena to rely on the RareGen Forecast because RareGen is a "new company with no track record selling any drugs" (ECF No. 334 at 29), several factors support Dr. Jena's reliance on the RareGen Forecast. First, Dr. Jena reviewed thirty-three forecast files prepared by Plaintiffs, indicating Plaintiffs regularly generated similar forecasts in the ordinary course of business. (ECF No. 348-3 at 10, 12.) Second, while RareGen was a relatively new company, the founders of the company were former

executives of UTC, one of whom was responsible for marketing branded Remodulin, and therefore knowledgeable about treprostinil. (Glass Decl., Marrow Dep., Ex. 10 (ECF No. 348-11) at 4); *see also Autowest, Inc.,* 434 F.2d at 566 (holding damages testimony was admissible because the financial projections on which the testimony was based "were the product of deliberation by experienced businessmen charting their future course"). Third, Plaintiffs are in the best position to offer reliable forecasts because they are financially incentivized to develop accurate projections. *See ZF Meritor*, 696 F.3d at 292 ("Businesses are generally well-informed about the industries in which they operate, and have incentives to develop accurate projections."). Plaintiffs have shown by a preponderance of the evidence Dr. Jena's damages opinion "rests on a reliable foundation." *Daubert*, 509 U.S. at 597. Whether Dr. Jena's damages opinion "relied on the best data in forming his opinion is a question for the jury." *Apotex*, 321 F.R.D. at 233; *see also Aetna Inc. v. Express Scripts, Inc.*, 261 F.R.D. 72, 81–82 (E.D. Pa. 2009) (finding "to the extent that there are facts in dispute which [the expert] should or should not have relied upon . . . a jury will be given the opportunity to sort through these facts and apply their conclusions in assessing" the expert witness).

Therefore, because Dr. Jena's report has substantiated the basis for his belief based on appropriate methods and procedures rather than subjective belief or unsupported speculation, Dr. Jena's testimony is reliable.[29] *See In re SemCrude L.P.*, 648 F. App'x at 213 (citing *Schneider ex*

---

[29] UTC also challenges Dr. Jena's testimony regarding his estimates of the Generic Penetration Rate in the intravenous treprostinil market, asserting Dr. Jena's estimated Sandoz's share of intravenous treprostinil sales to be three times higher than what occurred in the actual world. (ECF No. 334 at 3–5.) However, for admissibility purposes, Plaintiffs "'do not have to demonstrate to the judge by a preponderance of evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 744). An expert's testimony is reliable if it has good grounds for his or her belief based on appropriate methods and procedures. *See Schneider ex rel. Estate of Schneider*, 320 F.3d at

*rel. Estate of Schneider*, 320 F.3d at 404). Accordingly, UTC's motion to exclude Dr. Jena's damages opinion is **DENIED.**

## IV. CONCLUSION

For the reasons set forth above, Sandoz's Motion for Partial Summary Judgment is **GRANTED**, UTC's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, and UTC's Motion to Exclude is **DENIED.** An appropriate order follows.

***/s/ Brian R. Martinotti***
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated: March 30, 2022

404. In his report, Dr. Jena explained UTC's alleged conduct in the subcutaneous treprostinil market impacted Plaintiffs' ability to penetrate the intravenous treprostinil market. (ECF No. 348-3 at 5–6.) Dr. Jena provided several reasons for this assumption, including preferences of insurers to add products to their formulary that had both intravenous and subcutaneous versions available and preferences of physicians to not switch between branded and generic when prescribing different routes of administration to the same patient. (*Id.*) UTC may challenge the credibility of Dr. Jena's Generic Penetration Rate estimates for the intravenous treprostinil market, but that is for a jury to decide. *LePage's*, 324 F.3d at 165; *ZF Meritor*, 696 F.3d at 290 (finding that "the existence of conflicting evidence [is] not a basis on which to exclude" an expert's testimony).