<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SANDOZ INC., *et al.*,<br><br>               Plaintiffs,<br><br>         v.<br><br>UNITED THERAPEUTICS<br>CORPORATION,<br><br>               Defendant. | Case No. 2:19-cv-10170 (BRM) (JSA)<br><br>**REDACTED OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Plaintiff Sandoz Inc.'s ("Sandoz") Motion to Preclude Defendant United Therapeutics Corporation's ("UTC") experts from offering certain opinions and testimony at trial. (ECF No. 414; Sandoz's Mot. Br. (ECF No. 415)). UTC filed an opposition to the Motion to Preclude (ECF No. 431), and Sandoz filed a reply (ECF No. 434). Also before the Court is UTC's Motion *in Limine* 1 through 6. (ECF Nos. 422–26.) Sandoz filed opposition to UTC's Motion *in Limine* 1 through 6. (ECF Nos. 439, 440.) Further, before the Court is Sandoz's Motion *in Limine* 1 through 6. (ECF Nos. 427, 428.) UTC filed opposition to Sandoz's Motion *in Limine* 1 through 6. (ECF Nos. 437, 438.) Having reviewed the parties' submissions filed in connection with the Motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, Sandoz's Motion to Preclude is **GRANTED IN PART** and **DENIED IN PART without prejudice**, UTC's Motion *in Limine* 1 thorough 6 is **GRANTED IN PART**, **DENIED IN PART**, and **RESERVED IN PART**, and Sandoz's Motion *in Limine* 1 through 6 is **GRANTED IN PART** and **RESERVED IN PART**.

## I. BACKGROUND[1]

### A. Factual Background

This matter concerns the sale of brand name and generic treprostinil, a medication used to treat patients with pulmonary arterial hypertension ("PAH").[2] (UTC's Statement of Material Facts ("SMF") (ECF No. 322-1) ¶¶ 1–3; Sandoz's Resp. to UTC's SMF (ECF No. 336-1) ¶¶ 1–3.) UTC manufactures and sells the brand name medication, Remodulin, and Sandoz manufactures and sells generic treprostinil.[3] (Stipulation of Facts (ECF No. 445 at 6–7).) Treprostinil is an injectable medication administered either intravenously or subcutaneously.[4] (*Id.* at 6.) Subcutaneous administration of treprostinil requires a pump, such as the CADD-MS 3 pump, and a three-milliliter medical cartridge. (ECF No. 322-1 ¶¶ 4, 9–10; ECF No. 336-1 ¶¶ 4, 9–10.) In administering treprostinil, the medication is placed in a disposable medical cartridge that is then loaded into the pump. (ECF No. 320-1 ¶ 23; ECF No. 362-1 ¶ 23.)

Until 2019, Smiths Medical ASD Inc. ("Smiths") was the only manufacturer of the CADD-MS 3 pump and medical cartridge used to administer Remodulin. (ECF No. 320-1 ¶ 23;

---

[1] The factual and procedural background of this matter are well known to the parties and were previously recounted by the Court in the January 29, 2020 Opinion (ECF No. 168), the November 18, 2020 Opinion (ECF No. 251), and the March 30, 2022 Opinion (ECF Nos. 382, 388). Therefore, in the interest of judicial economy, the Court refers to those Opinions for a full recitation of the factual background of this dispute. The following facts were provided by the Court in the March 30, 2022 Opinion, where the Court addressed summary judgment motions and a motion to exclude an expert report. Additionally, the Honorable Jessica S. Allen, U.S.M.J. entered the Final Pretrial Order on October 5, 2023 (ECF No. 445), which lists an uncontested stipulation of facts established by the March 30, 2022 Opinion as well as contested facts.

[2] PAH is a disease that causes high blood pressure in the arteries that run from the heart to the lungs. (ECF No. 445 at 5.)

[3] Because Remodulin is the branded version of treprostinil, unless otherwise specified, the Court refers to the medication by its generic name when discussing the medication generally.

[4] Treprostinil is a synthetic form of prostacyclin. (ECF No. 178 ¶ 57.)

ECF No. 362-1 ¶ 23.) Smiths's CADD-MS 3 pump is only compatible with Smiths's three-milliliter medical cartridge. (ECF No. 322-1 ¶¶ 12–13; ECF No. 336-1 ¶¶ 12–13.) Smiths sold its CADD-MS 3 pumps and medical cartridges to two specialty pharmacy distributors, Accredo Health Group ("Accredo") and CVS Specialty (collectively, the "Specialty Pharmacies"), who in turn provided the injectable medication to patients. (ECF No. 320-1 ¶¶ 24–26; ECF No. 362-1 ¶¶ 24–26.)

### 1.     The 2015 Settlement Agreement

UTC launched its branded Remodulin in 2002. (ECF No. 445 at 6.) In 2011, Sandoz submitted an abbreviated new drug application with the Food and Drug Administration ("FDA"), seeking approval to market its generic treprostinil. (*Id*.) Shortly thereafter, UTC sued Sandoz, contending the generic version infringed on its patent. (ECF No. 320-1 ¶ 5; ECF No. 362-1 ¶ 5.) Ultimately, on September 29, 2015, Sandoz and UTC entered into the 2015 Settlement Agreement to resolve the litigation. (ECF No. 445 at 6.) Under the 2015 Settlement Agreement, UTC granted Sandoz the right to make and market its generic treprostinil beginning June 26, 2018. (*Id*.)

### 2.     2016 Supply Agreement

In January 2005, Smiths started developing the CADD-MS 3 pump, which is a modified insulin pump. (*Id*.) The CADD-MS 3 pump can be used to administer treprostinil intravenously or subcutaneously. (*Id*.) Essentially, Smiths reprogrammed an insulin pump's software so the pump would dispense medicine by milliliters instead of units of insulin. (ECF No. 322-1 ¶¶ 7, 9; ECF No. 336-1 ¶¶ 7, 9.).

In 2015, Smiths decided to discontinue making the CADD-MS 3 pump "primarily due to the lack of ongoing availability of critical components from third party suppliers." (ECF No.

322-1 ¶¶ 18–19; ECF No. 336-1 ¶¶ 18–19.) On August 25, 2015, Smiths sent an end-of-life notice for the CADD-MS 3 pump to the Specialty Pharmacies dispensing treprostinil to patients. (ECF No. 322-1 ¶ 21; ECF No. 336-1 ¶ 21.) By October 2015, Smiths shut down its manufacturing line for CADD-MS 3 pumps. (ECF No. 322-1 ¶ 24; ECF No. 336-1 ¶ 24.) Smiths discussed the discontinuation of the CADD-MS 3 pump with UTC before making the announcement. (ECF No. 322-1 ¶ 28; ECF No. 336-1 ¶ 28.)

UTC was concerned there may not be delivery platforms available for commercial use by the time Smiths exhausted its remaining supply of CADD-MS 3 pumps. (ECF No. 322-1 ¶ 34; ECF No. 336-1 ¶ 34.) Eventually, UTC and Smiths agreed to restart production and develop a partially updated version of the CADD-MS 3 pumps. (ECF No. 322-1 ¶ 39; ECF No. 336-1 ¶ 39.)

In March 2016, UTC and Smiths executed a supply agreement for the CADD-MS 3 pumps ("2016 Supply Agreement"). (ECF No. 322-1 ¶ 45; ECF No. 336-1 ¶ 45.) Under the 2016 Supply Agreement, Smiths committed to producing ████ CADD-MS 3 pumps and ████ cartridges. (*Id.*) UTC agreed to pay ████ million immediately, and a total of ████ for the pumps and ████ for the cartridges. (*Id.*)

In November and December 2017, because UTC effectively became the owner of all remaining CADD-MS 3 pumps pursuant to the 2016 Supply Agreement, UTC sought to directly contract with the Specialty Pharmacies to distribute the CADD-MS 3 pumps it purchased from Smiths. (ECF No. 322-1 ¶ 77; ECF No. 336-1 ¶ 77.) The agreement between UTC and the Specialty Pharmacies provided the Specialty Pharmacies would serve as non-exclusive distributors of the pumps "solely for supplying patients who have been dispensed Remodulin." (*Id.*)

### 3.   2017 Amended Supply Agreement

In November 2016, Smiths assessed the "resin amount" required to produce additional cartridges. (ECF No. 322-1 ¶ 58; ECF No. 336-1 ¶ 58.) Smiths located another company that had the same resin Smiths had used to produce its cartridges. (ECF No. 322-1 ¶ 59; ECF No. 336-1 ¶ 59.) Smiths purchased the additional resin from the company, ultimately buying more than it thought was needed to deliver on its commitment to UTC. (*Id.*)

In January 2017, Smiths informed UTC that customers had been buying large quantities of cartridges for use with drugs other than Remodulin. (ECF No. 322-1 ¶ 62; ECF No. 336-1 ¶ 62.) In February 2017, UTC advised Smiths it wished to amend the arrangement with the cartridges. (ECF No. 322-1 ¶ 66; ECF No. 336-1 ¶ 66.) Smiths did not agree to police how the Specialty Pharmacies used cartridges but committed to seek an agreement from the Specialty Pharmacies to use the cartridges for Remodulin only. (ECF No. 322-1 ¶ 73; ECF No. 336-1 ¶ 73.)

In July 2017, UTC and Smiths entered into a second amended agreement to the 2016 Supply Agreement ("2017 Amended Supply Agreement"). (ECF No. 322-1 ¶ 71; ECF No. 336-1 ¶ 71.) Under the 2017 Amended Supply Agreement, Smiths agreed "to use commercially reasonable efforts to amend its existing agreements with [the Specialty Pharmacies] to include a requirement that Cartridges sold . . . by Smiths . . . be used only with Remodulin." (ECF No. 322-1 ¶ 73; ECF No. 336-1 ¶ 73.) To that end, Smiths sent the Specialty Pharmacies draft agreements to restrict cartridges to Remodulin only. (ECF No. 322-1 ¶ 79; ECF No. 336-1 ¶ 79.) Smiths also agreed under the 2017 Amended Supply Agreement to "provide enhanced reporting to UT[C] regarding its manufacturing, inventory, purchases and sale of cartridges" on a monthly basis. (ECF No. 322-1 ¶ 72; ECF No. 336-1 ¶ 72.)

In January 2018, UTC asked Smiths for an update on the agreements with the Specialty Pharmacies to restrict cartridges to Remodulin only. (ECF No. 322-1 ¶ 78; ECF No. 336-1 ¶ 78.) In late 2018, Smiths emailed a Specialty Pharmacy distributor, requesting it sign the amended agreement "that requires us to only sell [CADD-]MS3 cartridges to UTC designated customers," adding, "[t]his is not a lot of dollars, but is very important to UTC to prevent generic drug users, and to manage a tight supply chain." (ECF No. 320-1 ¶ 32; ECF No. 362-1 ¶ 32.) However, in December 2018, UTC learned Smiths's agreements with the Specialty Pharmacies limiting cartridges for Remodulin only were never executed. (ECF No. 322-1 ¶ 81; ECF No. 336-1 ¶ 81.) UTC also learned at the time that Sandoz was preparing to launch its generic treprostinil. (*Id.*) UTC repeated its request for Smiths to execute agreements with the Specialty Pharmacies to restrict sale of the cartridges to Remodulin only.[5] (ECF No. 320-1 ¶ 33; ECF No. 362-1 ¶ 33.)

Faced with the prospect the cartridges could be siphoned for other uses, including sudden large purchases, because the Specialty Pharmacies had yet to execute amended agreements with Smiths, UTC requested Smiths place the cartridges "on allocation." (ECF No. 322-1 ¶ 82; ECF No. 336-1 ¶ 82; ECF No. 320-1 ¶ 35; ECF No. 362-1 ¶ 35.) As a result, Smiths agreed UTC could approve every cartridge sale by Smiths to the Specialty Pharmacies until they agreed to limit cartridge sale to Remodulin patients only. (ECF No. 322-1 ¶ 82; ECF No. 336-1 ¶ 82.)

---

[5] In a December 27, 2018 email, Smiths requested from Accredo: "UT[C] has asked Smiths to ask their US based customers to restrict the sale of the cartridges for Remodulin use only. As such, please review the attached, sign and return." (ECF No. 320-1 ¶ 33; ECF No. 362-1 ¶ 33.) In another December 2018 email, Smiths wrote to CVS Specialty that "[i]t is reaching the point that the product will go on allocation if these agreements are not received." (*Id.*)

### 4.     2019 Amended Supply Agreement

UTC requested the cartridges remain on allocation until restrictions were put on the Specialty Pharmacies to limit cartridge use.[6] (ECF No. 320-1 ¶ 37; ECF No. 362-1 ¶ 37.) While on allocation, UTC would approve the release of cartridges, provided that it received confirmation the cartridges were going to only Remodulin patients. (ECF No. 320-1 ¶ 39; ECF No. 362-1 ¶ 39.) By March 2019, the Specialty Pharmacies agreed to sign the amended agreements with Smiths to restrict use of the cartridges to Remodulin only.[7] (ECF No. 320-1 ¶¶ 49–50; ECF No. 362-1 ¶¶ 49–50.) Ultimately, Smiths opted out of counter-signing the agreements with the Specialty Pharmacies. (ECF No. 320-1 ¶ 51; ECF No. 362-1 ¶ 51.) Instead, in April 2019, Smiths entered into a third amended supply agreement with UTC ("2019 Supply Agreement"). (ECF No. 322-1 ¶ 85; ECF No. 336-1 ¶ 85.) Essentially, pursuant to the 2019 Supply Agreement, UTC took title to all Smiths's cartridges and became the sole distributor of cartridges compatible with the CADD-MS 3 pump. (ECF No. 320-1 ¶ 54; ECF No. 362-1 ¶ 54.) Thereafter, UTC contracted with the Specialty Pharmacies to reflect that UTC took title to the cartridges and to specify the terms and conditions for purchasing the cartridges from UTC. (ECF No. 322-1 ¶ 86; ECF No. 336-1 ¶ 86.)

---

[6] UTC's president testified UTC's decision to put cartridges on allocation was "negotiating leverage" while UTC was "trying to get people to move more quickly to sign agreements." (ECF No. 320-1 ¶ 38; ECF No. 362-1 ¶ 38.)

[7] In February 2019, CVS Specialty signed the amended agreement with Smiths, in which CVS Specialty "agree[d] to restrict use and/or sale of the Cartridges to patients or customers using the Cartridge in the delivery of [Remodulin] regardless of whether repurchased directly from Smiths [] or indirectly through third parties." (ECF No. 320-1 ¶ 49; ECF No. 362-1 ¶ 49.) In March 2019, Accredo signed its amended agreement with Smiths, in which Accredo "agree[d] that it will only sell and/or use, as applicable, that Cartridges for the sole purpose of delivering [UTC]'s Remodulin [] drug to PAH patients, regardless of whether the Cartridges are purchased directly from Smiths [] of [sic] indirectly through third parties." (ECF No. 320-1 ¶ 50; ECF No. 362-1 ¶ 50.)

### 5.    Sandoz's March 2019 Generic Launch

In August 2018, Sandoz entered into a Promotion Agreement with RareGen for the marketing of generic treprostinil. (ECF No. 445 at 7.) In October 2018, RareGen learned from Smiths that UTC had all of Smiths's stock of CADD-MS 3 pumps and UTC had to give permission for any of it to be sold. (ECF No. 322-1 ¶ 139; ECF No. 336-1 ¶ 139.) Notwithstanding, Sandoz and RareGen (collectively, "Plaintiffs") were still able to obtain CADD-MS 3 pumps from one of the Specialty Pharmacies. (ECF No. 322-1 ¶ 147; ECF No. 336-1 ¶ 147.) There were more than 3,000 CADD-MS 3 pumps owned by Accredo that were available for generic treprostinil. (*Id.*) According to Sandoz, the availability of CADD-MS 3 pumps was not a limiting factor to its launch. (*Id.*) Plaintiffs maintain Accredo had sufficient supplies of CADD-MS 3 pumps to support Sandoz's launch of generic treprostinil, despite Smiths's discontinuation. (ECF No. 336-1 ¶ 147.) However, Sandoz was unable to secure the cartridges required for subcutaneous use of its generic treprostinil.

In January 2019, Accredo informed Sandoz the cartridges can only be used with Remodulin. (ECF No. 322-1 ¶ 151; ECF No. 336-1 ¶ 151.) In an effort to obtain cartridges, Plaintiffs contacted Smiths to discuss potential options. (ECF No. 322-1 ¶¶ 164–65; ECF No. 336-1 ¶¶ 164–65.) During a January 15, 2019 telephone call between Plaintiffs and Smiths, Smiths referenced the exclusive arrangement with UTC for the manufacture of cartridges through 2022. (ECF No. 322-1 ¶ 164; ECF No. 336-1 ¶ 164.) However, Smiths suggested Plaintiffs "could potentially license" Smiths's "design for the MS-3 cartridge so that [Plaintiffs] could go and make it on [their] own." (ECF No. 322-1 ¶ 165; ECF No. 336-1 ¶ 165.) On March 25, 2019, Sandoz launched generic treprostinil for intravenous administration only, beginning the clock on a statutory 180-day period of exclusivity. (ECF No. 445 at 7.) On March 26, 2019,

Smiths sent Sandoz a proposed licensing agreement with terms Sandoz requested. (ECF No. 322-1 ¶ 169; ECF No. 336-1 ¶ 169.) Sandoz responded with an additional demand, requesting Smiths provide "an interim supply of cartridges for the period during which we are negotiating the license agreement[.]" (ECF No. 322-1 ¶ 170; ECF No. 336-1 ¶ 170.) Unable to accommodate Sandoz's demand, Smiths and Sandoz ended their proposed licensing agreement discussions. (ECF No. 322-1 ¶ 171; ECF No. 336-1 ¶ 171.)

In May 2019, RareGen entered into a Joint Development Agreement with Carelife, a device manufacturer, to produce alternative cartridges, as well as provide Plaintiffs with exclusivity over those alternative cartridges. (ECF No. 322-1 ¶ 174; ECF No. 336-1 ¶ 174.) In June 2020, Plaintiffs submitted a 510(k) application to the FDA for clearance of its alternative cartridges manufactured by Carelife. (ECF No. 322-1 ¶¶ 181–82; ECF No. 336-1 ¶¶ 181–82; ECF No. 445 at 7.) However, the FDA rejected Plaintiffs' application for an alternative cartridge because Smiths's user manual for its CADD-MS 3 pump provides the CADD-MS 3 pump is only compatible for use with Smiths's medical cartridge.[8] (ECF No. 322-1 ¶ 183; ECF No. 336-1 ¶ 183.) Ultimately, Smiths worked with Plaintiffs to facilitate FDA clearance of Sandoz's alternative cartridges for use with the CADD-MS 3 pump. (ECF No. 322-1 ¶¶ 184–85; ECF No. 336-1 ¶¶ 184–85.) The FDA cleared the alternative cartridges in March 2021, and Sandoz launched its generic treprostinil in the United States for subcutaneous administration in May 2021. (ECF No. 445 at 7.) In total, Plaintiffs' efforts to develop an alternative cartridge cost approximately $500,000. (ECF No. 322-1 ¶ 188; ECF No. 336-1 ¶ 188.)

---

[8] The FDA noted the CADD-MS 3 pump manual states, "Use only Smiths [] 3ml Medication Cartridges; other manufacturers' products will not work with the CADD-MS 3 Pumps." (ECF No. 322-1 ¶ 183; ECF No. 336-1 ¶ 183.) Therefore, the FDA advised Plaintiffs "to either work with Smiths [] to submit a new 510(k) allowing the use of this cartridge with their device or identify a different pump which allows 3rd party cartridges to be used with it." (*Id.*)

### 6.    Patrick Jones's Expert Opinion

UTC describes Patrick Jones ("Mr. Jones") as their expert on "the FDA clearance process for medical devices." (ECF No. 445 at 41.) UTC asserts he may testify on various matters including: the regulatory clearance process for medical devices; the average amount of time it takes a medical device to be cleared by the FDA; Plaintiffs' efforts to secure FDA clearance of an alternative cartridge for use with the CADD-MS 3 pumps; and whether those efforts rose to standards exercised in the pharmaceutical industry. (*Id*. at 41–42.)

Mr. Jones contends Sandoz should have begun taking steps to secure an alternative delivery service for subcutaneous infusion of generic treprostinil by "no later than May 2016" which would have placed Sandoz "in a position to launch by June 26, 2018." (Kent Decl., Ex. 1, Jones Report (ECF No. 415-2 ¶¶ 11, 13).) Mr. Jones also submits "Plaintiffs could have expected to obtain clearance for their cartridge within about 129 days of making their submission [to the FDA]." (*Id*. ¶ 15.)

### 7.    Dnyanesh Talpade's Expert Opinion

UTC retained Dnyanesh Talpade ("Mr. Talpade") as their expert on the field of medical practice development. Mr. Talpade opines Plaintiffs "had a number of reasonable options for securing a subcutaneous delivery system for generic treprostinil well ahead of their targeted launch in June 2018." (*Id*., Ex. 3, Talpade Report (ECF No. 415-4 ¶ 9).) Mr. Talpade asserts "Plaintiffs could have hired a device manufacturer to develop an alternative cartridge for use with [CADD-MS 3 pumps] within 6 to 12 months and for less than $300,000."[9] (*Id*.)

---

[9] Alternatively, Mr. Talpade offers a second timeline where he suggests "Plaintiffs could have hired a device manufacturer to modify an insulin pump within 12 to 24 months and likely for between $1.5 million and $3.5 million." However, the alternative timeline is not considered by UTC's damages expert (Dr. Nicholson) therefore it does not appear relevant to UTC's damages rebuttal.

### 8. Dr. Lisa Shafer's Expert Opinion

UTC retained Dr. Lisa Shafer ("Dr. Shafer") as an expert in the field of complex pharmaceutical product launches. (ECF No. 445 at 43.) UTC submits Dr. Shafer may testify "regarding whether Sandoz's product development work met the standards exercised in the pharmaceutical industry, specifically for pharmaceutical products that required specialized delivery devices." (*Id*.) Dr. Shafer opines "Sandoz's product development work for generic treprostinil fell far below industry standards" based upon her review of actions Sandoz should have undertaken from 2014–2017. (Kent Decl., Ex. 5, Dr. Shafer Report (ECF No. 415-6 ¶¶ 11, 122).)

### 9. Dr. Paul Forfia's Expert Opinion

UTC describes Dr. Paul Forfia ("Dr. Forfia") as a healthcare provider retained as an expert witness "who specializes in treating patients with PAH." (ECF No. 445 at 41.) UTC asserts he may testify on various matters such as: physicians' reaction to the launch of generic products designed to treat PAH; physicians' reaction to the launch of generic treprostinil; and the reluctance of PAH patients and treating physicians to adopt generic treprostinil. (*Id*.) In his expert report, Dr. Forfia submits "[w]hile I offer no opinion on the economic model that Dr. Jena uses to generate [a penetration rate of ██ by 2020], I disagree that generic treprostinil would have been able to obtain a ██ share of the injected treprostinil market." (Kent Decl., Ex. 12, Dr. Forfia Report (ECF No. 415-13 ¶ 55).) Dr. Forfia further opines "physicians and patients alike are reluctant to transition from Remodulin to generic treprostinil." (ECF No. 415-13 ¶ 13.)

### 10. Dr. Sean Nicholson's Expert Opinions

UTC retained Dr. Sean Nicholson ("Dr. Nicholson") as their economics expert. (ECF No. 445 at 42.) Dr. Nicholson will testify about Sandoz's "purported damages in this matter" and

whether Sandoz could have mitigated those damages. (*Id.*) Dr. Nicholson submitted two expert reports: (1) an initial report dated May 28, 2021 (the "Initial Report") (Kent Decl., Ex. 7, Dr. Nicholson Report (ECF No. 415-8)); and (2) a rebuttal report responding to the damages opinions offered by Sandoz's expert, Dr. Anupam Jena ("Dr. Jena") dated June 25, 2021 (the "Rebuttal Report") (*Id.*, Ex. 8, Dr. Nicholson Rebuttal Report (ECF No. 415-9).)

In the Initial Report, Dr. Nicholson opines Sandoz should have undertaken certain actions prior to when UTC breached the contract in 2019 for the purposes of mitigating its damages. Notably, Dr. Nicholson focused on two economic questions in the Initial Report "relevant to the question of legal mitigation":

> First, would it have been economically reasonable for Plaintiffs to develop a launch plan that accounted for the risk of potentially not having access to CADD-MS® 3 pumps and/or cartridges by independently securing their own supply of CADD-MS® 3 compatible cartridges and/or alternative SC pumps during the planning process?
>
> Second, given the estimated time it takes to secure an independent supply of CADD-MS® 3 compatible cartridges and/or alternative SC pumps, are there reasonable scenarios under which Plaintiffs would have had access to their own supply of CADD-MS® 3 compatible cartridges and/or alternative SC pumps in time for their March 2019 launch and could have mitigated alleged damages?

(ECF No. 415-8 ¶ 11.) Based upon his analysis, Dr. Nicholson opined "if Plaintiffs could have secured their own delivery mechanism before their launch, they would have avoided lost profits due to a lack of access to CADD-MS® 3 cartridges and mitigated damages." (*Id*. ¶ 13.)

In the Rebuttal Report, Dr. Nicholson cites to and relies on UTC's other experts including Mr. Talpade, Mr. Jones, Dr. Shafer, and Dr. Forfia. (ECF No. 415-9). Dr. Nicholson offers alternative damages calculations based on four mitigation scenarios. (*Id.* ¶¶ 187–88.) Scenario 1 assumes Sandoz developed a cartridge by March 2019. (*Id.* ¶ 10.) Dr. Nicholson opines Sandoz

12

could have reduced its damages to "at most ███████████." (*Id.*) In Scenario 2 and 3, Dr. Nicholson utilizes two cartridge-development timelines provided by Mr. Talpade which assume Sandoz secured cooperation from Smiths through an earlier settlement. (*Id.*, ¶¶ 10, 187–88.) Scenario 4 relies on Dr. Forfia's opinions contending physicians would have been reluctant to switch from Remodulin to generic treprostinil. (*Id.*)

### B.    Procedural History

On April 16, 2019, Plaintiffs filed their Complaint, asserting six claims against UTC and Smiths: (1) restraint of trade under 15 U.S.C. § 1 of the Sherman Antitrust Act (Count One); (2) monopolization under 15 U.S.C. § 2 of the Sherman Antitrust Act (Count Two); (3) restraint of trade under N.J. Stat. Ann § 56:9-3 (Count Three); (4) restraint of trade under N.C. Gen. Stat. § 75-1 (Count Four); (5) unfair trade practices under N.C. Gen. Stat § 75-1.1 (Count Five); and (6) tortious interference with prospective economic advantage (Count Six). (ECF No. 1.)

On April 19, 2019, Plaintiffs filed an application pursuant to L.Civ.R. 65.1 seeking expedited discovery. (ECF No. 11.) Discovery parameters were set by a May 8, 2019 Stipulated Scheduling Order. (ECF No. 49.) The application terminated on August 9, 2019. (*See* Docket Entry for 8/9/2019.) On May 24, 2019, UTC and Smiths filed a Motion to Dismiss. (ECF No. 53.) On June 17, 2019, Plaintiffs filed their opposition. (ECF No. 56.) On October 4, 2019, Sandoz moved for a preliminary injunction. (ECF No. 106.) On October 25, 2019, UTC filed an opposition. (ECF No. 122.) The Court issued an opinion denying both the Motion for a Preliminary Injunction and Motion to Dismiss. (ECF No. 168.)

On February 12, 2020, UTC and Smiths filed Answers to the Complaint. (ECF Nos. 171, 172.) On March 30, 2020, the Court entered a consent order allowing Plaintiffs to file a First Amended Complaint. (ECF No. 177.) On the same day, Plaintiffs filed their First Amended

Complaint (ECF No. 178) in which Sandoz asserted a breach of contract claim against UTC arising from its alleged failure to carry out its obligations under the 2015 Settlement Agreement (Count Seven). (*Id.* ¶ 107–21). On April 17, 2020, UTC and Smiths filed a Motion to Dismiss Count Seven of Plaintiffs' First Amended Complaint. (ECF Nos. 179, 181.) On May 11, 2020, Plaintiffs filed an opposition to UTC and Smiths' Motion to Dismiss. (ECF No. 184.) On September 14, 2020, the Court appointed the Honorable Jose L. Linares, U.S.D.J. (ret.) as special master to address discovery disputes. (ECF No. 234.) On November 13, 2020, Plaintiffs settled with Smiths (ECF No. 246), and all claims against Smiths were dismissed with prejudice (ECF No. 247).

On November 18, 2020, the Court denied UTC's Motion to Dismiss Count Seven of Sandoz's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 251, 252.) On December 16, 2020, UTC answered Sandoz's First Amended Complaint and asserted a counterclaim for "fraudulent concealment—spoliation" against Sandoz. (ECF No. 258 ¶¶ 72–97.) On September 10, 2021, Sandoz filed a Motion for Partial Summary Judgment (ECF No. 319; Sandoz's Mot. Br. (ECF No. 320)), and UTC filed its Motion for Summary Judgment (ECF No. 321; UTC's Mot. Br. (ECF No. 322)). On October 22, 2021, UTC filed its opposition to Sandoz's motion (ECF No. 341),[10] and on November 1, 2021, Sandoz filed its opposition to UTC's motion (ECF No. 348). On December 3, 2021, UTC filed its reply in support of its

---

[10] On December 1, 2021, UTC filed an amended brief in opposition to Sandoz's Motion for Partial Summary Judgment, which was accompanied by an amended response to Sandoz's statement of material facts and supplemental statements of disputed material facts. (ECF No. 362.) On February 17, 2022, Plaintiffs filed a correction to papers submitted in support of Plaintiffs' opposition to UTC's motion for summary judgment, replacing an exhibit that was previously submitted. (ECF Nos. 377, 378.) Plaintiffs also filed two corrections to papers submitted in support of Sandoz's reply in support of its motion for partial summary judgment, correcting clerical errors to citations in its brief and supplemental statement of disputed material facts. (ECF Nos. 377, 379.)

motion for summary judgment (ECF No. 365), and Sandoz filed its reply in support of its summary judgment motion (ECF No. 364).[11]

On October 20, 2021, UTC filed its motion to exclude damages opinions of Dr. Anupam Jena. (ECF No. 333.) On November 1, 2021, Plaintiffs filed an opposition (ECF No. 348), and on November 22, 2021, UTC filed its reply (ECF No. 358).

On March 30, 2022, the Court issued an opinion granting Sandoz's motion for partial summary judgment, granting in part and denying in part UTC's motion for summary judgment, and denying UTC's motion to exclude. (ECF Nos. 382, 383.) Therefore, Sandoz's antitrust claims (Counts One and Two), restraint of trade claims (Counts Three and Four), unfair trade practices claim (Count Five), and tortious interference claim (Count Six) were dismissed with prejudice. (*Id.*)

In the March 30, 2022 Opinion, the Court found UTC was liable on Sandoz's breach of contract claim arising under Count Seven. (*Id.*) The Court held "[b]y taking efforts to become the 'sole distributor' of cartridges and entering into agreements with the Specialty Pharmacies to restrict cartridge distribution for Remodulin use only, UTC took actions that [breached] the 2015 Settlement Agreement" with Sandoz. (ECF No. 382 at 39–40.) Additionally, the Court found the breach occurred in 2019. (*Id*. at 40 ("To the extent UTC contends it obtained the exclusive cartridge supply in 2016, not 2019, the record indicates otherwise. . . . UTC did not take title to the cartridges and enter into express agreements with the Specialty Pharmacies to restrict cartridge distribution until 2019.").)

---

[11] The Court refrained from addressing the parties' summary judgment motions to allow the parties an opportunity to resolve the litigation. The parties appeared for mediation before the Honorable Joseph A. Dickson, U.S.M.J. (ret.) but were unsuccessful.

On May 23, 2022, Judge Allen entered an Order scheduling the Final Pretrial Conference for June 17, 2022. (ECF No. 390.) On June 9, 2022, the parties filed a Proposed Final Pretrial Order detailing various discovery disputes before Judge Linares. (ECF No. 391 at 1–2.) Thereafter, Judge Allen entered an Order adjourning the Final Pretrial Conference. (ECF No. 394.) On January 27, 2023, Judge Linares issued an Opinion which resolved the remaining discovery disputes.[12] (ECF No. 400.)

On March 3, 2023, the parties filed an Amended Proposed Final Pretrial Order. (ECF No. 405.) Thereafter, the Court conducted two status conferences on March 9, 2023 and March 13, 2023. On March 24, 2023 the parties filed a Second Amended Proposed Final Pretrial Order. (ECF No. 413.)

Additionally, on March 24, 2023, Sandoz filed a Motion to Preclude United Therapeutics Corporation's Expert from Offering Certain Opinions and Testimony at Trial. (ECF No. 414; Sandoz's Mot. Br. (ECF No. 415)). On April 20, 2023, UTC filed its opposition to Sandoz's motion to preclude. (ECF No. 431.) On May 4, 2023, Sandoz filed its reply in further support of its motion to preclude. (ECF No. 434.)

On April 11, 2023, Judge Allen held the Final Pretrial Conference. On April 13, 2023, UTC filed Motion *in Limine* 1 through 6 (ECF Nos. 422–26), and Sandoz filed its Motion *in Limine* 1 through 6 (ECF Nos. 427, 428). On April 25, 2023, the parties filed a Third Amended Proposed Final Pretrial Order. (ECF No. 433.) On May 11, 2023, Sandoz filed an opposition to UTC's Motion *in Limine* 1 through 6 (ECF Nos. 439, 440), and UTC filed an opposition to Sandoz's Motion *in Limine* 1 through 6 (ECF Nos. 437, 438).

---

[12] Judge Linares signed the Opinion on January 27, 2023. The Opinion was filed on January 29, 2023.

On October 5, 2023, Judge Allen entered the Final Pretrial Order. (ECF No. 445.) The sole remaining issue of damages as to the breach of contract claim (Count Seven) will be resolved at a three-day bench trial before the undersigned.

## II.   LEGAL STANDARD

### A.     Motion to Preclude

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993). The Third Circuit has held "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)).

> First, the witness must be qualified to testify as an expert. Qualification requires that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert as such. Second, the testimony must be reliable. In other words, the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief. An assessment of the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Third, the expert testimony must fit, meaning the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.

*Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quotations and citations omitted).

"[T]he district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted). Motions to exclude evidence are within a district court's discretion. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d

17

717, 749 (3d Cir. 1994). However, Rule 702 "has a liberal policy of admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997), *as amended* (Dec. 12, 1997) (citation omitted). "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Id*. at 809.

In the context of a bench trial, "the Court's role as a gatekeeper pursuant to Daubert is arguably less essential." *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 596 n.10 (D.N.J. 2002) *aff'd*, 68 F. App'x 356 (3d Cir. 2003). "[A]rguments for excluding testimony carry substantially less weight when the Court acts as fact-finder." *Grande Vill. LLC v. CIBC Inc.*, Civ. A. No. 14-3495, 2018 WL 3085207, at *6 (D.N.J. June 22, 2018). Instead, "the court has the flexibility to allow testimony provisionally and revise its view once the testimony is taken." *Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 405 (E.D. Pa. 2007).

### B.    Motion *in Limine*

District courts have "wide discretion in determining the admissibility of evidence under the Federal Rules." *United States v. Abel*, 469 U.S. 45, 54 (1984). "Unlike a summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of fact, a motion *in limine* is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990) (citation omitted). The Federal Rules of Evidence embody a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." *Kannankeril*, 128 F.3d at 806. "The movant bears the burden of demonstrating that the evidence is inadmissible on any relevant ground, and the court may deny a motion *in limine* when it lacks the necessary specificity with respect to the evidence to be excluded." *Supernus Pharms., Inc. v.*

*Ajanta Pharma Ltd.*, Civ. A. No. 21-14268, 2023 WL 4866348, at *1 (D.N.J. July 31, 2023) (quoting *Leonard v. Stemtech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013)).

A district court's ruling on a motion *in limine* is "subject to change when the case unfolds, particularly if actual testimony differs from what was contained in the movant's proffer. Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce v. United States*, 469 U.S. 38, 41–42 (1984). "A trial court considering a motion *in limine* may reserve judgment until trial in order to place the motion in the appropriate factual context." *Supernus Pharms.*, 2023 WL 4866348, at *2 (quoting *United States v. Tartaglione*, 228 F. Supp. 3d 402, 406 (E.D. Pa. 2017)).

**III.  DECISION**

Sandoz moves to exclude certain opinions offered by UTC's proffered experts. (ECF No. 414; Sandoz's Mot. Br. (ECF No. 415)). UTC filed six motions *in limine* seeking to exclude various forms of evidence including hearsay and suggestions which may be presented at trial. (ECF Nos. 422–26.) Sandoz also filed six motions *in limine* seeking to exclude specific arguments, evidence, and references at the time of trial. (ECF Nos. 427, 428.) The Court addresses each in turn.

**A.  Sandoz's *Daubert* Motion to Preclude UTC's Experts**

Sandoz moves to exclude certain opinions offered by UTC's economic expert on damages Dr. Nicholson, as well as certain opinions offered by Mr. Jones, Mr. Talpade, Dr. Shafer, and Dr. Forfia. (ECF No. 414; Sandoz's Mot. Br. (ECF No. 415)). In particular, Sandoz seeks to exclude the following three categories of expert opinions: pre-breach mitigation opinions; opinions asserting Sandoz should have mitigated damages by settling with Smiths; and opinions contending physicians or patients would have been reluctant to use generic treprostinil.

(ECF No. 415 at 1–3.) At trial, Sandoz intends to prove its damages in part through the testimony of its economic expert, Dr. Jena. (ECF No. 415 at 1.) UTC intends to offer rebuttal testimony from its proposed expert economist, Dr. Nicholson. (*Id*.) In support of his rebuttal damages calculations, Dr. Nicholson relies on opinions offered by numerous proposed experts (collectively, "UTC's Experts") including: Mr. Jones, UTC's expert on the FDA clearance process for medical devices; Mr. Talpade, UTC's expert in the field of medical practice development; Dr. Shafer, UTC's expert in the field of complex pharmaceutical product launches; and Dr. Forfia, a healthcare provider who treats patients with PAH and UTC's expert in the field of pulmonology. (ECF No. 415-9.)

### 1.    Pre-Breach Mitigation Opinions

Sandoz asserts the Court should preclude UTC's Experts from opining Sandoz should have taken steps to mitigate damages before UTC breached the 2015 Settlement Agreement in 2019.[13] (ECF No. 415 at 17–20.) Sandoz argues UTC's Experts' opinions are inadmissible because they misapply the governing law on mitigation. (*Id*.) UTC counters pre-beach evidence is admissible to prove lack of causation. (ECF No. 431 at 15–26.) UTC asserts Sandoz's choices and actions before and after the breach are relevant and admissible to rebut Sandoz's causation case. (*Id*. at 18–23.) UTC further contends Sandoz misconstrues Dr. Nicholson's opinions. (*Id*. at 24–26.)

In reply, Sandoz submits UTC's Experts cannot opine Sandoz should have developed an alternative delivery system before UTC breached its contract by blocking access to the CADD-MS 3 system. (ECF No. 434 at 1–11.) Sandoz argues the damages trial must analyze a but-for

---

[13] Because the parties do not dispute the qualifications or reliability of Mr. Jones, Mr. Talpade, Dr. Shafer, and Dr. Nicholson, the Court focuses its inquiry on the fit requirement under the Federal Rules of Evidence governing admissibility of expert testimony. *See Schneider ex rel. Est. of Schneider*, 320 F.3d at 404.

world where Sandoz had access to CADD-MS 3 pumps and cartridges. (*Id*. at 1–6.) Sandoz asserts the sole remaining question for the damages trial is straightforward: How much generic treprostinil would Sandoz have sold if UTC had not breached its contract by blocking generic access to CADD-MS 3 cartridges? (*Id*. at 1.) In response to UTC's argument predicated on causation, Sandoz submits UTC misstates the law and cannot argue Sandoz "caused its own harm" by not developing its own cartridges years earlier. (*Id*. at 6–8.)

Regarding the "fit" requirement, Rule 702 requires an "expert's scientific, technical, or other specialized knowledge . . . help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In order to be helpful, expert testimony must be "sufficiently tied to the facts of the case [such] that it will aid the [factfinder] in resolving a factual dispute." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (quotation marks and citation omitted). On the contrary, "expert evidence which does not relate to an issue in the case is not helpful." *United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007) (quotation marks and citation omitted). The Third Circuit has noted the standard for analyzing the fit of an expert's analysis is "not that high," but "higher than bare relevance." *Paoli*, 35 F.3d at 745.

Here, Mr. Jones, Mr. Talpade, Dr. Shafer, and Dr. Nicholson each opine Sandoz should have developed an alternative cartridge and delivery system prior to 2019 when UTC breached the contract. *See*, *e.g.*, (ECF No. 415-2 ¶¶ 69, 74 (asserting Sandoz could have received FDA clearance for "an alternative disposable cartridge for use in the existing CADD-MS 3 pumps" in time for a June 26, 2018 launch)); (ECF No. 415-4 ¶ 75 ("Plaintiffs could have had a commercially-ready alternative cartridge or pump available well in advance of its targeted June 2018 launch date.")); (ECF No. 415-6 ¶ 122 ("[I]t is my opinion that a reasonable manufacturer in Sandoz's position would have started efforts to investigate a supply of appropriately

ambulatory infusion pumps and disposable cartridge reservoirs by no later than tentative approval by the FDA in October 2014, if not before.")); (ECF No. 415-8 ¶ 13 (opining "if Plaintiffs could have secured their own delivery mechanism before their launch, they would have avoided lost profits due to a lack of access to CADD-MS® 3 cartridges and mitigated damages")). While UTC maintains its experts' opinions on pre-breach evidence are admissible to prove lack of causation, the court finds the pre-breach opinions are not sufficiently tied to the factual dispute of damages, *Schiff*, 602 F. 3d at 173, and therefore Sandoz has demonstrated these opinions should be excluded.

The Court finds UTC's reliance on *Bulboff v. King Aircraft Title, Inc.*, Civ. No. 19-18236, 2021 WL 1186822, at *5 (D.N.J. Mar. 29, 2021), *Cromartie v. Carteret Sav. & Loan*, 649 A.2d 76, 84–85 (N.J. Super. Ct. App. Div. 1994), and *In re Transact, Inc.*, No. SACV 13-1312-MWF, 2014 WL 3888230, at *11 (C.D. Cal. Aug. 6, 2014) is misguided. UTC relies on *Bulboff* asserting "the nexus between and the harm alleged by the aggrieved party is relevant to damages, not liability." (ECF No. 431 at 17.) However, in *Bulboff*, the District Court cited a New Jersey Supreme Court decision and noted in New Jersey "a focus on principles of proximate cause was irrelevant in a contract case and confound[s] the analysis of damages." 2021 WL 1186822, at *5 (citing *Totaro, Duffy, Cannova and Co., L.L.C. v. Lane, Middleton & Co.*, L.L.C., 921 A.2d 1100, 1107–08 (N.J. 2007)). Next, UTC cites to *Cromartie* and asserts Sandoz cannot recover damages from UTC for self-inflicted harms. (ECF No. 431 at 18.) The Court does not find this argument persuasive because in *Cromartie* the New Jersey Appellate Division employed a traditional "but-for" analysis. 649 A.2d at 84–85. Additionally, UTC places reliance on *In re Transact, Inc.* contending evidence of a plaintiff's own mistakes "goes directly to causation." (ECF No. 431 at 21.) As Sandoz correctly notes, *In re Transact, Inc.* is inapposite because it

applies California law; specifically, a statute which provides contract damages must be "proximately caused" by the breach. (ECF No. 434 at 10) (citing *In re Transact, Inc.*, 2014 WL 3888230, at *11). Indeed, in New Jersey, "compensatory damages for breach of contract are not limited by principles of proximate causation." *City of Trenton v. Cannon Cochran Mgmt. Servs., Inc.*, No. A-5576-09T1, 2011 WL 3241579, at *4 (N.J. Super. Ct. App. Div. Aug. 1, 2011) (citing *Totaro*, 921 A.2d at 1107–08).

UTC contends its experts opine on causation not mitigation. Sandoz notes in its reply in further support of the Motion to Preclude, the portion of the "motion concerning pre-breach mitigation seeks to exclude only select opinions that Sandoz should have developed an alternative delivery systems years before UTC blocked access to CADD-MS 3 cartridges." (ECF No. 434 at 10.) The Court is disquieted by UTC's attempts to seemingly relitigate the issue of liability by conflating causation and damages. In the March 30, 2022 Opinion, the Court granted summary judgment on the issue of liability as to Sandoz's breach of contract claim (Count Seven). (ECF No. 382 at 39–40.) The sole remaining issue left for trial is damages. At trial, the Court will employ a "but-for" analysis where UTC did not breach the 2015 Settlement Agreement to determine the amount of damages. The Court finds UTC's Expert's opinions concerning Sandoz's pre-breach failures to develop an alternative delivery system will not assist the Court in determining damages. *See* Fed. R. Evid. 702(a). Therefore, the Court holds an analysis of Sandoz's pre-breach mitigation actions at the time of trial would not be helpful and instead result in a waste of judicial resources and time.

The duty to mitigate "arises as a matter of law upon breach." *Health Profs. & Allied Emps., Local 5091 v. Bergen Reg'l Ctr., L.P.*, Civ. A. No. 08-1031, 2010 WL 147938, at *3 (D.N.J. Jan 8, 2010). "There is no duty to mitigate until the plaintiff is aware that the defendant's

actions have constituted a breach." *Granelli v. Chi. Title Ins. Co.*, Civ. A. No. 10-2582, 2012 WL 2072648, at *8 (D.N.J. June 8, 2012) (citing *Koppers Co. Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1448 (3d Cir. 1996)). Furthermore, the Restatement (Second) of Contracts provides:

> Once a party has reason to know that performance by the other party will not be forthcoming, he is ordinarily expected . . . to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise. . . . The amount of loss that he could reasonably have avoided by . . . making substitute arrangements . . . is simply subtracted from the amount that would otherwise have been recoverable as damages.

*Health Profs.*, 2010 WL 147938 at *3 (quoting Restatement (Second) of Conts. § 350 cmt. b (Am. L. Inst. 1981)).

Therefore, because Sandoz did not have a duty to mitigate its damages arising from UTC's breach of the 2015 Settlement Agreement until the breach occurred in 2019, the Court finds Mr. Jones, Mr. Talpade, Dr. Shafer, and Dr. Nicholson's opinions asserting Sandoz should have developed an alternative delivery system years before UTC blocked access to CADD-MS 3 cartridges are inadmissible under Rule 702 because they are not helpful to determine the sole remaining factual dispute of damages. *See Schiff*, 602 F.3d at 173; *see also Ford*, 481 F.3d at 219 n.6. Accordingly, the portion of Sandoz's Motion to Preclude seeking to bar evidence of pre-breach mitigation is **GRANTED**.

### 2.    Earlier Settlement between Smiths and Sandoz Mitigation Opinions

In the second portion of its Motion to Preclude, Sandoz asserts the Court should preclude UTC's Experts from offering opinions concerning alternative cartridge development timelines which assume an earlier-in-time settlement with Smiths.[14] (ECF No. 415 at 21–29.) Sandoz

---

[14] The parties do not necessarily dispute the qualifications or fitness of Mr. Jones, Mr. Talpade, and Dr. Nicholson as it relates to opinions on an earlier Sandoz and Smiths settlement therefore the Court focuses its inquiry on the reliability requirement under the Federal Rules of Evidence governing admissibility of expert testimony. *See Schneider ex rel. Est. of Schneider*, 320 F.3d at 404.

contends these opinions are inadmissible because: (1) regulatory clearance within 12 months assumes an earlier settlement with Smiths violating settled law which holds a plaintiff is not required to settle legal claims to mitigate damages; and (2) UTC's Experts assume Smiths would have voluntarily cooperated without a settlement, therefore the opinions are pure speculation not grounded in a reliable methodology. (*Id*. at 23.) Additionally, Sandoz argues evidence of settlement offers and communications with Smiths is inadmissible under Federal Rule of Evidence 408. (*Id*. at 25–26.)

UTC counters expert opinions about Sandoz's delay in securing an alternate cartridge are admissible because: (1) the uncontroverted record shows Smiths was willing to assist Sandoz in clearing an alternate cartridge before the lawsuit; (2) Sandoz cannot seek to exclude UTC's expert opinions as inconsistent with facts when Sandoz invoked privilege over its post-suit negotiations with Smiths. (ECF No. 431 at 26–30.)

In reply, Sandoz reiterates UTC's Experts cannot opine on a cartridge development timeline predicated on the assumption Smiths would have voluntarily worked with the FDA to amend its CADD-MS 3 operator's manual. (*Id*. at 11–14.) Sandoz argues opinions concerning alternative cartridge development which assume an earlier-in-time settlement with Smiths are inadmissible because: (1) Smiths' offer to license its design would not have yielded an alternative cartridge for Sandoz to bring to market; (2) Smiths' cartridge design called for a resin which Smiths refused to share on the grounds that it was allocated to UTC; and (3) Smiths and Sandoz had already commenced settlement communications prior to the start of litigation. (*Id*. at 12–13.)

As to reliability, "[u]nder the Federal Rules of Evidence, it is the role of the trial judge to act as a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant,

but also reliable." *Kannankeril*, 128 F.3d at 806 (citing *Daubert*, 509 U.S. at 589). "[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). Along with "any other[ factors] that are relevant," courts consider the following factors in determining the reliability of a proposed expert's testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli*, 35 F.3d at 742 n.8 (citing *Daubert*, 509 U.S. at 591; *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985)); *Schneider ex rel. Est. of Schneider*, 320 F.3d at 405; *McGarrigle*, 838 F. Supp. 2d at 290. The party offering the expert's testimony carries the burden to establish admissibility by a preponderance of the evidence. *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999). Nonetheless, the "Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (citation omitted); *see also Kannankeril*, 128 F.3d at 806 (explaining Rule 702 "has a liberal policy of admissibility").

The Court is again disquieted by UTC's attempts to seemingly relitigate the issue of liability. The Court finds opinions concerning alternative cartridge development timelines which assume an earlier-in-time settlement with Smiths are not relevant nor helpful to the Court's "but-for" analysis of damages. *See* Fed. R. Evid. 702(a). UTC breached the 2015 Settlement

Agreement with Sandoz. (ECF No. 382 at 39–40.) Although the Court has already found Smiths would have collaboratively worked with Plaintiffs to achieve FDA clearance for its cartridge without this litigation (ECF No. 382 at 28 n.19), UTC's actions were the cause of this litigation therefore UTC cannot contend an earlier-in-time settlement with Smiths would have mitigated Sandoz's damages. *See United Steel, Paper & Forest, Rubber, Mfg., Energy Allied Indus. & Serv. Workers Int'l Union v. Neville Chem Co.*, Civ. A. No. 06-640, 2007 WL 2225846, at 3 (W.D. Pa. July 31, 2007) ("[S]ettlement offers do not trigger the duty to mitigate. There is no duty to surrender the claim in order to mitigate damages.") (citation omitted) *aff'd*, 298 F. App'x 209 (3d Cir. 2008). Further, the Court finds UTC's proffered opinions concerning alternative cartridge development timelines which assume an earlier-in-time settlement with Smiths are inadmissible because they are speculative and unreliable therefore Sandoz has demonstrated these opinions should be excluded.

Here, Mr. Jones, Mr. Talpade, and Dr. Nicholson each present alternative cartridge development timelines that assume an earlier-in-time settlement with Smiths. *See*, *e.g.*, (ECF No. 415-2 ¶¶ 69, 77 (claiming Sandoz had three separate avenues for an alternative delivery device all of which could have been completed in 129 days))[15]; (ECF No. 415-4 ¶ 80 ("Plaintiffs could have a cartridge developed and cleared within as little as 6 months from a device manufacturer with existing 510(k) approval for similar devices, within as little as 10 months from other device manufacturers, and within 12 months even in the event of months-long delays at one or more stages.")); (ECF No. 415-9 ¶ 186 (adopting and incorporating two of Mr. Talpade's timelines, the 10-month and the 12-month timeline, to support two alternative damages calculations that would cut off Sandoz's damages)).

---

[15] However, Dr. Nicholson does not rely on Mr. Jones's proffered timelines for his damages calculations therefore these timelines do not appear to be relevant to the upcoming damages trial.

The testamentary evidence establishes Mr. Jones, Mr. Talpade, and Dr. Nicholson do not have the factual support to opine and speculate as to Smiths's voluntary cooperation towards Sandoz's alternative cartridge development. At his deposition, Mr. Talpade did not cite nor provide the evidentiary basis for his opinion which contends Smiths would have cooperated outside of settlement negotiations. (Kent Decl., Ex. 4, Talpade Dep. (ECF No. 415-5 256:23–257:17).) Additionally, Dr. Nicholson testified he did not perform any independent analysis concerning whether Smiths would have provided voluntary assistance in support of an alternative cartridge. (*Id*., Ex. 10, Dr. Nicholson Dep. (ECF No. 415-11 183:8–184:6).) Mr. Jones similarly admitted he has not "seen any document or deposition testimony about whether Smiths would have been willing to change the language in its operator's manual." (*Id*., Ex. 2, Jones Dep. (ECF No. 415-3 238:17–239:16).) The Court also notes UTC's Experts overlook multiple necessities required for Sandoz to bring an alternative cartridge to market. Smiths needed to amend its instruction manual with the FDA to allow for an alternative cartridge developed by Sandoz.[16] The subject expert opinions do not offer evidence Smiths offered to amend its instruction manual.[17] Additionally, an alternative cartridge design also required a resin which Smiths had already completely allocated to UTC.[18]

In its role as gatekeeper, the Court finds opinions proffered by Mr. Jones, Mr. Talpade, and Dr. Nicholson concerning alternative cartridge development timelines which assume an

---

[16] Mr. Jones acknowledged "Plaintiffs could not have obtained FDA clearance for their cartridge unless and until Smiths agreed to change the language in its operator's manual." (*Id*. 236:11–15.)

[17] Mr. Talpade admitted at his deposition "Smiths had to voluntarily agree to change its instructions for use" for Plaintiffs to obtain regulatory clearance for an alternative cartridge. (ECF No. 415-5 257:4–20.)

[18] Smiths' witness testified it would take "anywhere from six months to probably a couple of years" for Sandoz to obtain regulatory approval of an alternative resin. (Kent Decl. May 4, 2023, Ex. 2, Carl Stamp Dep. (ECF No. 434-3 225:16–227:16).)

earlier-in-time settlement are purely speculative. The opinions subject of this portion of the motion are based "on unsupported speculation." *Calhoun*, 350 F.3d at 321.[19] Indeed, Mr. Jones, Mr. Talpade, and Dr. Nicholson fail to provide any factual basis for their speculation. Expert witnesses are not qualified "to predict the business practices of a . . . company in the 'but for' world because these opinions necessarily depend on the state of mind of [the company's] decision makers, and such testimony is more appropriately given by a fact witness, rather than an expert." *In re Gabapentin Pat. Litig.*, MDL No. 1384, Civ. A. No. 00-2931, 2011 WL 12516763, at *7 (D.N.J. Apr. 8, 2011) (citation and quotation marks omitted); *see also Holman Enters. v. Fid. & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 473 (D.N.J. 2008). UTC, as the party offering the experts' testimony, has failed to establish admissibility by a preponderance of the evidence. *Padillas*, 186 F.3d at 418.

Given the Court's reliability analysis and determinations, the Court does not find it necessary to perform a full Rule 408 analysis. Notwithstanding, the Court finds evidence of settlement offers and communications between Smiths and Sandoz is inadmissible to prove or disprove the amount of Sandoz's damages. *See Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 826–27 (2d Cir. 1992) ("Evidence that demonstrates a failure to mitigate damages goes to the 'amount' of the claim and thus, if the offer was made in the course of compromise negotiations, it is barred under the plain language of Rule 408."); *see also Affiliated Mfrs. v. Aluminum Co. of Am.*, 56 F.3d 521, 527 (3d Cir. 1995) ("The Rule 408 exclusion applies where an actual dispute or a difference of opinion exists, rather than when discussions crystallize to the point of threatened litigation.").

---

[19] *See also Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all.").

Accordingly, the portion of Sandoz's Motion to Preclude seeking to bar mitigation evidence of an earlier settlement between Smiths and Sandoz is **GRANTED**.

### 3.    Dr. Forfia's Opinions Concerning Physician and Patient Reluctance to Generic Treprostinil and the Generic Penetration Rate

Sandoz submits the testimony of Dr. Forfia concerning physician and patient reluctance to generic treprostinil and the generic penetration rate in the market should be precluded because it is untested and speculative.[20] (ECF No. 415 at 30–35.) UTC counters Dr. Forfia's PAH standard of care opinions are admissible because his extensive clinical experience and the underlying record support the reliability of his opinions. (ECF No. 431 at 32–39.) UTC further argues Dr. Forfia's opinions concerning the generic penetration rate are admissible because he does not provide an economic analysis. (*Id*. at 39.) In reply, Sandoz contends Dr. Forfia's personal experience does not constitute a reliable methodology to support opinions about: (1) whether physicians would have prescribed generic treprostinil; and (2) whether patients would have been reluctant to take generic treprostinil. (ECF No. 434 at 14.)

Dr. Forfia opines "[w]hile I offer no opinion on the economic model that Dr. Jena uses to generate [a penetration rate of ███ by 2020], I disagree that generic treprostinil would have been able to obtain a ███ share of the injected treprostinil market." (ECF No. 415-13 ¶ 55.) Dr. Forfia further asserts "physicians and patients alike are reluctant to transition from Remodulin to generic treprostinil." (*Id*. ¶ 13.)

"The qualification prong of Daubert refers to the requirement that the witness possess specialized expertise." *MD Retail Corp. v. Guard Ins. Grp.*, Civ. A. No. 14-6589, 2017 WL

---

[20] The parties do not dispute the fit of Dr. Forfia's opinions, therefore the Court focuses its inquiry on the qualifications and reliability requirements under the Federal Rules of Evidence governing admissibility of expert testimony. *See Schneider ex rel. Est. of Schneider*, 320 F.3d at 404.

1164499, at *5 (D.N.J. Mar. 28, 2017). The Third Circuit has "interpreted Rule 702's qualification requirement liberally." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (citations omitted). A "broad range of knowledge, skills, and training qualify an expert as such." *Paoli*, 35 F.3d at 741.

Regarding the reliability factor, when an expert's testimony involves "technical knowledge," as opposed to "traditional scientific knowledge," the reliability analysis turns "not on the methodology of the expert testimony, but on the professional and personal experience of the witness." *Crowley v. Chait*, 322 F. Supp. 2d 530, 539 (D.N.J. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). There is an abundance of caselaw establishing an expert's methodology may be supported by "personal knowledge or experience." *Kumho*, 526 U.S. at 150; *see also Ford*, 481 F.3d at 219; *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 165 (D.N.J. 2008). Proffered nonscientific testimony involving technical knowledge may not be subjected to the higher standard and review of traditional scientific knowledge. *See id*. Further, "a physician's highly specialized academic and professional qualifications in the area on which that expert is to testify favor a finding of reliability." *In re Proton-Pump Inhibitor Prods. Liab. Litig.*, MDL No. 17-2789, 2022 WL 18999830, at *6 (D.N.J. July 5, 2022); *see also O'Bryant v. Johnson & Johnson*, Civ. A. No. 20-2361, 2022 WL 7670296, at *14–15 (D.N.J. Oct. 13, 2022); *contra Pfizer Inc. v. Teva Pharms. USA, Inc.*, 461 F. Supp. 2d 271, 277–78 (D.N.J. 2006) (holding expert's "personal knowledge and experience . . . [were not a] sufficient basis for his broad conclusions concerning the impact of sales and marketing efforts on Celebrex prescriptions").

The Court first addresses the admissibility of Dr. Forfia's testimony regarding physician and patient reluctance to generic treprostinil. Dr. Forfia admitted he did not speak to other

physicians nor perform "any analysis of physicians' preferences and practices in treating PAH." (Kent Decl., Ex. 6, Dr. Forfia Dep. (ECF No. 415-7 67:7–68:13).) Indeed, Dr. Forfia did not "rely on any materials" in formulating his opinions about physicians' preferences and practices in treating PAH. (*Id*. 68:10–13.) Dr. Forfia also admitted he did not perform any analysis concerning patients' views on generic treprostinil nor did he discuss generic treprostinil with his own patients. (*Id*. 150:16–21; 157:13–17; 217:18–21.)[21] However, Dr. Forfia later clarified and testified he has extensively discussed the use of generic prostanoids with colleagues. (Orlofsky Decl., Ex. 24. Dr. Forfia Dep. (ECF No. 431-26 108:13–109:8).)

The Court recognizes Dr. Forfia has vast professional clinical experience and specialized expertise in treating PAH patients.[22] (*See* ECF No. 415-13.) Sandoz does not dispute Dr. Forfia's credentials, rather Sandoz contends Dr. Forfia's experience "qualifies him to testify about the disease, the treatment options, and his *own* prescribing practices." (ECF No. 434 at 14.) Given the liberal standard of admissibility in the context of a bench trial, the Court finds Dr. Forfia's testimony as to physician and patient reluctance to generic treprostinil is acceptable and admissible. Dr. Forfia's methodology is subject to challenge on cross-examination at trial and the Court will then assign the requisite credibility and weight to Dr. Forfia's testimony. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful

---

[21] In his expert report, Dr. Forfia submitted "[w]hen I presented generic treprostinil to my patients, those patients expressed an unwillingness to make the switch." (ECF No. 415-13 ¶ 60.) When confronted with this assertion at his deposition, Dr. Forfia clarified he personally had not discussed generic PAH treatments with his patients but other treating physicians and nurse practitioner whom he oversees have done so. (ECF No. 415-7 218:15–219:16.) Dr. Forfia later acknowledged "the statement as written [may be] incorrect." (*Id*. 220:1–4.)

[22] As set forth in Dr. Forfia's curriculum vitae, Dr. Forfia has specialized in treating PAH patients for nearly 20 years. Additionally, Dr. Forfia founded the Temple University Hospital's program on Pulmonary Hypertension. This program oversees the treatment of nearly 500 PAH patients and is one of fewer than 100 hospitals nationwide with specific accreditation in pulmonary hypertension. (*Id*.)

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Accordingly, the portion of Sandoz's Motion to Preclude seeking to bar Dr. Forfia's testimony regarding physician and patient reluctance to the generic treprostinil is **DENIED without prejudice**. Sandoz may renew its motion to bar this evidence at trial.

As to generic penetration rate, Dr. Forfia testified the generic penetration rate Dr. Jena applied[23] "seemed very, very high." (*Id.* 144:15–145:26.) Notwithstanding, Dr. Forfia admitted he is not qualified to provide expert testimony on the following: "matters of economics" (*id.* 30:3–5), "the average rate of genericization within a market" (*id.* 32:6–9), and "factors that contribute to generic penetration rates with a given market" (*id.* 32:10–15). Dr. Forfia further testified he does not have any expertise, nor has he conducted any research in the area of generic penetration rates. (*Id.* 148:1–8.) Here, the Court finds Dr. Forfia's potential scientific testimony concerning the penetration rate of generic treprostinil does not satisfy the qualification and reliability prongs of the *Daubert* analysis. Dr. Forfia does not have the scientific knowledge necessary to opine on the penetration rate of a market.[24] UTC, as the party offering the experts' testimony, has failed to establish admissibility by a preponderance of the evidence. *Padillas*, 186 F.3d at 418. Accordingly, the portion of Sandoz's Motion to Preclude seeking to bar Dr. Forfia's testimony concerning the generic penetration rate is **GRANTED**.

---

[23] In the March 30, 2022 Opinion, the Court found Dr. Jena's testimony is reliable because "Dr. Jena's report has substantiated the basis for his belief based on appropriate methods and procedures rather than subjective belief or unsupported speculation." (ECF No. 382 at 48.)

[24] UTC does not offer any caselaw suggesting a physician, like Dr. Forfia, may opine on an expert economist's calculation. (*See* ECF No. 431 at 44.) Rather, UTC merely asserts Dr. Forfia's testimony on the generic penetration rate is admissible because he does not provide an economic analysis.

B.    **UTC's Motion *in Limine* 1 through 6**

UTC has filed six motions *in limine* seeking to exclude: (1) evidence relating to supposed patient risk; (2) hearsay regarding purported states of mind of third-party payers; (3) evidence of purported cost savings to the health care system; (4) evidence of UTC's finances; (5) evidence of third parties' hearsay predictions of generic drug companies' future performance; and (6) the suggestion Smiths would not have assisted Sandoz with cartridge development. (ECF Nos. 422–26.)

1.    **UTC's Motion *in Limine* No. 1 Seeking to Exclude Evidence Relating to Supposed Patient Risk**

UTC asserts Sandoz has intimated UTC put patients at risk by forcing specialty pharmacies to use cartridges only for Remodulin patients. (ECF No. 423 at 1.) UTC argues these allegations are irrelevant, prejudicial, and a waste of time under Federal Rules of Evidence 402 and 403. (*Id*.) UTC further contends Sandoz has not listed a single witness competent to testify about these topics in contrast with Federal Rule of Evidence 602. (*Id*.) Sandoz counters evidence as to how UTC implemented cartridge restrictions is critical to understanding the impact of the breach and is directly relevant to proving the quantum of damages. (ECF No. 439 at 1.) Sandoz argues excluding evidence concerning UTC's efforts to enforce cartridge restrictions would unfairly prejudice Sandoz's ability to rebut UTC's primary defense because: (1) evidence concerning the measures UTC undertook to block generic access is relevant to assessing the credibility of UTC's present-day contention that few patients would have switched to Sandoz's generic treprostinil; and (2) UTC's strong-arm tactics impacted Sandoz's success with IV patients who did not use the CADD-MS 3. (*Id*. at 1–2.) Sandoz also submits it has identified deposition testimony from two Accredo witnesses who will provide testimony based on their personal knowledge. (*Id*. at 3.)

34

The Court has already found "[t]here is no evidence UTC restricted the Specialty Pharmacies from dispensing generic treprostinil with non-UTC cartridges, no evidence UTC prohibited the Specialty Pharmacies from sourcing non-UTC cartridges, and no evidence UTC prevented the Specialty Pharmacies from contracting with other suppliers of cartridges." (ECF No. 388 at 29.) Despite these findings, Sandoz asserts in the Final Pretrial Order: "UTC put patient's lives at risk through its cartridge allocation scheme because it understood the substantial threat that Sandoz'[s] generic launch posed to its Remodulin® business." (ECF No. 445 at 14.) The Court finds any evidence relating to patient risk allegedly caused by UTC is irrelevant to the issue of damages, prejudicial, and a waste of time. *See* Fed. R. Evid. 402, 403. Further, alleged patient risk caused by UTC does not make Sandoz's damages more or less probable. *See* Fed. R. Evid. 401. Accordingly, UTC's Motion *in Limine* No. 1 seeking to exclude evidence relating to supposed patient risk is **GRANTED**.

### 2.    UTC's Motion *in Limine* No. 2 Seeking to Exclude Hearsay Regarding Purported States of Mind of Third-Party Payers

UTC argues Sandoz's reliance on hearsay suggesting insurance companies disfavored generic intravenous treprostinil due to the lack of a generic subcutaneous option is foundationless and should be excluded. (ECF No. 424 at 1.) UTC contends Sandoz's reliance on documents including employee emails that refer to purported out-of-court statements by or about payers is misguided because these are self-serving statements which are unreliable hearsay under Federal Rule of Evidence 801, 802. (*Id*.) In reliance upon *Carden v. Westinghouse Elec. Corp*, 850 F.2d 996, 1003 (3d Cir. 1988), UTC asserts these statements are unreliable because they reflect "a reiteration of what someone told" someone else, and the primary source is "unknown." (*Id*. at 1–2.) UTC further argues these statements are unreliable because: there are multiple layers of hearsay in telephone-like chains between sources; and both Sandoz and RareGen employees

had a "strong self-interest" in demonstrating how difficult it was for payers to favor Sandoz's generic product to secure a better bargain and to assist their litigation.

Additionally, UTC submits Sandoz has not listed the requisite witnesses, such as either a payer employee or an expert in payer preferences. (*Id*. at 1.) UTC contends Sandoz's lay witnesses do not have personal knowledge as to payers' interests therefore their testimony is not admissible under Federal Rule of Evidence 602. (*Id*. at 2.) UTC concludes by arguing Sandoz's damages expert, Dr. Jena, should not be permitted to act as a conduit for the hearsay cited in his reports. (*Id*. at 3.) UTC submits Dr. Jena's hearsay is too vague and unreliable to quantify a purported "payer impact" to sales. (*Id*.)

In opposition, Sandoz counters UTC's Motion *in Limine* No. 2 improperly seeks to preclude Sandoz from presenting evidence UTC asserted is integral to Sandoz's damages claims in the third amended pre-trial order. (ECF No. 439-1 at 1.) Sandoz submits Federal Rule of Evidence 803(1)(6) provides many of the exhibits and emails subject of UTC's Motion *in Limine* No. 2 are admissible as business records or present sense impressions. (*Id*.) Sandoz asserts its lay witnesses have personal knowledge to testify about payers' interests. (*Id*.) Sandoz also contends Dr. Jena, as an expert healthcare economist and practicing physician, is given wide latitude to offer opinions. (*Id*. at 2.) Sandoz notes UTC's Motion *in Limine* No. 2 is problematic because UTC intends to offer expert opinions and testimony which rely on the very same documents UTC claims are objectionable. (*Id*. at 2–3.) Sandoz concludes by arguing UTC's motion is premature because hearsay objections must be evaluated after seeing how documents and testimony are offered in the context of trial. (*Id*. at 3.)

36

The Court **RESERVES** on deciding UTC's Motion *in Limine* No. 2 until it hears the testimony regarding purported states of mind of third-party payers at trial. *See Supernus Pharms.,* 2023 WL 4866348, at *2. UTC may renew its objection at trial.

### 3.    UTC's Motion *in Limine* No. 3 Seeking to Exclude Evidence of Purported Cost Savings to the Health Care System

In support of Motion *in Limine* No. 3, UTC contends evidence of the potential cost savings Sandoz's generic treprostinil would have provided to the health care system are irrelevant distractions and therefore should be excluded under Federal Rules of Evidence 402 and 403. (ECF No. 425 at 1.) UTC asserts the Court should only allow into evidence pricing information shown to be relevant to prescribing decisions. (*Id.* at 2.) UTC notes neither Dr. Jena nor Dr. Forfia has opined physician decision-making about treatment options is affected by systemic costs. (*Id.*) UTC concludes by asserting alleged systemic savings will waste time and muddle the record. (*Id.* at 3.)

Sandoz counters purported cost savings to the health care system are relevant evidence to prove the health care industry would have supported generic treprostinil. (ECF No. 439-2 at 1.) In reliance upon *Suter v. Gen. Accident Ins. Co. of Am.*, 424 F. Supp. 2d 781, 790 (D.N.J. 2006), Sandoz asserts evidence should not be excluded as prejudicial in the context of a bench trial. (*Id.* at 1–2.) Further, Sandoz argues evidence of price competition and systemic savings are relevant to support the notion Sandoz would have captured significantly more market share if UTC had not interfered with Sandoz's launch. (*Id.* at 3.) Sandoz also contends UTC ignores the concept "prescribing decisions" are influenced by insurer preferences and formulary tiering decisions which prefer a lower-cost generic drug. (*Id.*)

"[R]elevance is not a difficult condition to satisfy under the Federal Rules of Evidence*."* *United States v. Paz*, 124 F. App'x 743, 746 (3d Cir. 2005). Under Federal Rule of Evidence

401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more of less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. "[I]n the context of a bench trial, evidence should not be excluded under Rule 403 on the grounds that it is unfairly prejudicial, because the Court is capable of assessing the probative value of the article and excluding any arguably improper influences." *Suter*, 424 F. Supp. 2d at 790.

In the Final Pretrial Order, Sandoz asserts its "generic would result in hundreds of millions of dollars in savings for the health care system and savings for PAH patients." (ECF No. 445 at 13.) The Court finds evidence relating to purported cost savings to the health care system is relevant to the issue of generic treprostinil's potential market share if UTC had not breached the 2015 Settlement Agreement therefore this evidence makes Sandoz's damages more or less probable. *See* Fed. R. Evid. 401. Given the context of a bench trial, the Court further finds UTC has failed to identify a basis to exclude evidence of systemic cost savings under Rule 403. *Suter*, 424 F. Supp. 2d at 790. Accordingly, UTC's Motion *in Limine* No. 3 seeking to exclude evidence of purported cost savings to the health care system is **DENIED**.

### 4. UTC's Motion *in Limine* No. 4 Seeking to Exclude Evidence of UTC's Finances

UTC asserts the Court should preclude Sandoz from presenting evidence related to UTC's profits, margins, and the compensation of UTC's officers or directors because it is irrelevant and does not establish Sandoz's claimed lost profits. (ECF No. 426 at 1.) UTC contends the profits generated from Remodulin evidenced by 10-Ks between 2015 to 2018 are not relevant to Sandoz's alleged damages caused by the breach of contract. (*Id*. at 2.) UTC further argues evidence of UTC's finances are not relevant because punitive damages are not available for Sandoz's breach of contract claim. (*Id*.) UTC suggests Sandoz may seek to present

evidence of UTC's finances to make its request for damages appear more reasonable. (*Id.* at 3.) UTC further asserts its profits during a statutory period of patent exclusivity are not an apt comparator to Sandoz's expected profits. (*Id.*) As to evidence regarding the compensation of UTC's officers or directors, UTC submits UTC's CEO and Board Chair, Dr. Martine Rothblatt's compensation is irrelevant to the amount of Sandoz's claimed lost profits. (*Id.*)

In response, Sandoz agrees evidence related to executive salaries is irrelevant. (ECF No. 439-3 at 1.) However, Sandoz counters and asserts UTC's Motion *in Limine* No. 4 goes too far in seeking to prevent Sandoz from offering evidence concerning the profits UTC earned on treprostinil. (*Id.* at 1.) Sandoz argues UTC's yearly profits on its sales of treprostinil are relevant and probative evidence supporting the lost profits Sandoz seeks to prove at trial. (*Id.* at 1–2.) In the context of a bench trial, Sandoz submits the Court should deem UTC's profits and profit margins on Remodulin admissible because the Court is capable of assessing the probative value and excluding improper inferences. (*Id.* at 3.)

Sandoz does not object to the portion of UTC's Motion *in Limine* No. 4 seeking to exclude evidence of UTC's executives' salaries therefore this portion of UTC's motion is granted. Notwithstanding, the Court finds evidence of UTC's profits and margins is relevant because it is of consequence to the issue of damages and UTC's profit margin on Remodulin has the tendency to make Sandoz's damages, such as their lost profits on generic treprostinil, more or less probable. *See* Fed. R. Evid. 401. Accordingly, UTC's Motion *in Limine* No. 4 seeking to exclude evidence of UTC's finances is **GRANTED IN PART** and **DENIED IN PART**.

### 5. UTC's Motion in *Limine* No. 5 Seeking to Exclude Evidence of Third Parties' Hearsay Predictions of Generic Drug Companies' Future Performance

In support of Motion *in Limine* No. 5, UTC contends the Court should exclude pre-launch speculation, by Wall Street banks identified as "industry analysts," as to Sandoz's or other

companies' potential future sales of treprostinil. (ECF No. 422-1 at 1.) UTC argues financial guesswork is inadmissible pursuant to Rules 403 and 803 of the Federal Rule of Evidence because it lacks proper foundation and would unduly prejudice UTC since none of the Wall Street analysts will be subject to cross-examination at trial. (*Id*.) UTC further asserts Sandoz should be precluded from presenting this evidence as a "back-door" through Dr. Jena's testimony because it is not reasonably relied upon by experts in Dr. Jena's field as required by Federal Rule of Evidence 703. (*Id*.) UTC submits these market predictions do not fall under any exception to the hearsay rule. (*Id*. at 2.) Additionally, UTC argues the business records exception under Federal Rule of Evidence 803(6) does not apply because Sandoz does not offer evidence asserting the industry analysts at issue had personal knowledge to support their predictions. (*Id*. at 3.)

Sandoz counters the analyst reports which were attached to a UTC employee email and produced by UTC will show third-party analysts predicted a 50 to 90 percent conversion of treprostinil sales to the generic product upon generic launch. (ECF No. 440 at 1.) Sandoz argues these predictions of market analysts are both relevant and probative of the amount of damages Sandoz suffered. (*Id*.) Sandoz also counters Dr. Jena's reliance on the analyst reports in forming his opinion about Sandoz's damages is proper because they are "exactly the type of information that a healthcare economist would review and consider in determining the amount of product that would have been sold had UTC not broken its promise." (*Id*.) Additionally, Sandoz notes cross-examination of Dr. Jena's reliance on the analyst reports would be a proper alternative to granting UTC's Motion *in Limine* No. 5. (*Id*. at 2.)

Sandoz intends to offer evidence of industry analysts' predictions at trial. (ECF No. 445 at 13.) Dr. Jena reviewed the analyst reports to formulate his opinion on Sandoz's lost profits.

Under Rule 703, an expert may rely upon inadmissible evidence if an expert "in the particular field would reasonably rely on those kinds of facts or data." Fed. R. Evid. 703. The Court acknowledges these analyst reports may present hearsay issues. However, the Court **RESERVES** on deciding UTC's Motion *in Limine* No. 5 until it hears Dr. Jena's testimony concerning industry analysts' predictions of generic drug companies' future performance. *See Supernus Pharms.,* 2023 WL 4866348, at *2. UTC may renew its objection at trial.

6.    **UTC's Motion *in Limine* No. 6 Seeking to Exclude the Suggestion Smiths Would Not Have Assisted Sandoz with Cartridge Development**

UTC argues the Court has already found Smiths offered to license its cartridge design to Sandoz therefore the Court should preclude any suggestion Smiths would not have assisted Sandoz with cartridge development. (ECF No. 422-2 at 1.) UTC contends Sandoz plans to flip the court's prior findings by arguing Smiths would only help achieve FDA clearance for Sandoz's cartridge if it was part of a settlement to resolve litigation. (*Id.*) UTC asserts Sandoz seeks to employ a two-pronged attack to hide contradictory facts: first, Sandoz seeks to ban pre-suit evidence from 2019 under Federal Rule of Evidence 408 showing Smiths would have provided a license; and second, Sandoz plans to argue post-suit negotiations with Smiths in 2020 and 2021 delayed Sandoz's launch despite blocking discovery of such communications under the mediation privilege. (*Id.*) UTC argues Sandoz's approach improperly uses privilege as both a sword and shield unduly prejudicing UTC. (*Id.* at 1–2.)

Sandoz counters UTC's Motion *in Limine* No. 6 is unnecessary because it does not intend to argue Smiths would not have helped Sandoz secure regulatory approval for an alternative CADD-MS 3 cartridge without a settlement. (ECF No. 440-1 at 1.) On the contrary, Sandoz asserts its Motion *in Limine* No. 3 (ECF No. 428) and a portion of its Motion to Preclude (ECF Nos. 414, 415) seek to prevent either party from arguing about the timing of the regulatory

41

assistance Smiths provided under a settlement agreement. (*Id*.) Sandoz contends UTC's Motion *in Limine* No. 6 attempts to preserve UTC's ability to offer impermissible evidence. (*Id*.) Sandoz notes at trial UTC intends to argue Sandoz could have mitigated its damages by obtaining regulatory clearance earlier. (*Id*.) However, Sandoz asserts there is no evidence establishing Smiths would have provided regulatory assistance if this lawsuit was not filed therefore UTC's Experts can only speculate about what Smiths would have done. (*Id*. at 2.)

Sandoz does not object to UTC's Motion *in Limine* No. 6 because it does not intend to make the argument subject of this motion *in limine*. As noted above, *supra* III.A.2., the Court has found mitigation of damages evidence of an earlier settlement between Smiths and Sandoz is barred at trial. Accordingly, UTC's Motion *in Limine* No. 6 seeking to exclude the suggestion Smiths would not have assisted Sandoz with cartridge development is **GRANTED**.[25]

## C.    Sandoz's Motion *in Limine* 1 through 6

Sandoz has also filed six motions *in limine* seeking to exclude: (1) argument or evidence asserting UTC is not liable for the breach or UTC's breach was justified; (2) "pre-breach mitigation" argument or evidence; (3) discussions of Smiths/Sandoz settlement negotiations as well as limit references to Sandoz's settlement with Smiths; (4) evidence about UTC's 2016 CADD-MS 3 supply agreement or the first and second amendments to this agreement; (5) argument or opinion testimony asserting CADD-MS 3 cartridges were restricted before 2019; and (6) argument or opinion testimony contending generic treprostinil is not a safe and effective alternative to Remodulin. (ECF Nos. 427, 428.)

---

[25] Also noted above, *supra* III.A.2., the Court has already held Smiths would have collaboratively worked with Plaintiffs to achieve FDA clearance for its cartridge.

1. **Sandoz's Motion *in Limine* No. 1 Seeking to Exclude Argument or Evidence Asserting UTC is not Liable for the Breach or UTC's Breach was Justified**

Sandoz seeks an order prohibiting UTC from offering (1) argument or evidence about contract interpretation or other irrelevant provisions of the 2015 Settlement Agreement; and (2) argument or evidence related to UTC's purported good-faith justifications for restricting cartridges in breach of the 2015 Settlement Agreement. (ECF No. 427-1 at 1.) Sandoz asserts the Court has already decided the issue of liability in the March 30, 2022 Opinion therefore potential witnesses and documentary evidence as to UTC's reasons for breaching the settlement agreement should be excluded. (*Id*. at 1–3.)

UTC counters Sandoz's Motion *in Limine* No. 1 should be denied because the evidence at issue is related to damages. (ECF No. 437 at 1.) UTC asserts the granting of the motion would deprive UTC of its right to demonstrate Sandoz's own failings caused the claimed damages. (*Id*.) UTC notes the evidence seeks to establish Sandoz failed to act as reasonable company preparing a lunch would have acted. (*Id*. at 2–3.)

Here, Sandoz asserts UTC "appears poised to present evidence related to its purported good faith justifications for restricting cartridges" based upon UTC's assertions in the Second Amended Proposed Final Pretrial Order specifically UTC's list of witnesses. (ECF No. 427-1 at 1–2.) The Court will not reexamine the issue of UTC's liability on Sandoz's breach of contract claim. Further, UTC's supposed reasoning for breaching the 2015 Settlement Agreement is not relevant to the Court's analysis of the damages issue. Accordingly, Sandoz's Motion *in Limine* No. 1 is **GRANTED**.

2.    **Sandoz's Motion *in Limine* No. 2 Seeking to Exclude "Pre-Breach Mitigation" Argument or Evidence**

Sandoz asserts "pre-breach mitigation" argument or evidence should be barred at trial because it is improper. (ECF No. 427-2 at 1.) Sandoz contends evidence about what Sandoz could have done before 2019 is irrelevant. (*Id*. at 2.) Sandoz argues pre-breach evidence is not related to causation because: (1) causation was established in the March 30, 2022 Opinion; and (2) UTC's own experts expressly stated their findings were as to mitigation not causation. (*Id*. at 3.) In opposition, UTC submits the evidence subject of Sandoz's Motion *in Limine* No. 2 is admissible because it displays Sandoz's unreasonable choices contributed to their claimed damages. (ECF No. 437-1 at 1.) UTC argues causation of damages is an issue at trial therefore evidence from either before or after the breach is relevant to the cause of Sandoz's alleged damages. (*Id*. at 2.)

For the reasons set forth above, *supra* III.A.1., pre-breach mitigation evidence is barred at the time of trial. Accordingly, Sandoz's Motion *in Limine* No. 2 is **GRANTED**.

3.    **Sandoz's Motion *in Limine* No. 3 Seeking to Exclude Discussions of Settlement Negotiations and Limit References to Sandoz's Settlement with Smiths**

Sandoz submits references to settlement negotiations with Smiths should be barred under Federal Rules of Evidence 402 and 408. (ECF No. 428 at 1.) Sandoz argues UTC's argument asserting Sandoz could have settled with Smiths earlier to solve the cartridge issue is improper because: (1) a settlement offer is irrelevant to the issue of mitigation; and (2) Federal Rule of Evidence 408 bars evidence of settlement negotiations for the purposes of proving damages. (*Id*. at 2–3.) Sandoz contends references to the settlement agreement are relevant for the limited purpose of detailing how Sandoz obtained regulatory clearance for its alternative cartridge. (*Id*. at 3.)

In opposition to Sandoz's Motion *in Limine* No. 3, UTC argues Sandoz's settlement negotiations with Smiths are admissible because they prove Smiths was willing to help Sandoz obtain a cartridge years ago thus the settlement negotiations are relevant to the issue of damages. (ECF No. 438 at 1.) UTC counters Sandoz's assertion, as to the limited admissibility of the settlement negotiations, is misguided because the settlement negotiations: (1) establish Smith was willing and ready to help prior to Sandoz's lawsuit; and (2) are admissible for "another purpose" as permitted by Federal Rule of Evidence 408(b). (*Id*. at 1–2.) UTC also submits over ███████ of Sandoz's claimed damages are attributable to the period between the start of litigation of litigation and the execution of the settlement agreement therefore Sandoz cannot hide its discussions with Smiths but now argue those discussions justify the nineteen (19) month delay in the launch of its generic treprostinil.

For the reasons set forth above, *supra* III.A.2., the Court has held evidence of an earlier settlement between Smiths and Sandoz is barred at trial. Accordingly, Sandoz's Motion *in Limine* No. 3 to the extent it seeks to bar evidence of an earlier settlement between Smiths and Sandoz is **GRANTED**. As to the wide-sweeping nature of Sandoz's Motion *in Limine* No. 3, the Court **RESERVES** on deciding to exclude the testimony discussing and referring to the settlement negotiations between Smiths and Sandoz. *See Supernus Pharms.,* 2023 WL 4866348, at *2. UTC may renew its objection at trial.

### 4.    Sandoz's Motion *in Limine* No. 4 Seeking to Exclude Evidence about the 2016 Supply Agreement, the 2017 Amended Supply Agreement, and the 2019 Amended Supply Agreement

Sandoz contends prior negotiations and contracts between UTC and Smiths are not relevant to the issue of damages therefore this evidence should be excluded under Federal Rule of Evidence 402. (ECF No. 427-3 at 1.) Additionally, Sandoz argues the 2016 Supply Agreement, the 2017 Supply Agreement, and the 2019 Amended Supply Agreement should be

excluded because it would lead to "wasting time" at trial pursuant to Federal Rule of Evidence 403. (*Id*. at 2.) UTC counters by arguing the 2016 Supply Agreement, the 2017 Amended Supply Agreement, and the 2019 Amended Supply Agreement are admissible because: (1) the contested evidence will assist the Court in understanding the steps a reasonable PAH drug manufacturer would have taken after learning the pump required to deliver its drug had been discontinued; and (2) the documentary evidence is necessary context which Sandoz seeks to offer into evidence. (ECF No. 437-2 at 1.)

The Court **RESERVES** on deciding Sandoz's Motion *in Limine* No. 4 until it hears the testimony introducing evidence about the 2016 Supply Agreement, the 2017 Amended Supply Agreement, and the 2019 Amended Supply Agreement. *See Supernus Pharms*., 2023 WL 4866348, at *2. UTC may renew its objection at trial.

5.    **Sandoz's Motion *in Limine* No. 5 Seeking to Exclude Argument or Opinion Testimony that CADD-MS 3 Cartridges were Restricted before 2019**

Sandoz asserts the Court should exclude any attempt by UTC to introduce evidence, argument, or opinion testimony that CADD-MS 3 cartridges were restricted before 2019 because the timing of the cartridge restrictions was resolved in the March 30, 2022 Opinion. (ECF No. 427-4 at 1.) Sandoz notes UTC has indicated, in the Second Amended Proposed Final Pretrial Order (ECF No. 413 at 36–40), it still intends to argue cartridge restrictions were imposed by the 2016 Supply Agreement and the 2017 Amended Supply Agreement. (ECF No. 427 at 1–2.) Sandoz argues relitigating this issue would involve "wasting time" and "needlessly presenting cumulative evidence" at trial which is inadmissible pursuant to Federal Rule of Evidence 403. (*Id*. at 2.)

In opposition, UTC asserts it does not intend to introduce the 2016 Supply Agreement and the 2017 Amended Supply Agreement as evidence of pre-2019 restrictions on cartridge

distribution. (ECF No. 437-3 at 1.) Instead, UTC submits this evidence will be introduced because it is relevant to a determination of damages. (*Id*. at 2.) UTC contends the 2016 Supply Agreement and the 2017 Amended Supply Agreement are admissible because: (1) UTC's actions in response to Smiths' decision to discontinue the CADD-MS 3 platform show how a reasonable manufacturer of PAH treatments requiring use of an infusion pump would behave; (2) supplies of CADD-MS 3 cartridges would have been exhausted before Sandoz was prepared to launch its generic treprostinil without UTC's investment reflected in the 2016 Supply Agreement and the 2017 Amended Supply Agreement; and (3) they are necessary for Sandoz's introduction of the Third Amendment to the CADD-MS 3 Supply Agreement. (*Id*. at 2–3.)

The Court resolved this issue in the March 30, 2022 Opinion, "[t]o the extent UTC contends it obtained the exclusive cartridge supply in 2016, not 2019, the record indicates otherwise. . . . UTC did not take title to the cartridges and enter into express agreements with the Specialty Pharmacies to restrict cartridge distribution until 2019." (ECF No. 383 at 40.) Therefore, the Court will not relitigate the timeline of CADD-MS 3 cartridge restrictions. *See Waldorf v. Shuta*, 142 F.3d 601, 615 (3d Cir. 1998). Accordingly, Sandoz's Motion *in Limine* No. 5 to the extent it seeks to exclude argument or opinion testimony that CADD-MS 3 cartridges were restricted before 2019 is **GRANTED.**

> **6.    Sandoz's Motion *in Limine* No. 6 Seeking to Exclude Argument or Opinion Testimony that Generic Treprostinil is not a Safe and Effective Alternative to Remodulin**

In support of Motion *in Limine* No. 6, Sandoz asserts argument or opinion testimony that generic treprostinil is less safe or effective than Remodulin is irrelevant and counterfactual. (ECF No. 427-5 at 2.) Additionally, Sandoz argues UTC would be wasting time at trial by attempting to litigate the false issue of generic safety and effectiveness. (*Id*.) In opposition, UTC argue Sandoz's Motion *in Limine* No. 6 should be denied as moot because it does not intend to argue

generic treprostinil is not as safe and effective as Remodulin. (ECF No. 438-1 at 1.) UTC counters it intends to argue Sandoz's sales lagged because PAH physicians were reluctant to prescribe generic treprostinil since they were concerned potential variations would adversely affect fragile clients. (*Id*. at 1–2.) UTC asserts PAH physicians' reluctance to prescribing generic treprostinil is relevant to the Court's determination of damages. (*Id*. at 2.) Further, UTC contends there is nothing counterfactual about reluctance to transition patients from Remodulin to generic treprostinil based upon the record. (*Id*. at 2–3.)

Based upon UTC's assertion it does not intend to argue generic treprostinil is not as safe and effective, Sandoz's Motion *in Limine* No. 6 seeking to exclude argument or opinion testimony that generic treprostinil is not a safe and effective alternative to Remodulin is **GRANTED**. [26]

### IV.    CONCLUSION

For the reasons set forth above, Sandoz's Motion to Preclude (ECF No. 414; Sandoz's Mot. Br. (ECF No. 415)) is **GRANTED IN PART** and **DENIED IN PART without prejudice**, UTC's Motion *in Limine* 1 through 6 (ECF Nos. 422–26) is **GRANTED IN PART, DENIED IN PART,** and **RESERVED IN PART**, and Sandoz's Motion *in Limine* 1 through 6 (ECF Nos. 427, 428) is **GRANTED IN PART** and **RESERVED IN PART**. An appropriate order follows.

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated:  October 17, 2023

---

[26] The Court also refers the parties to its ruling on the portion of Sandoz's Motion to Preclude seeking to bar Dr. Forfia's testimony concerning physician and patient reluctance to the generic treprostinil set forth above, *supra* III.A.3.

48